## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MARGARET S. SUE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | **Civil Action No. 05-1355 (JR)** |
| ) | **ECF** |
| **THE UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DEFENDANT'S MOTION TO DISMISS
## OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT
## ON THE ISSUE OF LIMITING PLAINTIFF'S DAMAGES TO $100,000,
## THE AMOUNT OF HER ADMINISTRATIVE CLAIM.

Defendant United States of America, by and through its undersigned attorneys and

pursuant to Rules 12(b)(1) and 56 of the Federal Rules of Civil Procedure, hereby respectfully

moves to dismiss for lack of subject matter jurisdiction plaintiff Margaret S. Sue's claim in

excess of $100,000, or in the alternative for summary judgment in its favor on the issue of

limiting plaintiff's damages to $100,000, the amount sought in her administrative claim.

Pursuant to 28 U.S.C. § 2675(b), the Court should dismiss plaintiff's claim in excess of

$100,000, as "[a]ction under this section shall not be instituted for any sum in excess of the

amount of the claim presented to the federal agency, except where the increased amount is based

upon newly discovered evidence not reasonably discoverable at the time of presenting the claim

to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of

the claim."  Given this statutory provision, the Court lacks subject matter jurisdiction over the

excess amount requested in plaintiff's Complaint.  In the alternative, summary judgment is

sought on this issue because there are no material facts in dispute with respect to the application

of 28 U.S.C. § 2675(b) to limit plaintiff's recovery to the amount sought in her administrative

claim, and the evidence establishes that defendant is entitled to judgment as a matter of law.  A

statement of material facts as to which there is no genuine dispute, a memorandum of points and

authorities in support of this Motion, and a proposed Order are filed herewith.

Dated: November 30, 2005.                    Respectfully submitted,

/s/
KENNETH L. WAINSTEIN
D.C. Bar # 451058
United States Attorney

 /s/
R. CRAIG LAWRENCE
D.C. Bar # 171538
Assistant United States Attorney

 /s/
HEATHER R. PHILLIPS
C.A. Bar # 19620
Assistant United States Attorney
Civil Division
555 4th Street, N.W., Rm E4212
Washington, DC 20530
(202) 514-7139

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 30, 2005 a copy of the foregoing motion, as well as a

supporting memorandum, a statement of material facts, and a proposed order were served by

ECF, the Court's electronic filing system, upon counsel for Plaintiff:

       Peter Grenier
       Bode & Grenier
       1150 Connecticut Ave.


       _/s/_____
       Heather R. Phillips

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MARGARET S. SUE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| **v.** | )    **Civil Action No. 05-1355 (JR)** |
| | )    **ECF** |
| **THE UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS**
**NOT IN GENUINE DISPUTE**

In accordance with Local Rule 7(h), defendant submits this statement of material facts as to which there is no genuine dispute.

1.      On April 10, 2000, the plaintiff in this case, Margaret S. Sue, was rear-ended by Department of Commerce ("DOC") employee Obami C. Wray while both were traveling westbound on the Roosevelt Bridge, just prior to taking an exit into Washington, D.C.  Exhibit 2 (Accident Report); Exhibit 3 (Report of Accident/Illness).

2.      On January 9, 2002, the plaintiff in this case, represented by former counsel Kenneth J. Annis, filed a Claim for Damage Injury or Death Standard Form 95 ("SF 95") with the Department of Commerce ("DOC") claiming personal injury in the amount of $100,000. Exhibit 1 (SF 95).

3.      Along with the completed SF 95, on January 9, 2002, plaintiff also submitted to the DOC a five-page demand letter detailing her injuries and related costs, with attached medical records and other documentation supporting her claim.  Exhibit 4 (January 9, 2002 demand letter and accompanying documents Bates numbered pp. 1-78).

4.      On February 28, 2002, plaintiff submitted additional documentation in support of

her claim to the DOC.  Exhibit 5 (February 28, 2002 demand letter).

5.      On March 19, 2002, plaintiff submitted additional documentation in support of her claim to the DOC.  Exhibit 6 (March 19, 2002 demand letter and accompanying documents Bates numbered pp. 1-21).

6.      On April 5, 2002, plaintiff submitted additional documentation in support of her claim to the DOC.  Exhibit 7 (April 5, 2002 demand letter and accompanying documents Bates numbered pp. 1-16).

7.      On September 6, 2002, plaintiff submitted additional documentation in support of her claim to the DOC.  Exhibit 8 (September 6, 2002 demand letter and accompanying documents Bates numbered pp. 1-4).

8.      On February 20, 2003, plaintiff submitted additional documentation in support of her claim to the DOC.  Exhibit 9 (February 20, 2003 demand letter and accompanying documents Bates numbered pp. 1-50).

9.      On April 7, 2003, plaintiff submitted additional documentation in support of her claim to the DOC.  Exhibit 10 (April 7, 2003 demand letter and accompanying documents Bates numbered pp. 1-20).

10.     As of April 7, 2003, plaintiff claimed total special damages in the amount of $35,676.76.  Exhibit 10 at 1.

11.     On May 4, 2005, plaintiff, represented by current attorney, Peter Grenier, wrote a letter to the DOC indicating plaintiff's intent to file suit in this Court seeking "well in excess of $4,000,000."  Exhibit 11 (May 4, 2005 letter).

12.     At no time did plaintiff ever attempt to amend her administrative claim beyond

the $100,000 indicated in her SF 95.  Exhibit 1; Exhibits 4-11.

13.    On July 7, 2005, plaintiff filed the instant suit against the United States based on the April 10, 2000 accident.  See generally Complaint.

Dated: November 30, 2005.                    Respectfully submitted,

                                             /s/
                                             KENNETH L. WAINSTEIN
                                             D.C. Bar # 451058
                                             United States Attorney

                                             /s/
                                             R. CRAIG LAWRENCE
                                             D.C. Bar # 171538
                                             Assistant United States Attorney

                                             /s/
                                             HEATHER R. PHILLIPS
                                             C.A. Bar # 19620
                                             Assistant United States Attorney
                                             Civil Division
                                             555 4th Street, N.W., Rm E4212
                                             Washington, DC 20530
                                             (202) 514-7139

-3-

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MARGARET S. SUE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| **v.** ) | **Civil Action No. 05-1355 (JR)** |
| ) | **ECF** |
| **THE UNITED STATES OF AMERICA,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S**
**MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT**
**ON THE ISSUE OF LIMITING PLAINTIFF'S DAMAGES TO $100,000,**
**THE AMOUNT OF HER ADMINISTRATIVE CLAIM.**

**I. INTRODUCTION**

On January 9, 2002, the plaintiff in this case, Margaret S. Sue, filed an administrative

claim with the Department of Commerce ("DOC") claiming personal injury as a result of an

April 10, 2000 accident where plaintiff's car was rear-ended by a car driven by a DOC

employee. See Exhibit 1 (Standard Form ("SF") 95). The amount of the claim was for

$100,000. Id. On July 7, 2005, plaintiff filed the instant suit against the United States based on

the April 10, 2000 accident, alleging that the defendant's negligence caused her injuries. See

Complaint. In the *ad damnum* clause of her Complaint, plaintiff sought "compensatory damages

in the amount of not less than $5,000,000." Complaint at 9. On August 23, 2005, the United

States filed its answer to plaintiff's complaint. In its answer to the complaint, the United States

raised the issue that 28 U.S.C. § 2675(b) prohibits plaintiff from claiming or recovering an

amount against defendant in excess of that set forth in the administrative claim presented to the

DOC. Answer, Sixth Affirmative Defense. Defendant now moves to dismiss for lack of subject

matter jurisdiction plaintiff's claim for damages in excess of $100,000, or in the alternative for summary judgment on the issue of limiting plaintiff's damages in this case to $100,000, the amount sought in plaintiff's administrative claim.

## II.  STATEMENT OF FACTS

On April 10, 2000, at about 2:55 p.m., plaintiff was rear-ended by one of defendant's employees, Mr. Obami C. Wray, while plaintiff and Mr. Wray were driving westbound on the Roosevelt Bridge, just prior to taking an exit off the bridge into Washington, D.C.[1]  Exhibit 2 (Traffic Accident Report).  At the time of the accident, Mr. Wray was employed by the DOC as an automation technician.  Exhibit 3 (Report of Accident/Illness).  On January 9, 2002, almost two years after the accident, plaintiff, represented by her former counsel, Kenneth J. Annis, submitted a Standard Form 95 Claim for Damage, Injury, or Death ("SF 95") to the DOC. Exhibit 1.  Plaintiff's SF 95 was accompanied by a "demand package, medical records and bills." Exhibit 1; Exhibit 4 (January 9, 2002 demand letter and accompanying documents Bates numbered pp. 1-78).  Plaintiff indicated on her SF 95 that the amount of her claim was for $100,000 for personal injury.  Exhibit 1.

In the January 9, 2002 demand letter accompanying her SF 95, plaintiff stated that she had "suffered serious personal injuries as a result of the [April 10, 2000 accident], specifically in the neck, back, shoulder and leg areas, and was immediately transported to the George Washington University Hospital emergency room, where the treating physician noted, 'MVA from behind . . . put pt in C-collar b/c c/o neck pain.  C/o L buttock/sacral pain . . . c-spine

---

[1]  Although not relevant to the Court's assessment of this Motion, defendant has asserted that plaintiff was contributorily negligent in causing the accident.  See Answer, Fourth Affirmative Defense.

tenderness." Exhibit 4 at 1-2, 14. Plaintiff's January 9, 2002 demand letter further detailed the extensive medical treatment plaintiff had undertaken in the nineteen months since the April 10, 2000 accident.

Specifically, plaintiff had "received massage therapy at Vienna Massage Therapy from April 15 through May 16, 2000, as well as acupuncture treatments on April 21 and 26, 2000, from Dr. Bob Shao, Licenses Acupuncturist." Exhibit 4 at 2, 19-23. In addition, on April 26, 2000, plaintiff consulted with an orthopaedic surgeon, Dr. Peter J. Delenick. Exhibit 4 at 2, 24-30. Plaintiff had consulted with Dr. Delenick in the past; indeed, nine years before the accident, Dr. Delenick had performed a back operation on plaintiff – a laminectomy and fusion. Exhibit 4 at 35. Dr. Delenick noted that on April 26, 2000 plaintiff presented to him "complaining of neck pain, shoulder pain and lower back pain. She does state[] that she feels some mild tingling in her fingertips of her left hand." Exhibit 4 at 2, 27. Dr. Delenick ordered an MRI of plaintiff's cervical spine and lumbar spine, which she underwent on May 3, 2000, at IMI of Arlington. Exhibit 4 at 2, 27, 31-33. In addition, plaintiff was referred to a neurosurgeon, Dr. Edward Lang. Exhibit 4 at 2.

Plaintiff's January 9, 2002 demand letter to the DOC further noted that plaintiff saw Dr. Delenick for a follow up appointment on May 8, 2000. Exhibit 4 at 2, 28. On that date, Dr. Delenick noted that plaintiff had been referred to Dr. Lang for "cervical spondalosis C-4 through C-7, cervical strain, acute and cervical myofascial pain syndrome." Exhibit 4 at 2, 28. Although Dr. Delenick noted that [s]urgical intervention does seem likely to be avoided . . . . [t]he patient still appears to be holding the neck somewhat stiff. She has limited range of motion." Exhibit 4 at 2, 28. Dr. Delenick issued plaintiff two documents entitled "Patient Unable to Return to Work

-3-

or School," dated May 8, 2000, and May 23, 2000, which indicated that plaintiff was under his care for a "herniated disc – cervical spine," and that she was unable to return to work from May 8-23, 2005.  Exhibit 4 at 30, 74.

On May 10, 2000, plaintiff was examined by a neurosurgeon, Dr. Lang, who noted that after the April 10, 2000 accident "[plaintiff] had a sudden burning sensation in her head and neck . . . which radiated up into the temporal area as well.  Since then, the pain has settled primarily into her neck and has been a continued problem. . . .  the pain does go down the left arm and also that she has a feeling of hot and cold in the arm at times . . . . [she] appears to be holding her neck somewhat stiff . . . .  Neck movements were . . . limited in rotation. . . ."  Exhibit 4 at 2, 35-36.  Dr. Lang reviewed MRI reports he had ordered and noted that "she has definite cervical degenerative disk disease at C4 through C7.  I suspect that this is primarily secondary to osteophytes rather than soft disk herniation," and ultimately diagnosed "Cervical spondylosis, C4 through C7; cervical strain, acute; cervical myofascial pain syndrome," and prescribed a Medrol Dose Pak, a soft cervical collar, renewals of plaintiff's prescriptions for Flexeril and Lortabs, as well as ultra sound and heat treatments through a physical therapist.  Exhibit 4 at 2, 35-36.  Dr. Lang also ordered a "plain x-ray C spine with oblique views," based on "cervical disc disease post trauma."  Exhibit 4 at 38.  In addition, Dr. Lang recommended that plaintiff have "flexible working hours each week for the present time."  Exhibit 4 at 37.

Plaintiff's January 9, 2002 demand letter also informed the DOC that after her consultation with Dr. Lang, she began a course of physical therapy at McLean Physical Therapy on May 16, 2000.  Exhibit 4 at 3.  Her physical therapist, Alexandra H. Rouse, noted on May 22, 2000, that "after [plaintiff] was struck [by the other vehicle], she felt pain in her neck and upper

-4-

back. The pain has gotten progressively worse. At this time she rates her pain an 8/10. She describes her pain as a burning sensation . . . . The pain is constant . . . [and also] disturb[s] her sleep. . . . Upon awakening in the morning she feels pain immediately. . . . As of now, Ms. Sue is unable to lift things, clean, or sit for periods of time in front of her computer." Exhibit 4 at 3, 40-41. Plaintiff's physical therapist noted that plaintiff was taking Lortab, hydrocordone, and Flexeril." Exhibit 4 at 40. In a follow up visit with Dr. Delenick on May 23, 2000, Dr. Delenick noted "a chronic disc bulge at C-5, C-6, C-4 to C-5 and C-6 to C-7." Exhibit 4 at 29.

Plaintiff was also examined on January 19, 2001, by Dr. Richard A. Wirtanen, a chiropractor. Exhibit 4 at 3. In her January 9, 2002 demand letter plaintiff quoted from Dr. Wirtanen's findings that she had "constant . . . stiffness in the neck which is increased by backward movement. Pain rated at 9/10 . . . with 10 being extreme pain. Pain is radiating into the head. Constant . . . headaches located in the back of the head . . . . Rated the pain 8/10. . . . Aggravated by any activity of daily living. Constant . . . pain in the upper mid back . . . . Constant . . . pain in the lower back, radiating down the right leg. All of the above symptoms seem to be aggravated by any activity of daily living. . . . Orthopedic tests: Roland-Morris Low Back Pain and Disability Questionaire . . . 83% Rating = Severe Disability." Exhibit 4 at 3, 48-52. Dr. Wirtanen had also found – and plaintiff passed this information on to the DOC in her January 9, 2002 demand letter – that her cervical and lumbosacral ranges of motion were significantly limited, and that following a review of MRI and X-rays of her cervical spine, Dr. Wirtanen had diagnosed plaintiff with "Cervical Sprain/Strain whiplash injury, nonallopathic lesion of thoracic region, wrist sprain, closed dislocation of multiple cervical vertebrae, knee sprain/strain, and radicular syndrome of lower limbs," and started plaintiff on a course of

chiropractic treatment.  Exhibit 4 at 3, 43-47.  An MRI ordered by Dr. Wirtanen and taken on

February 1, 2001, indicated a "loss of disc spacing from C4-C7 with various degrees of

osteophyte formation demonstrated . . . [and] spondylosis."  Exhibit 4 at 68.

 Dr. Wirtanen issued the following final prognosis regarding plaintiff on October 5, 2001,

which plaintiff quoted in her January 9, 2002 demand letter:  "After seeing Ms. Sue for several

months and monitoring her progress, I determined that she [has] reached maximum medical

improvement [and] will have to receive care . . . for the rest of her life . . . she has an over 80-

90% chance of long term residuals such as persistent muscle pain, neck stiffness, headaches, and

paresthesia . . . [and] an altered ligamentous structure [as] it has healed [in a] less than optimal

[manner] . . . . The positive neurological and orthopedic findings, along with the positive X-ray

findings, and her loss of range of motion and symptomatology, point to a poor recovery."

Exhibit 4 at 3, 52-58.  Plaintiff's January 9, 2002 demand letter highlighted Dr. Wirtanen's

conclusion that plaintiff would "*require continued care for the rest of her life to maintain a*

*satisfactory quality of life . . . [and that] [a]t this point in time, it is with reasonable medical*

*certainty that this injury is permanent in nature and that a permanent disability has been*

*sustained by Ms. Sue.*"  Exhibit 4 at 4, 58 (emphasis added).  According to plaintiff's January 9,

2002 demand letter, as of that date, her specials amounted to $24,327.83.  Exhibit 4 at 4.

 While her claim against the DOC was pending, plaintiff provided further supplemental

evidence in support of her claim.  On February 28, 2002, plaintiff submitted a report from her

treating physician Dr. David Patterson, and indicated that "[a]dditional specials [would] be

forwarded upon receipt [to the DOC]."  Exhibit 5 (February 28, 2002 demand letter).  Dr.

Patterson noted plaintiff's "chronic back pain," and "substantial doses of narcotic pain

medications because of the persistent back pain." Exhibit 5 at 2. Dr. Patterson also noted that

plaintiff would require "at least another six months of physical therapy on a regular basis to get

her symptoms under better control." Exhibit 5 at 2.

       Over the next year, plaintiff continued to supplement her SF 95 with medical

documentation and support for her claim. On March 19, 2002, plaintiff submitted physical

therapy records from Physical Medicine and Rehabilitation, along with itemized bills for

$750.00, and noted that her total special damages had increased to $25,077.83. Exhibit 6 (March

19, 2002 demand letter and accompanying documents Bates numbered pp. 1-21). Again,

plaintiff informed the DOC that her claim was not complete by noting that "[a]dditional specials

will be forwarded upon receipt." Exhibit 6. Physical therapy records dated January 18, 2002,

and submitted along with plaintiffs March 19, 2002 demand letter, noted that "driving, prolonged

sitting, and lifting all exacerbate [plaintiff's] neck symptoms." Exhibit 6 at 14. The therapist

also noted that plaintiff's "lower back pain has been pretty consistent" since her back surgery ten

years previously. Exhibit 6 at 16.

       On April 5, 2002, in support of her pending claim, plaintiff forwarded to the DOC

additional records of examination by Dr. David Patterson, as well as his bill for $589.00. Exhibit

7 (April 5, 2002 demand letter and accompanying documents Bates numbered pp. 1-16).

Plaintiff noted that the total amount of her special damages had reached $25,666.83, and that she

would continue to send the DOC further documentation of special damages "upon receipt."

Exhibit 6 at 1. Dr. Patterson noted that plaintiff had "a long history of upper and lower back

pain and in fact had surgery on L5-S1 approximately 10 years ago. She has a laminectomy and

fusion. At the time of the surgery she already had nerve damage and lost the Achilles reflex on

the left side. She has continued to have at least a low level of pain since then." Exhibit 7 at 7.

Dr. Patterson noted that plaintiff had begun taking Hydrocodone for pain immediately after the

accident, and was, as of January 9, 2002, attempting to taper the amount of pain medication she

was taking. Exhibit 7 at 7. Dr. Patterson also indicated that plaintiff was taking additional

medications, including Neurontin, Effexor, Lorazepam, and Minocin. Exhibit 7 at 7.

The DOC next received an update from plaintiff in support of her SF 95 on September 6,

2002. Exhibit 8 (September 6, 2002 demand letter and accompanying documents Bates

numbered pp. 1-4). On that date, plaintiff submitted a report from Dr. Bruce Ammerman, the

third surgeon, and second neurosurgeon she had seen since the April 10, 2000 car accident,

which noted that she had "evidence of persistent post traumatic cervical and lumbar

radiculopathy, as a result of the 4-10-00 motor vehicle accident." Exhibit 8 at 1. Plaintiff's

September 6, 2002 letter further informed the DOC that Dr. Ammerman had referred plaintiff for

a myelogram. Exhibit 8 at 1, 3-4. Plaintiff also told the DOC that as of that date, September 6,

2002, her specials totaled $26,041.83, and that additional specials would be forwarded "upon

receipt." Exhibit 8 at 1.

Plaintiff submitted additional documentation in support of her claim against the DOC on

February 20, 2003. Exhibit 9 (February 20, 2003 demand letter and accompanying documents

Bates numbered pp. 1-50). In her February 20, 2003 demand letter, plaintiff described medical

treatment by Hand-N-Hand Physical therapy, Washington Radiology Associates (for MRIs of

the brain and cervical spine), Dr. Bruce Ammerman (reports issued on September 21, 2002, and

November 6, 2002), myelograms at Sibley Memorial Hospital, reports by Doctors Alexander

Powers (a third neurosurgeon) and M. Theresa Carlini, and chiropractic treatment by Dr.

-8-

Wirtanen. Plaintiff informed the DOC that her special damages as of that date – February 20, 2003 – totaled $34,345.76, but that "additional specials will be forwarded upon receipt." Exhibit 9 at 1.

According to the medical records accompanying plaintiff's February 20, 2003 demand letter, her MRI dated July 28, 2002, revealed "degenerative changes . . . within the cervical spine. Specifically, at the C3-C4 level, a mild diffuse disc bulge is noted, with posterior osseous ridging." Exhibit 9 at 21. The results of the myelogram ordered by Dr. Ammerman revealed "bony osteophytes, C3-C4, C5-C6, and C6-C7. Most pronounced at C6-C7. Bulging midline disc, C4-C5. Bulging, L4-L5 disc with borderline spinal stenosis." Exhibit 9 at 23, 27-29. Dr. Ammerman noted in his September 12, 2002 report that he had "discussed surgical intervention" with plaintiff, although he would "rather not proceed with [surgery] at this time." Exhibit 9 at 23. Dr. Ammerman also noted that he discussed "outpatient lumbar epidural blocks" with plaintiff. Exhibit 9 at 23. Dr. Ammerman's subsequent, November 6, 2002 report, noted that plaintiff had indeed received "three epidural blocks." Exhibit 9 at 24.

On April 7, 2003, the DOC received one final demand letter from plaintiff's former counsel with respect to plaintiff's pending SF 95. Exhibit 10 (Plaintiff's April 7, 2003 demand letter and accompanying documents Bates numbered pp. 1-20). In the April 7, 2003 demand letter, plaintiff stated that she had received medical treatment from Dr. Gary Kaplan at the Pain Management Clinic, and had been seen by an additional neurosurgeon – her fourth – Dr. James Campbell. Exhibit 10 at 1. Plaintiff informed the DOC that, "as per Dr. Campbell, report of March 7, 2003, Ms. Sue has 'significant spondylotic disease involving principally C4-C5, C5-C6 and C6-C7." Exhibit 10 at 1. Plaintiff further informed the DOC that Dr. Campbell had

-9-

recommended that plaintiff undergo an anterior cervical disectomy and fusion at the involved

levels, and that plaintiff's surgery was scheduled for May 14, 2003. Exhibit 10 at 1. In addition,

plaintiff noted that as of the date of the letter - April 7, 2003 – her special damages totaled

$35,676.76, and that "additional specials will be forwarded on receipt." Exhibit 10 at 1. Along

with her April 7, 2003 demand letter, plaintiff submitted additional records, including Dr.

Campbell's report concurring "with Dr. Gary Kaplan that this patient has significant cervical

spondylotic disease. There is evidence on exam of a myelopathy. This is consistent with the

mild pressure on the spinal cord from the spondylotic disease. I think the patient should undergo

an anterior cervical discectomy and fusion at the involved levels." Exhibit 10 at 20.

 Although plaintiff indicated in her April 7, 2003 demand letter that she would be

forwarding the DOC further documentation in support of her claim, no further communication

was ever received from plaintiff's former counsel, Mr. Annis, subsequent to the April 7, 2003

demand letter. Significantly, at no time in his communications with the DOC – which consisted

of seven letters (along with accompanying medical records and bills) dated January 9, 2002,

February 28, 2002, March 19, 2002, April 5, 2002, September 6, 2002, February 20, 2003, and

April 7, 2003 – did Mr. Annis ever attempt to amend the amount of damages claimed in

plaintiff's SF 95. See generally Exhibits 4-10. Indeed, at the time of his last communication

with DOC, in his letter dated April 7, 2003, Mr. Annis indicated that the total special damages

incurred by plaintiff as of that date totaled $35,676.76. Exhibit 10 at 1.

 On May 4, 2005, plaintiff, represented by current counsel, Mr. Peter Grenier, sent the

DOC a letter informing the DOC that plaintiff's past special damages exceeded $330,000, and

that he intended to file a suit "promptly so as to move this case along." Exhibit 11 (May 4, 2005

-10-

letter at 2).  No additional medical documentation was submitted.  Indeed, plaintiff made no

attempt to amend her administrative claim, which was still pending at the DOC, but instead, on

July 7, 2005, filed the instant suit requesting "compensatory damages in the amount of not less

than $5,000,000."  Complaint at 9.

### III.  ARGUMENT

**A.    Legal Framework**

**1.        Standard of Review Under 12(b)(1) and 56(c)**

Because "subject-matter jurisdiction is an 'Art. III as well as a statutory requirement[,] no

action of the parties can confer subject-matter jurisdiction upon a federal court.'"  Akinseye v.

District of Columbia, 339 F.3d 970, 971 (D.C. Cir. 2003) (quoting Ins. Corp. of Ir., Ltd. v.

Compagnie des Bauxite de Guinea, 456 U.S. 694, 702 (1982)).  On a motion to dismiss for lack

of subject-matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of

establishing that the court has subject-matter jurisdiction.  Lujan v. Defenders of Wildlife, 504

U.S. 555, 561 (1992).  The court may dismiss a complaint for lack of subject-matter jurisdiction

only if " 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his

claim which would entitle him to relief." '  Empagran S.A. v. F. Hoffman-Laroche, Ltd., 315

F.3d 338, 343 (D.C. Cir. 2003) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

However, because subject-matter jurisdiction focuses on the court's power to hear the claim, the

Court must give the plaintiff's factual allegations closer scrutiny when resolving a Rule 12(b)(1)

motion than would be required for a Rule 12(b)(6) motion for failure to state a claim.  Macharia

v. United States, 334 F.3d 61, 64, 69 (D.C. Cir.2003); Grand Lodge of Fraternal Order of Police

v. Ashcroft, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  Moreover, the court is not limited to the

-11-

allegations contained in the complaint.  Hohri v. United States, 782 F.2d 227, 241 (D.C. Cir.1986), vacated on other grounds, 482 U.S. 64 (1987).  Instead, to determine whether it has jurisdiction over the claim, the court may consider materials outside the pleadings.  Herbert v. Nat'l Acad. of Scis., 974 F.2d 192, 197 (D.C. Cir. 1992).

On the other hand, motions for summary judgment are governed by Federal Rule of Civil Procedure 56, which provides that the "judgment sought shall be rendered forthwith if . . . there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c).  Where no genuine dispute exists as to any material fact, summary judgment is required.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

## 2.    The FTCA

This case arises under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2671, *et seq,* which governs the terms of the federal government's waiver of sovereign immunity in tort actions.  Actions against the United States, its agencies and employees, are barred by sovereign immunity except in accordance with the explicit terms of statutory waiver of such immunity. Cox v. Secretary of Labor, 739 F. Supp. 28, 30 (D.D.C. 1990).  The FTCA provides the exclusive circumstances under which an individual may bring an action for monetary relief in a tort claim against the United States.  See 28 U.S.C. §§ 2679(b)(1), (b)(2).  Importantly:

> Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim.

28 U.S.C. § 2675(b).  Therefore, the FTCA "explicitly states that a plaintiff's damages under the FTCA are limited to the amount requested in the administrative claim unless the plaintiff can

satisfy a stringent 'newly discovered evidence' or 'intervening facts' standard." Calva -

Cerqueira v. United States, 281 F. Supp. 2d 279, 302 (D.D.C. 2003) (quoting 28 U.S.C. §

2675(b)); see also Hoehn v. United States, 217 F. Supp. 2d 39, 44 (D.D.C. 2002) (holding that

plaintiff failed to show that the "increased amount of damages claimed in the complaint was

based upon evidence 'newly discovered' that could not have been 'reasonably discovered'

earlier" through due diligence).[2]

    In assessing whether one of the two exceptions found in 28 U.S.C. § 2675(b) applies,

"[i]f a plaintiff could have reasonably obtained the information on the specific injuries needed to

make out the worst-case scenario when [she] filed the original claim, then new information about

the injuries will not qualify as 'newly discovered evidence' or 'intervening facts.'" Calva-

Cerqueira, 281 F. Supp. 2d at 302 (citing Dickerson v. United States, 280 F.3d 470, 476 (5th Cir.

---

[2]   The clause "at the time of presenting the claim," refers to when the plaintiff submits his or her claim or amended claim. Robison v. United States, 746 F. Supp. 1059, 1063 (D. Kan. 1990). It is defendant's contention that plaintiff's administrative "claim" encompassed not only the SF 95 she filed on January 9, 2002, but the seven letters and accompanying evidence she filed in support of her SF 95. See Exhibits 4-10. Defendant's view is consistent with the purpose of the statute, which is for the agency, in the first instance, to assess the claim and possible settlement. Reilly v. United States, 863 F.2d 149, 173 (1st Cir. 1988) ("The goal of the administrative claim requirement is to let the government know what it is up against . . . [ensuring] that 'the government will at all relevant times be aware of its maximum possible exposure to liability and will be in a position to make intelligent settlement decisions.'") (quoting Martinez v. United States, 780 F.2d 525, 530 (5th Cir. 1986)). Alternatively, pursuant to 28 C.F.R. § 14.2(c), "[a] claim . . . may be amended by the claimant at any time prior to final agency action or prior to the exercise of the claimant's option under 28 U.S.C. § 2675(a). Amendments shall be submitted in writing and signed by the claimant or his duly authorized agent or legal representative." Although plaintiff never amended her claim to reflect damages in excess of $100,000, the multiple letters and supporting documents she filed with the DOC in support of her claim may be viewed as amendments on her injuries. Therefore, plaintiff's option under 28 U.S.C. § 2675(a) to file suit in this Court did not accrue until "six months after the filing of [her last] amendment [on April 7, 2003]." 28 C.F.R. § 14.2(c); 28 U.S.C. § 2675(a) (agency's failure to make final disposition of a claim within six months after it is filed "shall, at the option of claimant any time thereafter, be deemed a final denial of the claim for purposes of this section.")

1986). Therefore, "[n]ewly discovered evidence is evidence that materially differs from the

worst-case prognosis of which the claimant knew or could reasonably have known when [she]

filed the claim, not evidence that merely bears on the precision of the prognosis." Calva-

Cerqueira, 281 F.Supp. 2d at 302 (citing Zurba v. United States, 318 F.3d 736, 741 (7th Cir.

2001); Low v. United States, 795 F.2d 466, 471 (5th Cir. 1986); Reilly v. United States, 863 F.2d

149, 171 (1st Cir. 1988) ("intelligence which serves only to bear out earlier suspicions cannot

unlock the FTCA's narrow escape hatch. Diagnoses which are no more than cumulative and

confirmatory of earlier diagnoses are neither 'newly discovered evidence' nor 'intervening facts'

for purposes of § 2675(b)").

      The Fifth Circuit in Low succinctly explained the policy behind the administrative cap,

noting that "[I]f the exact nature, extent and duration of each recognized disability must be

known before § 2675(b) will be given effect, that section will be rendered useless; and the

government will be unable to evaluate any claim made against it without the threat that, if it does

not settle, its liability may increase substantially." Low, 795 F.2d at 471; see also Lebron v.

United States, 279 F.3d 321 (5th Cir. 2002) (noting that the provision encourages settlements).

"The [administrative] claims process is meant largely to furnish notice to the government

sufficient to allow it to investigate the alleged negligent episode to determine if settlement would

be in the best interest of all." Lopez v. United States, 758 F.2d 806, 809-10 (1st Cir. 1985)

(citations omitted); see also S.Rep. No. 1327, 89th Cong., 2d Sess. 2, reprinted in 1966 U.S.Code

Cong. & Admin.News 2515, 2516 (fundamental purpose of requiring an administrative claim is

"to ease court congestion and avoid unnecessary litigation, while making it possible for the

Government to expedite the fair settlement of tort claims asserted against the United States").

Furthermore, "[a]s between prospective defendant and prospective plaintiff, the latter is in by far the better position to determine the worst-case scenario or, if uncertain, to paint the picture as bleakly as reason permits and conscience allows. If a plaintiff misjudges, as to matters known or easily deducible when her claim is filed, it seems more equitable for her to bear the burden of miscalculation than to impose it on the sovereign." Reilly, 863 F.3d at 173.

The FTCA's terms, conditions, and requirements, cannot be waived by the court or parties to a suit, as they are jurisdictional in nature. Pullen v. United States 1997 WL 350003, *2 (D.D.C.). Furthermore, "[p]laintiff has the burden of showing that her case fits within one of these exceptions." Zurba, 318 F.3d at 739; Stokes v. United States 937 F. Supp. 11, 17 (D.D.C. 1996) (holding burden is on plaintiff "to establish that special circumstances exist"). In determining whether a plaintiff satisfies one of the two exceptions to the FTCA, the Court applies an objective standard. Michels v. United States, 31 F.3d 686, 689 (8th Cir. 1994). Finally, if the Court determines that plaintiff has met one of the § 2675(b) exceptions, then the Court may allow plaintiff to add damages *for those claims* "not subject to the [administrative claim] cap." Id.

**B.    The Documentation Submitted by Plaintiff in Support of Her SF 95 Demonstrates the Absence of Intervening Facts and That Plaintiff Knew or Reasonably Could Have Known the Extent of Her Damages.**

In her Complaint, plaintiff argues that "[s]ince January 9, 2002, a plethora of claim-related facts, none of which was reasonably discoverable prior [to] that date, has been discovered." Complaint at ¶ 16. According to plaintiff, she has suffered permanent, collison-related injuries that "will require permanent ongoing treatment . . . includ[ing] prescription drug treatment and physical therapy, as well as possible future surgeries and other treatment. . . . [and

her] work and earning capacity have been permanently reduced as a result of her collision-related injuries." Complaint at ¶¶ 10-11.

In support of her request for damages above the amount requested in her administrative claim, plaintiff alleges she could not have reasonably foreseen "the permanency and extent of [her] physical injuries . . . [her] psychological, emotional, and psychiatric injuries . . . [her] work disabilities, and the resulting loss of income and benefits . . . [her] significant cervical spondylotic disease . . . the nature and extent of the prescription drug treatment required to treat [her] injuries . . . [her] chronic physical pain and pain-related impairment . . . [and her] limitations in daily life [including care of her daughter and sexual dysfunction]." Complaint at ¶ 16. These assertions are not supported by the evidence. Instead, the evidence available to plaintiff at the time she presented her claim to the DOC reveals that her current medical situation[3] was both foreseeable and reasonably discoverable, and that no intervening facts have occurred.

In short, the evidence plaintiff contends was undiscoverable at the time she filed her administrative claim "addresses the precision with which the severity [of her] condition could be known," but does not alter the fact that at the time she filed her claim, plaintiff knew she suffered from severe back problems and all the potential attendant consequences. See Low, 795 F.2d 466, 471. As such, plaintiff is limited to the amount requested in her administrative claim –

---

[3] Defendant does not concede that the extensive medical treatment plaintiff has undergone over the past five years was necessitated by the April 10, 2000 accident. It is defendant's contention, however, for purposes of this motion, that at the time plaintiff submitted her administrative claim, the extent of plaintiff's future back problems – whatever the cause – was reasonably foreseeable, and that no intervening facts occurred that changed the foreseeable prognosis of plaintiff's continued back problems.

$100,000 – and the Court should dismiss for lack of subject matter jurisdiction plaintiff's claim

for damages in excess of $100,000, or in the alternative grant defendant's motion for summary

judgment limiting plaintiff's damages to $100,000, the amount requested in her administrative

claim.

>    1.    **The Nature, Extent, and Prognoses of Plaintiff's Claimed Physical and Psychological Injuries Were Reasonably Foreseeable.**

When plaintiff first contacted the DOC, on January 9, 2002, almost two years after the

April 10, 2000 accident, plaintiff informed the DOC that she had "suffered serious personal

injuries as a result of the [April 10, 2000 accident], specifically in the neck, back, shoulder and

leg areas."  Exhibit 4 at 1-2.  Indeed, during the intervening nineteen months – April 10, 2000

through January 9, 2002 – since the date of the accident, plaintiff had sought out extensive

medical treatment, which she detailed to the DOC in her January 9, 2002 demand letter and

package.  Exhibit 4.  That evidence shows that almost immediately after the accident, in May of

2000, plaintiff went to see an orthopaedic surgeon, Dr. Delenick, who had previously treated her

for back problems, and had conducted back surgery – a laminactomy and fusion – on plaintiff in

1991.  Exhibit 4 at 27-29, 35.  Given plaintiff's prior back problems, and prior back surgery, it

was reasonably foreseeable that plaintiff might require future back surgery for any back injuries

sustained in the April 10, 2000 accident, and it is reasonable to assume that plaintiff was aware

of this possibility.  See Norrell v. United States, 2002 WL 32060141, *5 (E.D. Tenn.) (finding

that spinal fusion surgery following car accident was "not newly discovered evidence or an

intervening fact within the meaning of § 2675(b)").

Furthermore, as of January 9, 2002, plaintiff had consulted with not one, but two

surgeons: orthopaedic surgeon Doctor Delenick and neurosurgeon Dr. Lang.  Exhibit 4 at 24-41.

-17-

Plaintiff's knowledge of the possibility of future medical complications and surgeries stemming from injuries sustained as a result of the April 10, 2000 accident can be inferred from these consults with an orthopaedic surgeon and a neurosurgeon as well as from their findings.  Dr. Delenick noted on May 8, 2000, that plaintiff had been referred to Dr. Lang for "cervical spondalosis C-4 through C-7, cervical strain, acute and cervical myofascial pain syndrome." Exhibit 4 at 2, 28.  Although Dr. Delenick noted that [s]urgical intervention does seem likely to be avoided . . . . [t]he patient still appears to be holding the neck somewhat stiff.  She has limited range of motion."  Exhibit 4 at 2, 28.  The very fact that surgical intervention was a possibility as of May 8, 2000, indicates that plaintiff was aware that a need for back surgery was reasonably foreseeable at the time she filed her administrative claim.  See Riedemann v. United States, 2005 WL 2465912, *4 (S.D. Ill.) ("What is particularly telling is that the plaintiff had an appointment to visit an orthopedic *surgeon*.  Any reasonable person would have anticipated that a surgeon would recommend surgery as a possible, even probable, resolution to her back problems, especially as conservative treatments had not worked.") (emphasis in original).

Moreover, MRI reports taken on May 2, 2000, revealed that plaintiff "ha[d] definite cervical degenerative disk disease at C4 through C7. . . . [suspected to be] primarily secondary to osteophytes rather than soft disk herniation," and as a result, Dr. Lang ultimately diagnosed "Cervical spondylosis, C4 through C7; cervical strain, acute; cervical myofascial pain syndrome."  Exhibit 4 at 2, 35-36.  Dr. Lang ordered a "plain x-ray C spine with oblique views," based on "cervical disc disease post trauma."  Exhibit 4 at 38.  Thus, as of May of 2000, plaintiff had already been diagnosed with cervical degenerative disk disease.  This is consistent with Dr. Campbell's finding on March 7, 2003, that plaintiff had "significant cervical spondylotic

-18-

disease," and his recommendation that she "undergo an anterior cervical discectomy and fusion" for that condition – the very condition that plaintiff had been diagnosed with in May of 2000. Exhibit 10 at 20.

Plaintiff's January 9, 2002 demand letter further informed the DOC that on January 19, 2001, she had been examined by Dr. Richard A. Wirtanen, a chiropractor. Exhibit 4 at 3. Dr. Wirtanen noted that plaintiff's cervical and lumbosacral ranges of motion were significantly limited, reviewed the MRI and X-rays of her cervical spine, and diagnosed "Cervical Sprain/Strain whiplash injury, nonallopathic lesion of thoracic region, wrist sprain, closed dislocation of multiple cervical vertebrae, knee sprain/strain, and radicular syndrome of lower limbs," and started plaintiff on a course of chiropractic treatment. Exhibit 4 at 3, 43-47. The MRI ordered by Dr. Wirtanen and taken on February 1, 2001, indicated "loss of disc spacing from C4-C7 with various degrees of osteophyte formation demonstrated . . . [and] spondylosis." Exhibit 4 at 68.

In addition, Dr. Wirtanen issued the following final prognosis regarding plaintiff on October 5, 2001, which plaintiff quoted in her January 9, 2002 demand letter: "After seeing Ms. Sue for several months and monitoring her progress, I determined that she [has] reached maximum medical improvement [and] *will have to receive care . . . for the rest of her life . . . she has an over 80-90% chance of long term residuals such as persistent muscle pain, neck stiffness, headaches, and paresthesia . . .* [and] an altered ligamentous structure [as] it has healed [in a] less than optimal [manner] . . . . *The positive neurological and orthopedic findings, along with the positive X-ray findings, and her loss of range of motion and symptomatology, point to a poor recovery.*" Exhibit 4 at 3, 52-58 (emphasis added). Plaintiff's January 9, 2002 demand letter

-19-

highlighted Dr. Wirtanen's conclusion that plaintiff would *"require continued care for the rest of her life to maintain a satisfactory quality of life . . . [and that] [a]t this point in time, it is with reasonable medical certainty that this injury is permanent in nature and that a permanent disability has been sustained by Ms. Sue."* Exhibit 4 at 4, 58 (emphasis added). Therefore, as of January 9, 2002, plaintiff had been told by at least one of her treating physicians that her injuries were permanent in nature and that she would need long term care. Similarly, on January 18, 2002, plaintiff's physical therapist noted that "driving, prolonged sitting, and lifting all exacerbate [plaintiff's] neck symptoms." Exhibit 6 at 14.

While her claim remained pending, plaintiff provided the DOC with numerous updates on her medical condition and prognoses. In addition to seeing neuro and orthopaedic surgeons Dr. Delenick and Dr. Lang, plaintiff consulted with <u>three</u> additional neurosurgeons. On September 6, 2002, plaintiff submitted additional materials to the DOC in support of her administrative claim, including a report from Dr. Bruce Ammerman, a neurosurgeon, which noted that plaintiff had "evidence of persistent post traumatic cervical and lumbar radiculopathy, as a result of the 4-10-00 motor vehicle accident." Exhibit 8 at 1. Plaintiff's September 6, 2002 demand letter also noted that Dr. Ammerman had referred plaintiff for a myelogram. Exhibit 8 at 1, 3-4. In addition, plaintiff sought another neurosurgical consultation with Dr. Alex Powers, who, on October 16, 2002, met with plaintiff and "reviewed with her considerations that might incorporate surgical treatments." Exhibit 13 (Report of Neurosurgical Consultation by Dr. Alex Powers).

According to the medical records accompanying plaintiff's supplemental demand letter submitted to the DOC on February 20, 2003, her MRI dated July 28, 2002 revealed

-20-

"degenerative changes . . . within the cervical spine. Specifically, at the C3-C4 level, a mild diffuse disc bulge is noted, with posterior osseous ridging." Exhibit 9 at 21. The results of the myelogram ordered by Dr. Ammerman revealed "bony osteophytes, C3-C4, C5-C6, and C6-C7. Most pronounced at C6-C7. Bulging midline disc, C4-C5. Bulging, L4-L5 disc with borderline spinal stenosis." Exhibit 9 at 23, 27-29. Dr. Ammerman noted in his September 12, 2002 report that he had "discussed surgical intervention" with plaintiff, although he would "rather not proceed with [surgery] at this time." Exhibit 9 at 23. Dr. Ammerman also noted that he discussed "outpatient lumbar epidural blocks" with plaintiff. Exhibit 9 at 23. Dr. Ammerman's subsequent, November 6, 2002 report, noted that plaintiff had indeed received "three epidural blocks." Exhibit 9 at 24.

Finally, on April 7, 2003, the DOC received one last demand letter from plaintiff with respect to her pending SF 95. Exhibit 10. In the April 7, 2003 demand letter, plaintiff informed the DOC that she had been seen by an additional, fourth, neurosurgeon, Dr. James Campbell. Exhibit 10 at 1. Plaintiff told the DOC that, "as per Dr. Campbell, report of March 7, 2003, [plaintiff had] 'significant spondylotic disease involving principally C4-C5, C5-C6 and C6-C7." Exhibit 10 at 1. Plaintiff further informed the DOC that Dr. Campbell had recommended that plaintiff undergo an anterior cervical disectomy and fusion at the involved levels, and that plaintiff's surgery was scheduled for May 14, 2003. Exhibit 10 at 1. Along with her April 7, 2002 demand letter, plaintiff submitted additional medical records, including Dr. Campbell's report concurring "with Dr. Gary Kaplan that this patient has significant cervical spondylotic disease. There is evidence on exam of a myelopathy. This is consistent with the mild pressure on the spinal cord from the spondylotic disease. I think the patient should undergo an anterior

-21-

cervical discectomy and fusion at the involved levels." Exhibit 10 at 20. The evidence further reflects that on February 20, 2003, Dr. Kaplan had opined that plaintiff was "going to end up a surgical case." Exhibit 14 (Letter from Dr. Kaplan to Dr. Campbell).

Likewise, with respect to her claim that evidence "regarding the permanency and extent of Ms. Sue's psychological, emotional, and psychiatric injuries," Complaint at ¶ 16, line 2, was not available, the evidence reflects that plaintiff was taking Effexor – a medication commonly prescribed for depression – at the time of the car accident on April 10, 2000. Exhibit 4 at 9 (noting patient currently taking Effexor). Her patient medical history – noted in her emergency record from GW Hospital, noted "depression." Exhibit 23 (Emergency Department Medical Record PMH). Plaintiff continued to take Effexor following the accident. Exhibit 7 at 7, Exhibit 21 (Medical History submitted to plaintiff's treating physician, Dr. M. Theresa Carlini, on October 17, 2002). Plaintiff was seeing a psychiatrist, Dr. Wise, during the pendency of her claim, who suggested increasing her dosage of Effexor. Exhibit 15 (Letter from Dr. Wise to Dr. Clancy). Plaintiff had also been seeing Dr. Margaret Clancy in weekly psychotherapy sessions since April of 2001 "for the treatment of depression secondary to medical problems." Exhibit 25 (Letter from Dr. Clancy to Disability Determination Services). It was therefore reasonably foreseeable for plaintiff to expect continued and future mental concerns and psychological harm resulting from the extensive medical treatment she had undergone. See Benjamin v. United States, 85 F. Supp. 2d 1034, 1036 (D. Colorado 2000) (finding that plaintiff's depression and disabling and constant pain suffered since the accident are not "significantly different from what was expected in his case or what would be expected in a 'normal' automobile accident case involving a back injury").

Given these medical reports and prognoses, plaintiff's assertion in her Complaint that the "permanency and extent" of her injuries and future care needs were not reasonably discoverable prior to her making her administrative claim for $100,000, is untenable. Indeed, nothing that has occurred since plaintiff submitted her administrative claim to the DOC "materially differs from the worst-case prognosis of which the claimant knew or could reasonably have known when the claim was filed." Zurba, 318 F.3d at 741 (quoting Lebron, 279 F.3d at 331); see also Calva-Cerqueira, 281 F. Supp. 2d at 302 ("[n]ewly discovered evidence is evidence that materially differs from the worst-case prognosis of which the claimant knew or could reasonably have known when [she] filed the claim, not evidence that merely bears on the precision of the prognosis."). Plaintiff's injuries did not worsen in a way that was not reasonably discoverable, and therefore the alleged "permanency and extent" of her injuries, Complaint at ¶ 16, does not constitute "newly discovered evidence" or "intervening facts" for purposes of the exceptions to the statutory cap. Reilly, 863 F.2d at 172-73 (even though a "worst case scenario" had come to pass, plaintiff was barred from increasing her claim because she had been put on "fair notice" of that possibility); Pulaski v. United States, 2002 WL 32124966 (D. Conn. 2002) (plaintiff's medical records indicated that ultimate diagnosis was, at most, cumulative and confirmatory of his earlier diagnoses). As such, the Court should dismiss for lack of subject matter jurisdiction plaintiff's damages in excess of $100,000, or grant defendant's motion for summary judgment on the issue of limiting plaintiff's damages to $100,000, the amount sought in her administrative claim.

2.    **Plaintiff's Alleged Work Disabilities and Future Loss of Income Were Foreseeable Given Her Claimed Physical Injuries and Given That Plaintiff Provided Documentation in Support of Her Administrative Claim That Noted Multiple Periods Where Plaintiff Was Unable to Work.**

Plaintiff alleges in her Complaint that the "extent of [her] work disabilities, and the resulting loss of income and benefits," was not reasonably foreseeable when she filed her administrative claim with the DOC; however, the evidence proves otherwise. As early as May of 2000, plaintiff received medical recommendations that she be excused from work as a result of her back problems. Exhibit 4 at 30, 75. For example, Dr. Delenick issued plaintiff documents entitled "Patient Unable to Return to Work or School," dated May 8, 2000, and May 23, 2000, which indicated that plaintiff was under his care for a "herniated disc – cervical spine," and that she was unable to return to work from May 8 through May 23, 2000. Exhibit 4 at 30, 74. On May 31, 2000, Dr. Lang recommended that plaintiff have "flexible working hours each week for the present time." Exhibit 4 at 37.

Furthermore, in her January 9, 2002 demand letter, plaintiff informed the DOC that she had missed work "from May 30-June 20, 2000 and that she was allowed to work only half-time from June 20 through July 7, 2000." Exhibit 4 at 4. On September 30, 2002, on behalf of plaintiff, Dr. Ammerman sent CIGNA a disability form noting that plaintiff had not been able to work since July 22, 2002, and that he would make a further evaluation of plaintiff's ability to work "upon completion of outpatient [epidural] blocks." Exhibit 24 (CIGNA Disability form). On August 9, 2002, plaintiff indicated in a letter to her physician, Dr. Clancy, that she was currently out of work on "short term disability." Exhibit 26 (August 9, 2002 Letter from Plaintiff to Dr. Clancy). In a letter dated April 1, 2003, Dr. Carlini, one of plaintiff's treating

-24-

physicians, noted that plaintiff, who had "been under [her care for] neck/low back pain and coccygodynia . . . has been diagnosed with cervical disc disease and cervical myelopathy . . . *has been unable to work since 10/17/02 because of the severity of her symptoms.*"  Exhibit 20 (emphasis added).  Similarly, on December 17, 2002, plaintiff informed another of her treating physicians, Dr. Patterson that she was "having such pain that she cannot sit down . . . . [and that she] was also recently laid off from her job and is trying to negotiate a settlement with them. She does not feel that she can work right now.  Her short term disability was discontinued since she was laid off."  Exhibit 22 (Medical Records of Dr. Patterson).

Finally, Dr. Wirtanen, plaintiff's chiropractor, informed plaintiff on October 11, 2001, that she would "require continued care for the rest of her life . . . [and] [a]t this point in time, it is with reasonable medical certainty that this injury is permanent in nature and that a permanent disability has been sustained by [plaintiff].  Exhibit 4 at 58.  Like the plaintiff in Lowry v. United States, 958 F. Supp. 704, 721 (D. Mass 1997), at the time she submitted her administrative claim to the DOC, plaintiff knew that she was disabled and had received disability benefits, and had received a prognoses that she was permanently disabled.  Therefore, "[t]he handwriting of the potential worst-case scenario was on the wall [by the time plaintiff filed her administrative claim]."  Id.  As such, plaintiff was on fair notice that she should guard against the worst-case scenario when preparing her claim, and "[t]he fact that the degree of disability was uncertain [is], in and of itself, inadequate to trigger the exception to § 2675(b)."  Reilly, 863 F.2d at 172-73 (citing Low, 795 F.2d at 471).

3.    **Plaintiff's Need for Future Physical Therapy Was Reasonably Foreseeable at the Time She Filed Her Administrative Claim.**

Plaintiff contends that her need for "permanent ongoing treatment," Complaint at ¶¶ 10-11, was not reasonably foreseeable, or caused by intervening events.  Yet, plaintiff's extensive courses of treatment, both prior to, and during the course of her administrative claim, belie this statement.  Indeed, plaintiff received extensive massage and physical therapy in the years following the April 10, 2000 accident, as well as acupuncture.  Specifically, plaintiff informed the DOC on January 9, 2002, that she had "received massage therapy at Vienna Massage Therapy from April 15 through May 16, 2000, as well as acupuncture treatments on April 21, and 26, 2000, from Dr. Bob Shao, Licensed Acupuncturist."  Exhibit 4 at 2, 19-23.  She began a course of physical therapy at McLean Physical Therapy on May 16, 2000.  Exhibit 4 at 3.  On February 12, 2002, Dr. Patterson noted that plaintiff would require "at least another six months of physical therapy on a regular basis to get her symptoms under better control" Exhibit 5 at 2.  Plaintiff submitted additional physical therapy records to the DOC on March 19, 2002 from Physical Medicine and Rehabilitation.  Exhibit 6.  Likewise, in her February 20, 2003 demand letter, plaintiff noted, and provided, extensive documents respecting physical therapy treatment by Hand-N-Hand Physical therapy, and extensive chiropractic treatment by Dr. Wirtanen.  Therefore, a continued need for such therapy in the future was reasonably foreseeable, no "intervening events" have occurred, and plaintiff's claims in excess of the $100,000 are barred by the administrative cap.  Calva-Cerqueira 281 F. Supp. 2d at 302 ("If a plaintiff could have reasonably obtained the information on the specific injuries needed to make out the worst-case scenario when [she] filed the original claim, then new information about the injuries will not qualify as 'newly discovered evidence' or 'intervening facts.'") (citation omitted).

-26-

**4.    Given Plaintiff's Statements to Her Medical Providers That Her Pain Has Continued, Unabated, Since the April 10, 2000 Accident, Her Future, Continued Battle With Pain and Need for Medication Was Reasonably Foreseeable.**

Plaintiff alleges that the extent and permanency of her pain, as well as continued usage of pain medications was not foreseeable, or constitutes an intervening event.  Complaint at § 16.  The record evidence, however, shows that plaintiff has complained of chronic, continuous pain to her medical providers since the date of the April 10, 2000 accident.  For example, on May 10, 2000, Dr. Lang noted that after the April 10, 2000 accident, plaintiff  "had a sudden burning sensation in her head and neck . . . which radiated up into the temporal area as well.  Since then, the pain has settled primarily into her neck and has been a continued problem. . . .  the pain does go down the left arm and also that she has a feeling of hot and cold in the arm at times . . . . [she] appears to be holding her neck somewhat stiff . . . .  Neck movements were . . . limited in rotation. . . ."  Exhibit 4 at 2, 35-36.  On May 22, 2000, plaintiff's physical therapist, Alexandra H. Rouse, noted that "after [plaintiff] was struck [by the other vehicle], she felt pain in her neck and upper back.  The pain has gotten progressively worse.  At this time she rates her pain an 8/10.  She describes her pain as a burning sensation . . . .  The pain is constant . . . [and also] disturb[s] her sleep. . . .  Upon awakening in the morning she feels pain immediately. . . .  As of now, Ms. Sue is unable to life things, clean, or sit for periods of time in front of her computer."  Exhibit 4 at 3, 40-41.

Following her visits with Dr. Wirtanen in 2001, he found that plaintiff has "constant . . . stiffness in the neck which is increased by backward movement.  Pain rated at 9/10 . . . with 10 being extreme pain.  Pain is radiating into the head.  Constant . . . headaches located in the back of the head . . . .  Rated the pain 8/10. . . .  Aggregated by any activity of daily living.  Constant . .

-27-

. pain in the upper mid back . . . . Constant . . . pain in the lower back, radiating down the right leg. All of the above symptoms seem to be aggravated by any activity of daily living. . . . Orthopedic tests:  Roland-Morris Low Back Pain and Disability Questionaire . . . 83% Rating = Severe Disability." Exhibit 4 at 3, 48-52.

When plaintiff visited Tysons Corner Healing Centre on February 15, 2002, she indicated to them that her "head/neck pain remains same as accident on 4/00." Exhibit 17 (Medical record from Tysons Corner Healing Centre). Plaintiff's treating physician, Dr. Patterson, noted in his February 12, 2002 report that plaintiff had "chronic back pain," and took "substantial doses of narcotic pain medications because of the persistent back pain." Exhibit 7 at 6. Plaintiff told one of her neurosurgeons – Dr. Campbell – who ultimately performed surgeries on her back, that she had "been plagued by pain in the low back, buttock and coccyx region [since the accident]." Exhibit 12 (Record of Visit with Dr. Campbell). Plaintiff had likewise told Dr. Kaplan, at the Pain Management Clinic, that "since [the April 10, 2000 car accident] she has suffered with pain in her neck and throughout her mid and low back, with paresthesias in both hands and some problems in her legs. She also has a constant headache unless she takes medication." Exhibit 14. Dr. Thomas Wise, a psychiatrist, noted on October 1, 2003, that since the accident plaintiff "has had a variety of severe pain complaints that include pain in her neck, lower back and shoulders." Exhibit 15. Dr. Marcia Ribeiro, another of plaintiff's treating physicians, similarly noted that plaintiff's "pain has remained severe over five years and radiates around her head as in a band and down to her shoulders and arms accompanied by tingling and numbness." Exhibit 16 (Initial Evaluation Note by Dr. Marcia Ribeiro). Plaintiff submitted her medical history to Dr. Theresa Carlini on October 17, 2002, and indicated that she had had "head, neck, shoulder,

low back, bottom – severe pain numbness in arms/back," and that sitting was a major problem, and that she had had the upper body problems for 2 ½ years, and the lower back problems for ten years – but that the lower back problems had been exacerbated by the April 10, 2000 accident. Exhibit 21 (Plaintiff's Medical History Form).

      Moreover, as one would expect given the chronic pain plaintiff has complained of, she has been on multiple medications, including pain medications, since the April 10, 2000 accident. For example, on May 22, 2000, plaintiff's physical therapist noted that plaintiff was taking Lortab, Hydrocordone, and Flexeril." Exhibit 4 at 40. In his January 9, 2002 notes, Dr. Patterson wrote that plaintiff had begun taking Hydrocodone for pain immediately after the accident, and was, as of January 9, 2002, attempting to taper the amount of pain medication she was taking." Exhibit 7 at 7. Dr. Patterson also noted that plaintiff was taking additional medications, including Neurontin, Effexor, Lorazepam, and Minocin. Exhibit 7 at 7. Plaintiff's April 7, 2003 demand letter to the DOC noted that she had received medical treatment from Dr. Gary Kaplan at the Pain Management Clinic. Exhibit 10 at 1. Plaintiff's August 28, 2002 medical records from Sibley Memorial Hospital indicated that she had been on Hydrocodone for two years. Exhibit 18 (Sibley Memorial Hospital Record Dated August 28, 2002). Dr. Carlini further noted on October 17, 2002, that plaintiff "has been symptomatic for neck and upper back pain for the past two and one half years and low back pain for the past ten years," and that plaintiff's "[c]urrent medication regimen for pain management includes hydrocodone . . . Neurontin . . . and Gabitril." Exhibit 19 (October 17, 2002 letter from Dr. Carlini to Dr. Clancy); Exhibit 21.

      Given plaintiff's constant, chronic pain since the date of the April 10, 2000 accident, her

current contention that she could not have reasonably foreseen a continuation of chronic pain, a continued need for pain medications, and concerns about the medications long-term effects, does not square with the record evidence.  As such, these damages were reasonably foreseeable at the time plaintiff filed her administrative claim, and damages in excess of $100,000 - the amount requested in her administrative claim, should be denied.  See Salcedo-Albanez v. United States, 149 F. Supp. 2d 1240 (S.D. Cal., 2001) (holding that although condition of plaintiff's eye injury had worsened, plaintiff's vision loss was foreseeable at time she filed administrative complaint and thus she would not be permitted to amend to increase damage claim in the FTCA complaint).

## IV.  CONCLUSION

In the nineteen months following the April 10, 2000 accident, plaintiff met with numerous doctors regarding the chronic pain and attendant problems she suffered as a result of her back injuries.  While presenting her claim to the DOC, plaintiff consulted with one orthopaedic and four neurosurgeons, and met with at least one psychiatrist.  Plaintiff took multiple pain medications, and expressed concern about their long-term effects.  Plaintiff was unable to work for significant periods of time, and was labeled permanently disabled by at least one of her treating physicians.  While her administrative claim was pending with the DOC, plaintiff submitted further documentation demonstrating she knew that pain and future surgery were likely – indeed, as of April 7, 2003, the date of plaintiff's last communication with the DOC respecting her SF 95, one back surgery was scheduled.

Given these facts, no newly discovered evidence or intervening facts exist that could justify an increased amount for plaintiff's personal injury claim.  As such, the Court should limit plaintiff's damages to $100,000, the amount requested by plaintiff in her administrative claim.

Dated: November 30, 2005.                    Respectfully submitted,

                                                            /s/_____
                                                            KENNETH L. WAINSTEIN
                                                            D.C. Bar # 451058
                                                            United States Attorney


                                                             /s/_____
                                                            R. CRAIG LAWRENCE
                                                            D.C. Bar # 171538
                                                            Assistant United States Attorney


                                                             /s/_____
                                                            HEATHER R. PHILLIPS
                                                            C.A. Bar # 19620
                                                            Assistant United States Attorney
                                                            Civil Division
                                                            555 4th Street, N.W., Rm E4212
                                                            Washington, DC 20530
                                                            (202) 514-7139

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **MARGARET S. SUE,** | ) |
| | ) |
| **Plaintiff,** | ) |
| **v.** | )     **Civil Action No. 05-1355 (JR)** |
| | )     **ECF** |
| **THE UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

**ORDER**

Upon consideration of defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction or for Summary Judgment, the Opposition thereto, and the entire record herein, it is this _____ day of _____, hereby

ORDERED that the defendant's motion is hereby GRANTED and this case is hereby DISMISSED.

_____
UNITED STATES DISTRICT JUDGE