## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**MARGARET S. SUE**                     )
                                        )
            **Plaintiff,**              )
                                        ) **Civil Action No. 05-1355 (JR)**
        **v.**                          )
                                        )
**THE UNITED STATES OF AMERICA**        )
                                        )
            **Defendant.**              )
_____)

### PLAINTIFF MARGARET SANDRA SUE'S

### (1) OPPOSITION TO DEFENDANT'S
### MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY
### JUDGMENT ON THE ISSUE OF LIMITING
### PLAINTIFF'S DAMAGES TO $100,000, THE
### AMOUNT OF HER ADMINISTRATIVE CLAIM

### AND

### (2) CROSS-MOTION FOR SUMMARY  JUDGMENT ON THE ISSUE
### OF PERMITTING RECOVERY IN EXCESS OF $100,000

Plaintiff Margaret Sandra Sue ("Ms. Sue"), through undersigned counsel,

respectfully submits her (1) memorandum in opposition to Defendant's Motion for

Dismiss Or in the Alternative For Summary Judgment on the Issue of Limiting Plaintiff's

Damages to $100,000, the Amount of Her Administrative Claim (the "Motion"); and (2)

cross-motion for summary judgment on the issue of permitting recovery in excess of

$100,000. In a nutshell, in this clear liability (rear-end automobile collision) case,

Defendant seeks to limit Plaintiff to a recovery equivalent to **_less than one half of one_**

**_percent  (< 0.5%)_** of Plaintiff's special damages, which exceed **_$5,000,000.00._**  This is

without even contemplating a penny for non-economic (_i.e._, pain and suffering) damages,

which arguably dwarf the special damages herein, given the daily agony in which

Plaintiff lives, and which multiple high level doses of narcotics and other pain control

measures cannot completely mask.

The Motion seeks relief which contradicts not only the black letter, the judicial

interpretations, and the spirit and intent of the Federal Tort Claims Act, but incredibly,

***blatantly contradicts the very legal position*** asserted by the United States in a previous

case in this very Court (and, ultimately, the D.C. Circuit).

As a matter of law this Court must deny the Motion to Dismiss because:

1)  The facts alleged in Plaintiff's Complaint, if taken as true, confer
    subject-matter jurisdiction on this Court to adjudicate Plaintiff's
    claims in excess of $100,000.00 pursuant to the 28 U.S.C. § 2675(b)
    "newly discovered evidence" and "intervening facts" exceptions; and

2)  As discussed herein, Plaintiff can easily prove a set of facts – that
    Ms. Sue's damages in excess of $100,000.00 are based upon "newly
    discovered evidence" and "intervening facts" – in support of her
    claim which would entitle her to relief.

Similarly, this Court should deny the Motion for Summary Judgment because:

1)  28 U.S.C. § 2675(b) of the Federal Tort Claims Act ("FTCA")
    *expressly* permits a claimant to recover a sum in excess of the
    amount of her administrative claim if such excess recovery is based
    upon intervening facts or newly discovered evidence not reasonably
    discoverable at the time she presented her claim;

2)  As is the case here, "newly discovered evidence" and "intervening
    facts" include: a) the unforeseen post-claim deterioration,
    exacerbation, or aggravation of a claimant's condition, b) the
    unforeseen post-claim discovery of the permanency of the claimant's
    injuries, and c) unforeseen post-claim surgeries; as such, the Motion
    fails if Plaintiff proves the existence of any <u>one</u> of the above
    categories of "newly discovered evidence" and "intervening facts" --
    Plaintiff presents ample evidence below to prove the existence of <u>all</u>
    categories;

3)    Ms. Sue's administrative claim was presented on January 9, 2002; her condition suddenly and unexpectedly deteriorated between January 9, 2002 and the July 7, 2005, filing of this lawsuit;

4)    Ms. Sue's injuries (and later surgical treatment) were not discovered to be permanently disabling until between January 9, 2002 and July 7, 2005;

5)    Multiple expert surgeons assured Ms. Sue prior to January 9, 2002 that she would *not* require surgery, yet Ms. Sue ultimately did require four major surgeries, performed between April 2003 and December 2004; additionally, in November 2005, she underwent surgical implantation of a spinal stimulator -- this procedure alone cost more than $80,000.00;

6)    Ms. Sue was working circa January 9, 2002, but was eventually (and unexpectedly) completely disabled from work as a result of her post-claim deterioration, in or around July 2002;

7)    While Ms. Sue was able to engage in some athletic activities and care for herself and her young daughter circa January 9, 2002, she thereafter deteriorated to the point of being completely disabled from work;

8)    Ms. Sue was taking few prescription medications circa January 9, 2002, but unexpectedly required a significant increase in the number, type, and dosage of prescription medications as a result of her post-claim deterioration;

9)    Neither the deterioration of Ms. Sue's condition, the permanency of her injuries, her post-claim surgeries, her permanent disability from work, her present inability to care for herself or her daughter, nor her post-claim prescription medication requirements were known or reasonably discoverable on January 9, 2002.

Plaintiff respectfully cross-moves for summary judgment on the issue of permitting Plaintiff's recovery in excess of $100,000.00. The undisputed material facts plainly support Plaintiff's right to recover in excess of her administrative claim pursuant to 28 U.S.C. § 2675(b). A statement of genuine issues regarding Defendant's Statement of Material Facts, a statement of material facts not in dispute, a memorandum of points

and authorities in opposition to Defendant's Motion and in support of Plaintiff's Cross

Motion, and a proposed Order are filed herewith.

Respectfully submitted,

MARGARET SANDRA SUE

By:    _Peter C. Grenier /s/_
          Peter C. Grenier (D.C. Bar No. 418570)
          Bode & Grenier, L.L.P.
          1150 Connecticut Avenue, N.W.
          Ninth Floor
          Washington, D.C.  20036
          (202) 828-4100
          (202) 828-4130 (fax)
          *Counsel for Plaintiff*

Dated: January 5, 2006

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of January 2006, I served a true and accurate copy of the foregoing Opposition and Cross Motion, including all exhibits and attachments, by electronic case filing and U.S. Mail, postage-prepaid upon:

>Heather R. Phillips, Esquire
>Assistant United States Attorney
>Judiciary Center Building
>Civil Division
>555 4th Street, N.W., Room E-4212
>Washington, D.C. 20530
>(202) 514-7139
>(202) 514-8780 (fax)
>*Counsel for Defendant*

_____*Peter C. Grenier /s/*_____
Peter C. Grenier

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____ )
                                     )

**MARGARET S. SUE** )
                                     )

            **Plaintiff,** )
                                     ) **Civil Action No. 05-1355 (JR)**

         **v.** )
                                       )

**THE UNITED STATES OF AMERICA** )
                                     )

         **Defendant.** )
_____ )

### PLAINTIFF'S STATEMENT OF GENUINE ISSUES IN OPPOSITION TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

In accordance with LCvR 7(h), Plaintiff Margaret S. Sue ("Ms. Sue") submits this statement of genuine issues in opposition to Defendant's statement of material facts.

1.        **Defendant's alleged "fact:"** "On April 10, 2000, the plaintiff in this case, Margaret S. Sue, was rear-ended by Department of Commerce employee Obami C. Wray while both were traveling westbound on the Roosevelt Bridge, just prior to taking an exit into Washington, D.C."

       **Genuine issue:** Plaintiff denies that the above description of the incident giving rise to this litigation is complete, but does not dispute the facts stated. *See* Complaint.

2.        **Defendant's alleged "fact:"** "On January 9, 2002, the plaintiff in this case, represented by former counsel Kenneth J. Annis, filed a Claim for Damage Injury or Death Standard Form 95 'SF95' with the Department of Commerce claiming personal injury in the amount of $100,000."

       **Response:** Plaintiff does not dispute the facts stated.

3.    **Defendant's alleged "fact:"** " Along with the completed Form 95, on January 9, 2002, plaintiff also submitted to the DOC a five-page demand letter detailing her injuries and related costs, with attached medical records and other documentation supporting her claim."

**Response:** Plaintiff does not dispute the facts stated.

4.    **Defendant's alleged "fact:"** "On February 28, 2002, plaintiff submitted additional documentation in support of her claim to the [Department of Commerce]."

**Genuine issue:** Plaintiff denies that the February 28, 2002 letter submitted by Plaintiff to the Department of Commerce (the "DOC") was anything other than a status communication between Ms. Sue's then-counsel and the DOC. The letter does not constitute an amendment of Plaintiff's claim, and contains no language regarding amendment.  *Exhibit* 35.

5.    **Defendant's alleged "fact:"** "On March 19, 2002, plaintiff submitted additional documentation in support of her claim to the DOC."

**Genuine issue:** Plaintiff denies that the March 19, 2002 letter submitted by Plaintiff to the DOC was anything other than a status communication between Ms. Sue's then-counsel and the DOC. The letter does not constitute an amendment of Plaintiff's claim, and contains no language regarding amendment.  *Exhibit* 36.

6.    **Defendant's alleged "fact:"** "On April 5, 2002, plaintiff submitted additional documentation in support of her claim to the DOC."

**Genuine issue:** Plaintiff denies that the April 5, 2002 letter submitted by Plaintiff to the DOC was anything other than a status communication between Ms. Sue's then-

counsel and the DOC. The letter does not constitute an amendment of Plaintiff's claim, and contains no language regarding amendment. *Exhibit* 37.

7.    **Defendant's alleged "fact:"** "On September 6, 2002, plaintiff submitted additional documentation in support of her claim to the DOC."

**Genuine issue:** Plaintiff denies that the September 6, 2002 letter submitted by Plaintiff to the DOC was anything other than a status communication between Ms. Sue's then-counsel and the DOC. The letter does not constitute an amendment of Plaintiff's claim, and contains no language regarding amendment. *Exhibit* 38.

8.    **Defendant's alleged "fact:"** "On February 20, 2003, plaintiff submitted additional documentation in support of her claim to the DOC."

**Genuine issue:** Plaintiff denies that the February 20, 2003 letter submitted by Plaintiff to the DOC was anything other than a status communication between Ms. Sue's then-counsel and the DOC. The letter does not constitute an amendment of Plaintiff's claim, and contains no language regarding amendment. *Exhibit* 39.

9.    **Defendant's alleged "fact:"** "On April 7, 2003, plaintiff submitted additional documentation in support of her claim to the DOC."

**Genuine issue:** Plaintiff denies that the April 7, 2003 letter submitted by Plaintiff to the DOC was anything other than a status communication between Ms. Sue's then-counsel and the DOC.  The letter does not constitute an amendment of Plaintiff's claim, and contains no language regarding amendment. *Exhibit* 40.

10.    **Defendant's alleged "fact:"** "As of April 7, 2003, plaintiff claimed total special damages in the amount of $35,676.76."

**Genuine issue:** Plaintiff denies that the April 7, 2003 letter submitted by Plaintiff to the DOC was anything other than a status communication between Ms. Sue's then-counsel and the DOC. The letter does not constitute an amendment of Plaintiff's claim, and contains no language regarding amendment. Therefore, the $35,676.76 figure does not represent Plaintiff's "claimed total special damages" circa April 7, 2003. *Exhibit* 40.

11.     **Defendant's alleged "fact:"** "On May 4, 2005, plaintiff, represented by current attorney, Peter Grenier, wrote a letter to the DOC indicating plaintiff's intent to file suit in this Court seeking 'well in excess of $4,000,000.'"

**Genuine issue:** Plaintiff denies that the May 4, 2005 letter states Plaintiff's intention to "file suit in this Court." The May 4, 2005 letter states "[Ms. Sue's] past special damages (*i.e.*, medical expenses, services, prescriptions), exclusive of lost wages, now exceeds $330,000.00," and "we currently intend to institute an action wherein we shall seek well in excess of $4,000,000.00." *Exhibit* 34.

12.     **Defendant's alleged "fact:"** "At no time did plaintiff attempt to amend her administrative claim beyond the $100,000 indicated in her SF 95."

**Genuine issue:** Plaintiff denies that the above statement is fact. Rather, the amendment or non-amendment of Plaintiff's administrative claim is a legal conclusion, and is therefore not appropriately included in a "statement of material facts." *See* LCvR 7(h); *Exhibits* 34-40.

Respectfully submitted,

MARGARET SANDRA SUE

By: _____*Peter C. Grenier /s/*_____
         Peter C. Grenier (D.C. Bar No. 418570)
         Bode & Grenier, L.L.P.
         1150 Connecticut Avenue, N.W.
         Ninth Floor
         Washington, D.C.  20036
         (202) 828-4100
         (202) 828-4130 (fax)
         *Counsel for Plaintiff*

Dated: January 5, 2006

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of January 2006, I served a true and accurate copy of Statement of Genuine Issues in Opposition to Defendant's Statement of Material Facts by electronic case filing and U.S. Mail, postage-prepaid upon:

> Heather R. Phillips, Esquire
> Assistant United States Attorney
> Judiciary Center Building
> Civil Division
> 555 4th Street, N.W., Room E-4212
> Washington, D.C. 20530
> (202) 514-7139
> (202) 514-8780 (fax)
> *Counsel for Defendant*

_____*Peter C. Grenier /s/*_____
Peter C. Grenier

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
**MARGARET S. SUE**                     )
                                        )
        **Plaintiff,**        )
                                        ) **Civil Action No. 05-1355 (JR)**
      **v.**                   )
                                        )
**THE UNITED STATES OF AMERICA**        )
                                        )
        **Defendant.**        )
_____)

### PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

In accordance with LCvR 7(h), Plaintiff submits this statement of material facts not in genuine dispute in support of her cross motion for summary judgment.

1.      On April 10, 2000, the car operated by Plaintiff Margaret S. Sue ("Ms. Sue") was rear-ended by the car operated by Obami C. Wray on the Roosevelt Bridge in the District of Columbia.  Mr. Wray was the sole cause of the collision, and was cited for failure to pay full time and attention. *Exhibit* 2.

2.      On May 8, 2000, Ms. Sue was treated by Dr. Peter J. Delenick, an orthopedic surgeon, at which time Dr. Delenick stated that "surgical intervention does seem likely to be avoided." *Exhibit* 6.

3.      At no time during Dr. Delenick's treatment of Ms. Sue did he state that surgery might be required. *Exhibit* 5 at ¶4.

4.      On May 31, 2000, Dr. Edward Lang, a neurosurgeon, examined Ms. Sue, and noted that "she is taking very little medication and is working." *Exhibit* 7.  Dr. Lang stated that Ms. Sue "has had several physical therapy treatments and has shown

significant improvement," and prescribed "continued conservative treatment," including physical therapy. *Exhibit* 7.

5.      At no time did Dr. Lang recommend that Ms. Sue undergo surgery.  He advised Ms. Sue that she would not require surgery. *Exhibit* 5 at ¶6.

6.      On January 9, 2002, Ms. Sue was treated by David W. Patterson, M.D. Dr. Patterson noted that despite Ms. Sue's Crash-related pain, she continued to engage in some athletic activities, including rowing, weight lifting, swimming, and water aerobics. *Exhibit* 11 at 1.

7.      On January 9, 2002, Dr. Patterson stated that "she will do well with a good physical therapist," and prescribed physical therapy. He did not recommend surgery. *Exhibit* 11 at 2.

8.      On January 9, 2002, Ms. Sue presented to the United States Department of Commerce her administrative claim arising out of the April 10, 2000 crash. *Exhibit* 32.

9.      On February 12, 2002, Dr. Patterson noted that Ms. Sue "… is responding remarkably well to the physical therapy.  As a result, we have been able to continue to taper her off her pain medications and her memory is improving.  The musculoskeletal discomfort that is a direct result of [the Crash] is improving with physical therapy." *Exhibit* 12.

10.     Seven months after presenting her administrative claim, on September 12, 2002, Dr. Bruce Ammerman, a neurosurgeon, examined Ms. Sue and stated that he "would rather not proceed with [surgical intervention] at this time." *Exhibit* 15.

11.     Alexandros D. Powers, M.D., a neurosurgeon, examined Ms. Sue on October 16, 2002.  Dr. Powers stated "I would not recommend <u>consideration</u> of surgical

interventions" and prescribed "conservative modalities in lieu of consideration of surgical interventions." *Exhibit* 16 at 3.

12.     On November 6, 2002, Dr. Ammerman noted that Ms. Sue experienced improvement as a result of the epidural blocks, and prescribed "continued conservative care." *Exhibit* 18.

13.     On March 7, 2003, Dr. James N. Campbell, a neurosurgeon, recommended that Ms. Sue undergo a multi-level "anterior cervical discectomy and fusion."  This was the first time a physician recommended surgical intervention to treat Ms. Sue's April 10, 2000 injuries. *Exhibit* 20 at 2.

14.     With the exception of several missed and part-time weeks of work in the aftermath of the Crash, and subsequent time off work to attend medical appointments, Ms. Sue worked full-time in her pre-Crash executive-level capacity, between April 10, 2000 and July 22, 2002. *Exhibit* 5 at ¶7.

15.     On April 9, 2003 – exactly fifteen months after Ms. Sue presented her administrative claim – Ms. Sue underwent an "anterior discectomy and fusion at C4-5, C5-6, [and] C6-7" performed by Dr. James N. Campbell. *Exhibit* 21.

16.     On May 1, 2003, Dr. Campbell stated that Ms. Sue "has relief of her preoperative symptoms" and "will gradually increase her activities and she will be back working in a couple of weeks." *Exhibit* 23.

17.     Over two years after Ms. Sue presented her administrative claim, on March 31, 2004, Dr. Campbell performed upon Ms. Sue a coccygectomy. See *Exhibit* 26.

18.     On June 1, 2004, Dr. Campbell performed upon Ms. Sue an anterior discectomy and fusion at C3-4. *Exhibit* 27 at 1.

3

19.     On December 7, 2004 – nearly three years after Ms. Sue presented her administrative claim, Dr. Campbell performed a "Laminectomy of L4-5." *Exhibit* 27 at 3.

20.     On the date Ms. Sue presented her administrative claim, January 9, 2002, her special damages totaled $24,327.83. *Exhibit* 32 at 6.

21.     As of the date of this document, Ms. Sue's special damages total in excess of $5,000,000.00.  Ms. Sue's present special damages therefore exceed her special damages circa January 9, 2002 by more than $4,975,000.00.  *See generally* Plaintiff's Initial Disclosures (previously submitted to this Court); Plaintiff's Rule 26(a)(2) Disclosures (previously submitted to this Court).

22.     At no time did Plaintiff submit an amended Standard Form 95 Claim for Damage, Injury, or Death.

> Respectfully submitted,
>
> MARGARET SANDRA SUE
>
> By:     _____*Peter C. Grenier /s/*_____
>          Peter C. Grenier (D.C. Bar No. 418570)
>          Bode & Grenier, L.L.P.
>          1150 Connecticut Avenue, N.W.
>          Ninth Floor
>          Washington, D.C.  20036
>          (202) 828-4100
>          (202) 828-4130 (fax)
>          *Counsel for Plaintiff*

Dated: January 5, 2006

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of January 2006, I served a true and accurate copy of Statement of Material Facts Not in Genuine Dispute by electronic case filing and U.S. Mail, postage-prepaid upon:

      Heather R. Phillips, Esquire
      Assistant United States Attorney
      Judiciary Center Building
      Civil Division
      555 4th Street, N.W., Room E-4212
      Washington, D.C. 20530
      (202) 514-7139
      (202) 514-8780 (fax)
      *Counsel for Defendant*

                *Peter C. Grenier /s/*
                 Peter C. Grenier

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                    )
**MARGARET S. SUE**                 )
                                    )
          **Plaintiff,**            )
                                    ) **Civil Action No. 05-1355 (JR)**
     **v.**                         )
                                    )
**THE UNITED STATES OF AMERICA**    )
                                    )
          **Defendant.**            )
_____)

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN**

**(1) OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR IN THE
ALTERNATIVE FOR SUMMARY JUDGMENT ON THE ISSUE OF LIMITING
PLAINTIFF'S DAMAGES TO $100,000, THE
AMOUNT OF HER ADMINISTRATIVE CLAIM**

**AND**

**(2) SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY
JUDGMENT ON THE ISSUE OF PERMITTING
<u>RECOVERY IN EXCESS OF $100,000</u>**

<u>**Introduction**</u>

In April 2000, Ms. Sue was severely injured by Defendant's employee, who,
while acting within the scope of his employment,[1] negligently drove his car into the rear
of Plaintiff's car on the Roosevelt Bridge. She certainly had hoped to recover and to
resume her previously bustling professional and athletic life, as well as being a mother to
a young girl, and held that hope for quite some time.

Instead, beginning around mid-2002, Ms. Sue suffered a gradual downward spiral
and marked increase in symptoms. This downward spiral culminated in four <u>major</u> spine

---

[1]       This is uncontested.

surgeries between April 2003 and December 2004.  Between January 9, 2002 and the present, Ms. Sue has incurred more than **$575,000.00** in additional medical expenses and lost income.  She will never work again and earn the six-figure salary she had been earning, she will require extensive future treatment/home modifications and the like, and the present value of her special damages exceeds **$5,000,000.00**.

A plethora of intervening facts and new evidence regarding the nature, extent, and necessary treatment of Ms. Sue's injuries emerged between the January 9, 2002, submission of Ms. Sue's administrative claim and the July 7, 2005, filing of this lawsuit. As of the date of this filing, Ms. Sue's day consists of not much more than: the ingestion of strong narcotics (including morphine and hydrocodone); the self-administering of pain-relieving electrical impulses to her spine via a wireless neural transmitter surgically implanted two months ago; lengthy naps throughout the day; and physical and pain therapy.

All medical experts, both for Plaintiff and for Defendant, concur that Ms. Sue cannot work and that she is severely and permanently disabled.  For example, Defendant's own expert orthopedic surgeon, Dr. Joel Fechter, evaluated Ms. Sue as having a "25% - 28%" whole body permanent impairment rating.

Despite the fact that these intervening facts and newly discovered evidence clearly entitle Ms. Sue to recover a sum in excess of her administrative claim amount, Defendant seeks to improperly and unlawfully limit Ms. Sue's damages at trial to $100,000.00, or 0.5% of the special damages caused by Defendant's employee's negligence.

Defendant's position ignores the law, and disingenuously ignores <u>its</u> <u>own</u> legal position taken in a previous case in <u>this</u> <u>Circuit</u>. *See* Brief for United States of America, at 37, *Husovsky v. United States of America, et al.*, 590 F.2d 944, 954 (D.C. Cir. 1978) (attached hereto as *Exhibit* 1).

The plain language of the relevant statutes and the binding precedent of this Circuit entitle Ms. Sue to recover her true compensatory damages, which presently exceed $5,000,000.00 in special damages alone (in addition to non-economic/pain and suffering damages that arguably dwarf the special damages), pursuant to the § 2675(b) exception of the Federal Tort Claims Act. Despite ample opportunity, Defendant has refused to settle this meritorious claim, and instead asks the Court to harshly penalize Ms. Sue merely because she made a good-faith estimate of her likely damages almost exactly *four years ago*, when her special damages totaled $24,327.83.

The Motion mischaracterizes the applicable law, and inexplicably argues in direct contradiction of the settled precedent of this Circuit, as well as <u>this</u> <u>Defendant's</u> prior written statements regarding <u>these</u> <u>very</u> <u>issues</u> in <u>this</u> <u>jurisdiction</u> before the United States Court of Appeals for the District of Columbia Circuit. *See Exhibit* 1 at 36-37.

## I.     BRIEF FACTUAL BACKGROUND

More than fourteen years ago, in 1991, Ms. Sue underwent decompression and fusion surgery at the lowest level of her back, the L5-S1 level of her lumbo-sacral spine, after having lifted a propane tank for her grill. Dr. Peter J. Delenick, an orthopedic surgeon, performed the surgery. The surgery remedied L5-S1 pain from which Ms. Sue suffered prior to the procedure. Between the 1991 surgery and the April 10, 2000 Crash, Ms. Sue underwent minor post-surgery follow-up treatment, including physical therapy

and massage therapy.  The 1991 surgery and post-surgery treatment resolved Ms. Sue's L5-S1 pain.

For the roughly nine years between the 1991 surgery and the Crash, Ms. Sue enjoyed an active lifestyle unrestricted by back pain.  Ms. Sue successfully worked in various professional jobs, and often kept grueling hours.  Ms. Sue traveled often throughout the world.  Ms. Sue participated in rigorous hikes, kayaking trips, and snorkeling expeditions.  In addition, Ms. Sue played organized softball.  Ms. Sue makes no claim for any pre-Crash medical treatment.

On April 10, 2000 at approximately 2:55 p.m., Ms. Sue lawfully drove her 1992 Ford Taurus ("Ms. Sue's Car") westbound on the Roosevelt Bridge in the District of Columbia.  Obami C. Wray, an employee of the United States Department of Commerce traveling in the scope of his employment, simultaneously operated a 1987 Volvo 240 ("Mr. Wray's Car") westbound on the Roosevelt Bridge directly behind Ms. Sue.  The weather was clear.  As a result of Mr. Wray's negligence, he caused the front his vehicle to violently collide with the rear of Ms. Sue's Car (the "Crash").  Mr. Wray, the sole cause of the collision, was cited for failure to pay full time and attention, and he paid the fine without challenging the charge.  *See Exhibit* 2.

Ms. Sue was immobilized on a backboard, transported via ambulance, and treated at The George Washington University Hospital Emergency Room.  Ms. Sue sustained serious back and neck injuries as a result of the Crash, and immediately complained of "back and neck pain – burning left side of neck." *Exhibit* 3.

On April 26, 2000, Dr. Delenick, the orthopedic surgeon who performed the 1991 surgery on Ms. Sue, ordered an MRI of Ms. Sue's cervical and lumbar spine, and

prescribed 10 mg of Flexural per day for ten days. *See Exhibit* 4[2].  Dr. Delenick did not

mention the possibility of surgery during that visit.  *See* Affidavit of Margaret Sandra Sue

(attached hereto as *Exhibit* 5) at ¶3.  On May 8, 2000, Ms. Sue saw Dr. Delenick for

follow-up, at which time Dr. Delenick stated that "surgical intervention does seem likely

to be avoided." *Exhibit* 4 at 2.  Ms. Sue periodically saw Dr. Delenick for follow-up

between May 8, 2000 and September 28, 2001, during which time Dr. Delenick

recommended conservative measures including physical therapy and trigger point

injections.  At no time during Dr. Delenick's treatment of Ms. Sue did he state that

surgery might be required or recommend surgery. *See Exhibit 5* at ¶4.  Quite to the

contrary, Dr. Delenick repeatedly assured Ms. Sue that she would recover via

conservative measures, and that she would not require surgery. *See Exhibit* 5 at ¶4-5.

Ms. Sue was referred to Dr. Edward Lang, a neurosurgeon, by Dr. Delenick.  Dr.

Lang first treated Ms. Sue on May 10, 2000.  Dr. Lang thoroughly examined Ms. Sue,

and, as is typical, recommended "conservative measures," including a soft cervical collar,

physical therapy, and a Medrol Dose Pak. *Exhibit* 6 at 2.  On May 31, 2000, Dr. Lang

examined Ms. Sue, and noted that "she is taking very little medication and is working."

*Exhibit* 7.  Dr. Lang stated that Ms. Sue "has had several physical therapy treatments and

has shown significant improvement," and "continues to show good progress," and

prescribed "continued conservative treatment," including physical therapy. *Id*.  Dr. Lang

did not recommend surgery. *See Exhibit* 5 at ¶6.  In fact, he advised Ms. Sue that she

would not require surgery, partly because she "continued to show good progress." *See Id*.

---

[2] For the purpose of resolving Defendant's Motion and Plaintiff's Cross-Motion, both parties stipulate to
the authenticity of all medical records attached thereto.

Ms. Sue underwent several massage therapy and acupuncture treatments in April and May of 2000, as part of the "conservative treatment" advised by Drs. Lang and Delenick.

Ms. Sue was referred to McLean Physical Therapy by Dr. Lang. Ms. Alexandra Rouse, a physical therapist, first treated Ms. Sue on May 16, 2000, and noted that Ms. Sue's condition was "helped" by massage therapy. *Exhibit* 8.  Ms. Sue underwent physical therapy several times at McLean Physical Therapy between May 16, 2000 and June 30, 2000.  Ms. Sue experienced benefits from the physical therapy, but her Crash-related pain did not fully resolve.

Ms. Sue missed several weeks of work in the aftermath of the Crash, and took intermittent time off to attend her medical appointments thereafter.  She returned to work at a reduced schedule between June 20, 2000 and July 7, 2000.  Subsequently, Ms. Sue continued to successfully work full-time in her pre-Crash capacity for IMS Health, her pre-Crash employer, and in a similar capacity for Digital Think, Inc. through July 22, 2002. *See Exhibit* 5 at ¶7.

Throughout 2000, the conservative treatments prescribed by her physicians provided Ms. Sue with partial relief from her Crash-related back and neck pain.  Ms. Sue was repeatedly advised that she was not a surgical candidate, and that her Crash-related pain was best treated with physical therapy, massage therapy, and the prescription drugs hydrocodone and lorazepam.

In January of 2001, Ms. Sue encountered Richard A. Wirtanen, a chiropractor, at her gym.  He was not a surgeon or a medical doctor. Ms. Sue never stopped being treated by true medical doctors, who could prescribe medication, diagnose and treat her

medically, and advise her regarding surgical options and medical prognoses. Dr.
Wirtanen was at the gym advertising the benefits of chiropractic treatment, and Ms. Sue
made an appointment with him in the hope of reducing her residual Crash-related pain.
*See Exhibit* 5 at ¶8.

On January 19, 2001, Dr. Wirtanen examined Ms. Sue, noted her Crash-related
pain, and recommended a regimen of chiropractic adjustment, hot packs, and massage
therapy. See *Exhibit* 9 at 5. On October 11, 2001, Dr. Wirtanen transmitted a report to
Ms. Sue's then-counsel. The report stated that Ms. Sue "responded very well to
chiropractic care," that she "reached maximum medical improvement," and that she
would require "continued [chiropractic] care for the rest of her life to maintain" her status
as of the date of the report. *Id*. at 11; Exhibit 10 at ¶9. Dr. Wirtanen defines "maximum
medical improvement" as "the maximum extent to which <u>chiropractic</u> care will improve a
patient's condition." *Id.* at ¶16. (emphasis added).

Dr. Wirtanen never provided the October 11, 2001 report to Ms. Sue, nor did she
ever see it. *See Exhibit* 5 at ¶9. Dr. Wirtanen, a chiropractor, is not licensed to perform
surgery or prescribe medicine. *See Exhibit* 10 at ¶¶6-7. Dr. Wirtanen never referred Ms.
Sue to a surgeon. Dr. Wirtanen never told Ms. Sue that her Crash-related pain and
disabilities would increase dramatically, that she would become completely and
permanently disabled from work, or that she would be almost wholly unable to perform
any normal daily tasks. See *Exhibit 10* at ¶10; *Exhibit 5* at ¶10.

On January 9, 2002, the very day that Ms. Sue's FTCA claim was presented, Ms.
Sue was treated by David W. Patterson, M.D. Dr. Patterson noted that despite Ms. Sue's
Crash-related pain, she continued to engage in some athletic activities, including rowing,

weight lifting, swimming, and water aerobics.  See *Exhibit* 11 at 1.  Dr. Patterson stated

that "she will do well with a good physical therapist," and prescribed physical therapy.

*Id*. at 2.  Dr. Patterson did not recommend surgery. *See Exhibit 5* at ¶11.

On January 9, 2002, Ms. Sue presented her administrative claim (the "Claim") to

the United States Department of Commerce.  At that time, her special damages totaled

$24,327.83, of which $11,983.68 represented lost wages as of that date.   Ms. Sue's

special damages presently exceed two hundred times that amount, totaling in excess of

$5,000,000.00. Ms. Sue's special damages include, at a minimum – past medical

treatment: $249,564.37; past prescription drugs: $47,118.33; past rehabilitative,

therapeutic, and assistive equipment: $47,651.95; past and future lost income, benefits,

and life-care/medical expenses: $4,664,502.00. Ms. Sue's post-claim lost wages total

$344,633.00, as set forth in the expert report of Dr. Richard Edelman, a copy of which

has previously been filed.

Dr. Patterson referred Ms. Sue to Hand-N-Hand Physical Therapy. Ms. Sue was

evaluated at Hand-N-Hand Physical Therapy on January 18, 2002, where she

subsequently underwent regular physical therapy. See *Exhibit* 11 at 2.  On February 12,

2002, Dr. Patterson noted that Ms. Sue:

> … is responding remarkably well to the physical therapy.
> As a result, we have been able to continue to taper her off
> her pain medications and her memory is improving.  The
> musculoskeletal discomfort that is a direct result of [the
> Crash] is improving with physical therapy.

Dr. Patterson prescribed further physical therapy to "get her symptoms under better

control."  See *Exhibit* 12.  Ms. Sue continued physical therapy at Hand-N-Hand Physical

Therapy.

In mid-2002, Ms. Sue's pain level began to dramatically increase, and she began to suffer from disabling weakness and numbness in her upper body, particularly her arms. *See Exhibit 5* at ¶12. This sudden and unexpected increase in pain, as well as the emergence of upper extremity numbness, incapacitated Ms. Sue and prevented her from engaging in many normal daily activities. *Id.* The sudden-onset pain and numbness also prevented Ms. Sue from performing her job functions. *Id.* at ¶13. As a result, Ms. Sue ceased working. Ms. Sue's last day of work was July 22, 2002, more than six months <u>after</u> she presented her FTCA claim. *See Exhibit 5* at ¶13. Because Ms. Sue's disability from work was expected to be brief, she was subsequently granted short-term disability benefits by CIGNA Group Insurance.

In an effort to improve her condition and return to work quickly, Ms. Sue sought further medical treatment. On July 22, 2002, Ms. Sue was treated by Dr. Patterson, who noted that she suffered from "upper extremity weakness and numbness." *Exhibit* 13. Dr. Patterson ordered an MRI of her neck and head. *See Id.* Upon review of Ms. Sue's MRI on August 5, 2002, Dr. Patterson referred Ms. Sue to a neurosurgeon.

As part of her effort to improve her condition and return to work, Ms. Sue was assessed by Dr. Bruce Ammerman, a neurosurgeon, on August 8, 2002. *See Exhibit* 14. Dr. Ammerman noted that Ms. Sue's recently-increased pain, as well as her upper-body numbness, was caused by the Crash. He ordered "myelography for further clarification." *Exhibit* 10 at 2. Upon review of Ms. Sue's myelogram and post-myelogram CT scan on September 12, 2002, Dr. Ammerman stated that he "would rather not proceed with [surgical intervention] at this time," and prescribed lumbar epidural blocks, a conservative treatment. *Exhibit* 15. On October 3, 2002 – more than eight months <u>after</u>

Ms. Sue presented her FTCA claim – Dr. Patterson again noted that Ms. Sue "was not a surgical candidate." *Exhibit* 13.

Alexandros D. Powers, M.D., a neurosurgeon, examined Ms. Sue on October 16, 2002. *Exhibit* 16.  Dr. Powers observed Ms. Sue's pain and numbness, and stated "I would not recommend <u>consideration</u> of surgical interventions." *Exhibit* 16 at 3.  Dr. Powers prescribed "nonsurgical modalities," and "conservative modalities in lieu of consideration of surgical interventions."  Dr. Powers also stated that surgery, which he <u>declined</u> <u>to</u> <u>consider</u> as an option, had "near and long-term limitations," and could result in the "perpetuation or worsening of [Ms. Sue's] symptomatology." *Id*.

On October 17, 2002, Ms. Sue was treated by M. Theresa Carlini, M.D., a Physical Medicine and Rehabilitation specialist.  Dr. Carlini stated that Ms. Sue's "pain symptoms are fairly well controlled with the current regimen." *Exhibit* 17 at 1.  She prescribed continued conservative treatment, including "exercise … stretching … deep tissue massage …" *Id*. at 2.

On November 6, 2002 – more than nine months <u>after</u> Ms. Sue filed her FTCA claim – Dr. Ammerman noted that Ms. Sue experienced improvement as a result of the epidural blocks, and prescribed "continued conservative care." *Exhibit* 18.

Ms. Sue was again treated by Dr. Carlini on December 18, 2002.  Dr. Carlini noted that Ms. Sue's Crash-related pain had recently "benefited from myotherapy for deep tissue massage."  Dr. Carlini prescribed continued conservative treatment, including daily "Sitz baths," trigger point injections, continued prescription drug treatment, and physical therapy. *Exhibit* 19.

On January 14, 2003, Dr. Patterson prescribed a "caudal epidural," which is a conservative pain treatment.

In February of 2003, Ms. Sue was referred to James N. Campbell, M.D., a neurosurgeon. Dr. Campbell assessed Ms. Sue on March 7, 2003. He noted Ms. Sue's neck and back pain, and requested MR scans of Ms. Sue's spine. See *Exhibit* 20. After examining Ms. Sue, and reviewing the scans, Dr. Campbell recommended that Ms. Sue undergo a multi-level "anterior cervical discectomy[3] and fusion." *Exhibit* 20 at 2. March 7, 2003 – over one year <u>after</u> Ms. Sue presented her FTCA claim – is the first date on which <u>any</u> of Ms. Sue's multiple physicians recommended surgery. *See Exhibit 5* at ¶22.

On April 9, 2003 – exactly fifteen months <u>after</u> Ms. Sue presented her FTCA claim – Dr. Campbell performed an "anterior discectomy and fusion at C4-5, C5-6, [and] C6-7," three levels of the cervical (i.e. neck area) spine. *Exhibit* 21. Ms. Sue enjoyed "a good relief of symptoms" as a result of the April 9, 2003 surgery, and therefore "will begin to consider career options as she continues to recover from surgery." *Exhibit* 22. On May 1, 2003, Ms. Sue was treated by Dr. Campbell in follow-up to the April 9, 2003 surgery. Dr. Campbell stated that Ms. Sue "has relief of her preoperative symptoms" and "will gradually increase her activities and she will be back working in a couple of weeks." *Exhibit* 23.

On June 5, 2003, Dr. Campbell noted that Ms. Sue was "having some lumbar spine problems" and "also has coccyodynia." *Exhibit* 24. On November 13, 2003, Dr. Campbell noted that Ms. Sue "still has some upper neck discomfort." *Exhibit* 25. On

---

[3] Disc removal.

March 31, 2004, Dr. Campbell performed a coccygectomy[4] in the hope that the procedure would alleviate Ms. Sue's coccyx pain. See *Exhibit* 26.

On March 2, 2004 – over two years <u>after</u> Ms. Sue filed her FTCA claim – she was granted long-term disability benefits by CIGNA Group Insurance, with the date of the disability identified as July 23, 2002.

On June 1, 2004, Dr. Campbell performed an anterior discectomy and fusion at C3-4 in the hope that the procedure would alleviate Ms. Sue's upper neck pain.  Ms. Sue's neck pain was somewhat relieved, but her lower-back pain continued.  On December 7, 2004 – nearly three years <u>after</u> Ms. Sue presented her FTCA claim, Dr. Campbell performed a "Laminectomy of L4-5." *Exhibit* 27.  Ms. Sue's L4-5 pain was somewhat relieved, but she continued to experience some pain and limitations in the aftermath of the surgeries performed by Dr. Campbell.  Dr. Campbell is one of many medical experts designated by Plaintiff, and will opine that all of the surgeries and related symptoms were caused by the April 10, 2000, crash.

## II.     <u>ARGUMENT</u>

### a.  <u>Legal Standards</u>

Defendant correctly states that "the court may dismiss a complaint for lack of subject-matter jurisdiction only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitled him to relief." Motion at 11 (internal quotations and citations omitted).  "While the district court may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction, the court must still 'accept all of the factual allegations in [the] complaint

---

[4] Coccyx (tailbone) removal.

as true.'" *Jerome Stevens Pharmaceuticals, Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir.

2005) (*quoting United States v. Gaubert*, 499 U.S. 315, 327 (1991)).

"The standard under which [the United States Court of Appeals for the District of

Columbia Circuit] reviews a grant of summary judgment is clear: Under Rule 56 of the

Federal Rules of Civil Procedure, summary judgment is upheld on appeal only where

there is no genuine issue of material fact, and, viewing the evidence in the light most

favorable to the nonmoving party, the movant is entitled to prevail as a matter of law."

*Abourezk v. New York Airlines, Inc.*, 895 F.2d 1456, 1457 (D.C. Cir. 1990) (internal

citations and quotations omitted).  "Accordingly, in our review of summary judgment, the

party against whom summary judgment was granted has the benefit of all reasonable

evidentiary inferences that can be drawn in his favor." *Id*. at 1458 (internal citations and

quotations omitted).  "[A]t the summary judgment stage the judge's function is not

himself to weigh the evidence and determine the truth of the matter but to determine

whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

249 (U.S. 1986).

The "Supreme Court held that the [Federal Tort Claims] Act is to be liberally

construed. The rule of strict construction, applicable to other statutes waiving

governmental immunity, does not apply to the Federal Tort Claims Act."  *United States v.

Alexander*, 238 F.2d 314, 317 (5th Cir. 1956) (citing *United States v. Yellow Cab Co.*,

340 U.S. 543 (1951))

"As a threshold matter, it should be observed that, in revising the procedure for

filing [FTCA] claims, Congress manifested no interest whatsoever in restricting

claimants' rights under the Federal Tort Claims Act or in restricting their access to the

courts. To the contrary, Congress identified private litigants as the primary beneficiaries of the amendments. … The requirement of presentment it imposed on claimants was solely for the purpose of expediting settlement of claims in those instances where settlement was appropriate." *GAF Corporation v. United States*, 818 F.2d 901, 917-918 (D.C. Cir. 1987).

### b. The FTCA Permits Recovery In Excess of Ms. Sue's Claim Amount As a Result of "Newly Discovered Evidence" and "Intervening Facts" Relating to the Amount of Her Claim

The Federal Tort Claims Act (the "FTCA") requires that an injured party present his/her claim to the allegedly liable Federal agency prior to the institution of an action. *See 28 U.S.C. § 2675*. If the agency denies the claim, the injured party may institute an action against the United States. *Id*. "The failure of an agency to make final disposition of a claim within six months after it is filed shall, at the option of the claimant any time thereafter, be deemed a final denial of the claim …" *Id*.

The amount of the administrative claim does <u>not</u> limit an injured party's recovery if 'during the time between the filing of the administrative claim and the filing of the lawsuit, there are intervening facts or newly discovered evidence 'relating to the amount of the claim.'" *Husovsky v. United States of America, et al.*, 590 F.2d 944, 954 (D.C. Cir. 1978) (quoting 28 U.S.C. § 2675(b)). "Newly discovered evidence" must not have been "reasonably discoverable at the time of presenting the claim." *28 U.S.C. § 2675(b)*.

The United States has historically agreed -- and indeed, *argued* -- that "deterioration, exacerbation, or aggravation of the claimant's physical condition" are intervening facts that trigger the § 2675(b) exception, and thereby permit the claimant to recover sums in excess of the original claim amount. *Exhibit* 1 at 36-37; *Husovsky*, 590

F.2d at 955. Facts regarding "new condition[s] or [the] permanency of a condition existing at the time the claim is filed" also trigger the § 2675(b) exception, and permit recovery in excess of the claim amount. *Id*.

In addition, post-claim surgeries not anticipated at the time of the claim are "newly discovered evidence" that permit the claimant to recover more than the amount of the claim. *See, e.g.*, *Michels v. United States*, 815 F.Supp. 1244, 1263 (S.D. Iowa. 1993), *aff'd* 31 F.3d 686 (8th Cir. 1994); *Craig v. United States of America*, 2002 U.S. Dist. LEXIS 17950 (attached hereto as *Exhibit* 28). It is well-settled that "plaintiff should not be charged with knowing what the doctors could not tell him." *Fraysier v. United States*, 766 F.2d 478, 481 (11th Cir. 1985); *Cole v. United States*, 861 F.2d 1261, 1262 (11th Cir. 1988).

When filing an administrative claim, the claimant is not required to anticipate their hypothetical "worst-case scenario." *Craig v. United States of America*, 2002 U.S. Dist. LEXIS 17950 at 10. Indeed, such a requirement would encourage claimants to artificially inflate claims, thus frustrating primary purpose of the FTCA – the settlement of meritorious claims. *Id.*; *McNeil v. United States*, 508 U.S. 106, 112n7 (1993).

For the purpose of § 2675(b) analysis, the relevant time period is the interim between the presentation of the administrative claim and the date of the claimant's civil suit. *See 28 U.S.C. § 2675(b)*; *Husovsky*, 590 F.2d at 954 n24.

As set forth below, the Motion mischaracterizes the relevant law with respect to: 1) the circumstances which qualify as "newly discovered evidence" or "intervening facts" under the § 2675(b) exception; 2) . The Motion's incorrect construction of the § 2675(b) exception and relevant cased law is unsupported by the statutory language, binding

precedent, and the legislative history of § 2675(b).  In fact, the Motion's erroneous discussion of the § 2675(b) exception is at odds with arguments correctly asserted <u>by this</u> Defendant in other FTCA litigation.  Most galling, the Motion's mischaracterizations are directly contrary to written statements regarding <u>these</u> <u>very</u> <u>issues</u> made by <u>this</u> <u>Defendant</u> in <u>this</u> <u>jurisdiction</u> before the United States Court of Appeals for the District of Columbia Circuit. (discussed *infra*).

Defendant asks this Court to improperly and unjustly limit Ms. Sue's recovery to a tiny fraction (<u>i.e.</u> less than 0.5%!) of the true harm cause by Defendant's employee.  Indeed, Defendant literally asks this Court to *punish* Ms. Sue for her reasonableness and honesty when in January 2002, not having any expectation that months later her condition would spiral to the point of life-altering incapacities, multiple surgeries, and high-dosage narcotics, she valued her claim at $100,000.00.

The dramatic mid-2002 increase in Ms. Sue's pain and limitations was not known or reasonably discoverable on January 9, 2002, the date of Ms. Sue's administrative claim.  Equally unknown and undiscoverable were Ms. Sue's post-claim surgeries, her permanent disability from work, her inability to care for herself or her daughter, as well as the drastic increase in the prescription medication and other medical treatment required to treat Ms. Sue's Crash-related injuries.  Because Ms. Sue's ongoing disabling pain is inextricably intertwined with the nature and permanency of her Crash-related injuries, and because the deterioration of Ms. Sue's was unknown and undiscoverable, the degree and permanency of Ms. Sue's pain is therefore also an intervening fact.  Ms. Sue is therefore entitled to recover a sum in excess of her administrative claim as a result of this newly discovered evidence and these intervening facts.

On January 9, 2002, the date Ms. Sue presented her claim to Defendant, her Crash-related pain seemed to be under control, she was working, and she was caring for herself and her young daughter. *See Exhibit 5* at ¶14. At the time she presented her administrative claim, Ms. Sue had been assured by Dr. Delenick, an orthopedic surgeon, Dr. Lang, a neurosurgeon, and Dr. Patterson, an internist, that she would not require surgery to remedy her Crash-related injuries. *See Exhibit* 5 at ¶¶3,4,5,6,11; *Exhibit* 2; *Exhibit* 6; *Exhibit* 7; *Exhibit* 11. She had also been assured by multiple physicians that her injuries would resolve through the implementation of conservative measures, such as physical therapy and small doses of prescription medication. See *Exhibit* 5 at ¶¶5,6,11; *Exhibit* 6, *Exhibit* 7; *Exhibit* 11. Ms. Sue had responded very well to chiropractic care, and had managed her pain with a combination of conservative treatments. Ms. Sue and her physicians expected that her Crash-related pain and limitations would decrease in the future. *See Exhibit* 5 at ¶¶5,6,11; *Exhibit* 7; *Exhibit* 11 at 2; .

Beginning in mid-2002, well <u>after</u> the date she presented her administrative claim, Ms. Sue's pain and limitations increased dramatically. She also began to suffer from severe upper-body numbness, which she did not experience prior to the date of her claim. She required four major spinal surgeries, which removed her coccyx, fused her neck at the C3-7 levels, and fused her lumbar spine at L4-5. Since the date of Ms. Sue's FTCA claim, she has required significantly more powerful prescription medication to manage her pain. Ms. Sue is presently evaluated as completely and permanently disabled from work by the U.S. Social Security Administration, CIGNA Group Insurance, Defendant's expert witness (Kathleen Sampeck), and Plaintiff's expert witness (Phillip Bussey). *See Exhibit* 29 at 6; *Exhibit* 30 at 5-6. Ms. Sue is unable to care for herself or her daughter.

The sudden, unexpected onset of Ms. Sue's post-claim symptoms was neither known nor reasonably discoverable on January 9, 2002. Ms. Sue is therefore entitled to recover a sum in excess of her administrative claim pursuant to the § 2675(b) exception.

### c. The Unforeseen Post-Claim Deterioration, Exacerbation, and Aggravation of Ms. Sue's Condition Constitutes "Newly Discovered Evidence" and "Intervening Facts."

It is widely acknowledged that an unforeseen post-claim deterioration, exacerbation, or aggravation of a claimant's condition constitutes intervening facts or newly discovered evidence relating to the amount of the claim. Binding upon this Court is the United States Court of Appeals for the District of Columbia Circuit holding that "deterioration, exacerbation, or aggravation of the claimant's physical condition" are intervening facts that trigger the § 2675(b) exception. *Husovsky*, 590 F.2d at 955. *Husovsky* further states that change to a plaintiff's "life expectancy, … the amount of … medical treatment he would require in the future, the total amount of reduction in earning potential during his life, and the total pain and suffering he would endure … surely constitutes an intervening fact, relating to the amount of (his) claim." *Id*. (internal quotations omitted). The United States not only agreed with that statement, but *embraced* that legal position when it seemingly *helped* its defense position.

Other Circuits consistently reach the same result. "A reasonably based change in expectation as to the *severity* and permanence of an injury is newly discovered evidence within the meaning of section 2675(b)." *Cole*, 861 F.2d at 1262 (permitting recovery in excess of claim amount because plaintiff's condition deteriorated after the date of his claim") (emphasis added). "A known injury can worsen in ways not reasonably discoverable by the claimant or his or her treating physician, and … such 'newly

discovered evidence' or 'intervening facts,' if convincingly proved, can warrant §

2675(b) relief." *Craig v. United States of America*, U.S. Dist. LEXIS 17950 at 9.

(attached hereto as *Exhibit* 28). The § 2675(b) exception "does not limit that proof to

particular kinds of evidence or facts. It does not say that an unforeseen additional injury

may qualify for § 2675(b) relief, but an unforeseen worsening of a known injury may

not." *Michels v. United States*, 31 F.3d 686, 688 (8th Cir. 1994) (affirming a verdict in

excess of the claim amount when plaintiff's already-severe injuries unexpectedly

worsened post-claim). As a result of "the significant worsening of her condition well

over a year [after her claim was filed], the need for the second operation and extensive

additional treatment were not reasonably foreseeable at the time the administrative claim

was filed. *Allgeier v. United States*, 909 F.2d 869, 879 (6th Cir. 1990) (applying §

2675(b) exception and permitting recovery in excess of claim amount). *Zubra v. United

States*, 318 F.3d 736, 739 (7th Cir. 2003) (permitting recovery in excess of claim despite

the fact that plaintiff "experienced [serious] emotional and psychological symptoms in

greater or lesser degree since … 17 months before she filed her administrative claim,"

because  plaintiff's "fears and anxieties had all become significantly worse only after she

had filed her claim.")

    In past litigation, The United States of America acknowledged that an unforeseen

post-claim deterioration, exacerbation, or aggravation of a claimant's condition

constitutes intervening facts or newly discovered evidence relating to the amount of the

claim. In *Husovsky*, this very Defendant argued that "… **a Fact**[*sic*] **relating to

deterioration, exacerbation, or aggravation of the claimant's physical condition**" is

an intervening fact within the meaning of the § 2675(b) exception. *Exhibit* 1 at 36-37;

19

*Husovsky*, 590 F.2d at 955 (emphasis added).  Despite the Motion's obfuscation of the issue, Defendant's argument in *Husovsky* accurately states the rule of this Circuit –  an unforeseen post-claim deterioration, exacerbation, or aggravation of a claimant's condition constitutes intervening facts or newly discovered evidence relating to the amount of the claim.

It is incontrovertible that Ms. Sue's condition deteriorated after she presented her FTCA claim on January 9, 2002.  As set forth more fully above, Ms. Sue's present condition is worlds worse than her status circa January 9, 2002.  On the day Ms. Sue presented her claim, she was working full-time as an executive earning a six-figure income. See *Exhibit* 5 at ¶14.  Today, Ms. Sue is completely and permanently disabled from all work. *See Exhibit* 29 at 6; *Exhibit* 30 at 5-6.  Defendant's <u>own</u> medical experts uniformly agree that Ms. Sue will never work again.  In fact, Defendant's orthopedic expert, Dr. Joel Fechter, testified that Ms. Sue now has a 25-28% <u>whole</u> <u>body</u> impairment.

On the day Ms. Sue presented her claim, she had been assured by three physicians that she would not require surgery, and that her condition would resolve as a result of physical therapy and other conservative treatment. *See Exhibit* 2; *Exhibit* 7; *Exhibit* 11 at 2.  Today, Ms. Sue has undergone four major spine surgeries, as well as the surgical implantation of an electric spinal stimulator.  *See Exhibit* 21; *Exhibit* 26; *Exhibit* 27.  Her pain is dramatically worse than it was on January 9, 2002, despite extensive treatment, and she requires vastly stronger prescription drugs to control her pain.  On the day Ms. Sue presented her claim, she was functionally able to care for herself and her young daughter. *See Exhibit 5* at ¶14.  In fact, Ms. Sue was able to engage in some athletic

activities (including rowing, weight lifting, swimming, and water aerobics) circa the date of her FTCA claim.  Today, Ms. Sue is unable to prepare meals, walk at a normal rate, drive long distances, travel independently, or care for her young daughter.  *See Exhibit 5* at ¶16.  In fact, as defense counsel observed at Ms. Sue's deposition, Ms. Sue laid down on the conference room floor and slept, had to self-administer morphine before her deposition, and self-administered electrical impulses via her spinal stimulator throughout the proceeding.

Ms. Sue did not reasonably know, nor could she have reasonably known, of her subsequent deterioration on the date she presented her claim, and Defendant cannot demonstrate otherwise.  Prior to January 9, 2002, Dr. Delenick told Ms. Sue that she would recover with the help of conservative treatment. *See Exhibit 5* at ¶¶4-5.  Prior to January 9, 2002, Dr. Lang stated that Ms. Sue "has shown significant improvement" as a result of conservative measures, and prescribed "continued conservative measures." *Exhibit* 7.  Prior to January 9, 2002, Ms. Sue "responded very well to chiropractic care," and was "helped" by massage therapy. *Exhibit* 9; *Exhibit* 8.  On January 9, 2002, the very day Ms. Sue presented her FTCA claim, Dr. Patterson informed Ms. Sue that she would not require surgery, that her Crash-related injuries would improve, and that "she will do well with a good physical therapist." *Exhibit* 5 at ¶11; *Exhibit* 11 at 2.  At no time did any of Ms. Sue's treating physicians tell Ms. Sue that her condition would or could dramatically worsen, that she would or could be permanently disabled from work, or that she would or could require the extensive post-claim treatment that eventually occurred. *See Exhibit 5* at ¶¶4,5,6,11.

The possibility of Ms. Sue's deterioration was not reasonably knowable on the date she presented her claim. A "plaintiff should not be charged with knowing what the doctors could not tell him." *Fraysier*, 766 F.2d at 481; *Cole*, 861 F.2d at 1262. The medical records and assurances of Drs. Delenick, Lang, and Patterson noted above show that Ms. Sue's future deterioration was not reasonably discoverable. Circa January 9, 2002, Ms. Sue and her doctors noted that post-Crash conservative measures were working, and that they expected Ms. Sue's condition to improve further with more physical therapy and massage therapy. With the exception of the minimal time Ms. Sue took off to recover in the wake of the Crash, and time spent at medical visits, Ms. Sue continued to work full-time in her pre-Crash capacity. None of Ms. Sue's many competent physicians suggested that she would be unable to continue working in the future. In fact, Dr. Lang noted, prior to January 9, 2002, that Ms. Sue "is taking very little medication and is working." *Exhibit* 7. While Ms. Sue's physician's noted that she suffered from "cervical spondylosis" this degenerative condition existed asymptomatically prior to the Crash, and was mildly symptomatic after the Crash. On the date Ms. Sue's FTCA claim was filed, her physicians expected even these symptoms to be resolved through physical therapy. See *Exhibit* 2; *Exhibit* 6; *Exhibit* 7; *Exhibit 11* at 2.. Neither Ms. Sue nor her doctors had any reason to believe that Ms. Sue's Crash-related injuries would become dramatically more symptomatic in mid-2002.

Ms. Sue's doctors continued not to diagnose Ms. Sue as a surgical case for more than one year <u>after</u> she presented her FTCA claim. On October 16, 2002, Dr. Ammerman stated that he "would rather not proceed with [surgical intervention] at this time," and prescribed conservative treatment. *Exhibit* 15. Dr. Powers stated that he would not even

consider surgical intervention. *See Exhibit* 16. Even after Ms. Sue's April 9, 2003

surgery – and more than fifteen months <u>after</u> Ms. Sue presented her administrative claim

– Dr. Campbell expected that Ms. Sue "will be back working in a couple of weeks."

*Exhibit* 23. Dr. Ammerman, in sworn deposition testimony in this litigation, confirms

that as of "September 12th of 2002 … it would not have been reasonable for Ms. Sue to

believe that she would be having surgery at some point in the future." *Exhibit* 31 at 38.

Dr. Ammerman also states, "[Ms. Sue's] findings, as noted by Dr. Campbell, were worse

the next year and she had surgery which I think was quite reasonable. … I wish I could

foretell the future. I can't do it." *Id*. at 39.

The Motion makes much of Dr. Wirtanen's October 11, 2001 report. Contrary to

the Motion's mischaracterizations, this chiropractic report does not predict Ms. Sue's

future deterioration or make such deterioration known or reasonably discoverable. Ms.

Sue never saw or read the October 11, 2001 report, and therefore cannot be charged with

knowing its contents. Even if Ms. Sue had read the report, she merely would have

learned that she had "responded very well to chiropractic care," that she "reached

maximum medical improvement," and that she would require "continued [chiropractic]

care for the rest of her life to maintain" her status as of the date of the report. *Exhibit* 9 at

11; *Exhibit* 10 at ¶9. Dr. Wirtanen defines "maximum medical improvement" as "the

maximum extent to which <u>chiropractic</u> care will improve a patient's condition." *Id.* at

¶16.

Dr. Wirtanen, a chiropractor, is not licensed to perform surgery or prescribe

medicine. *See Exhibit* 10 at ¶¶6-7. The statements in his report are necessarily limited to

by his expertise, and merely set forth his expectations regarding Ms. Sue's future

chiropractic treatment. *See Exhibit* 10 at ¶16. Dr. Wirtanen's statements regarding permanency related to his belief that Ms. Sue's minor level of disability circa October 11, 2001 was permanent. *See Exhibit* 10 at ¶15. Dr. Wirtanen neither believed nor communicated to Ms. Sue that a precipitous deterioration of her condition, like the deterioration she experienced in mid-2002, was possible. *See Exhibit* 10 at ¶10; *Exhibit 5* at ¶10.

Dr. Wirtanen never referred Ms. Sue to a surgeon. *See Exhibit* 10 at ¶8. The October 11, 2001 report does not predict that Ms. Sue would require four major spinal surgeries, which removed her coccyx, removed discs and fused her neck with plates and screws at four levels of her cervical spine, and fused her lumbar spine at L4-5. Dr. Wirtanen never told Ms. Sue that her Crash-related pain and disabilities would increase dramatically, that she would become completely and permanently disabled from work, that she would require mind-boggling amounts of prescription medication (including heavy narcotics), or that she would be almost-wholly unable to perform normal daily tasks. See *Exhibit* 10 at ¶10; *Exhibit 5* at ¶10.

Without meaning to cast aspersions on any particular field of health care practice, Plaintiff observes that the October 11, 2001 report (something she had never seen or known about) is directly contradicted by Ms. Sue's physicians, who were more qualified to assess Ms. Sue's condition and possessed greater expertise, and in whom she reposed her trust. While the October 11, 2001 report states that Ms. Sue's injuries were permanent, Dr. Patterson subsequently stated that "she will do well with a good physical therapist," and prescribed physical therapy. *Exhibit* 11 at 2. Drs. Lang and Delenick consistently and repeatedly prescribed conservative treatment, and Dr. Lang Dr. Lang

stated that Ms. Sue "has shown significant improvement."  Ms. Sue is entitled to rely upon the superior expertise of her physicians to diagnose her injuries and inform her of her prognosis.  She should not be required to credit the vague opinions of a non-physician – opinions she did not even know about until only very recently – when they are contradicted by the specific prognoses of highly-qualified medical doctors. And indeed, from her subjective perspective, she did not even know that another human being had said something contradictory to what a plethora of surgeons were telling her.

Contrary to the government's contention, the nature and extent of Ms. Sue's injuries do not merely relate to the "precision" with which the severity of her injuries could be known.  Rather, the nature and extent of Ms. Sue's injuries are pertinent to whether her injuries discovered after January 9, 2002 were intervening facts under section 2675(b).  Ms. Sue is entitled to recover a sum in excess of her claim amount if the excess claims are the result of a deterioration, exacerbation, or aggravation of her physical condition.  Ms. Sue's excess claims are of precisely such a nature.

For example, there exists not a *scintilla* of evidence -- written or oral -- even remotely suggesting to Ms. Sue prior to January 9, 2002, that she would have multiple levels of her spine fused together with metal plates and screws some day; or that she would have her tailbone removed; or that in November 2005, she would need an $80,000.00 surgical procedure whereby an electrical spine stimulator would help alleviate her pain.  Surely Defendant is not seriously suggesting that a claimant, who knew or should have known that her special damages would ultimately exceed *five million dollars*, would liit her own claim to $100,000.00!

### d. Ms. Sue's Unforeseen Post-Claim Discovery of Her Injuries' Permanence Constitutes "Newly Discovered Evidence" and "Intervening Facts."

An unforeseen post-claim discovery of an injury's permanency constitutes an intervening fact or newly discovered evidence relating to the amount of the claim. The United States Court of Appeals for the District of Columbia Circuit holds that "a fact establishing … [the] permanency of a condition [that existed] at the time the claim is filed" is an intervening fact that triggers the § 2675(b) exception. *Husovsky*, 590 F.2d at 955.

Other Circuits consistently reach the same result. "A reasonably based change in expectation as to the severity and *permanence* of an injury is newly discovered evidence within the meaning of section 2675(b)." *Cole*, 861 F.2d at 1262 (permitting recovery in excess of claim amount because plaintiff learned, after the date of his claim, that "his condition was permanent and that he would never return to work") (emphasis added). In *Murphy v. United States*[5], the claimant experienced repeated pre-claim "seizure-like episodes," yet recovered in excess of the claim amount pursuant to the § 2675(b) exception because "Plaintiff should not reasonably have been expected to know the severity and *permanence* of her seizure-like disorder prior to the filing of her administrative complaint." *Id*. at 1204 (emphasis added). A claimant's need for post-claim surgery and the subsequent "determination that the injuries were permanent" constitutes an intervening fact and newly discovered evidence, thus permitting excess recovery pursuant to the § 2675(b) exception. *Allgeier v. United States*, 909 F.2d 869, 878 (6th Cir. 1990).

---

[5] 833 F. Supp. 1199 (E.D. Va. 1993)

In past litigation, The United States of America acknowledged that … "a fact establishing … [the] permanency of a condition existing at the time the claim is filed" is an intervening fact that triggers the § 2675(b) exception. *Exhibit* 1 at 36-37; *Husovsky*, 590 F.2d at 955.

As set forth above and below, Ms. Sue's Crash-related injuries suddenly and unexpectedly worsened in mid-2002, <u>after</u> the date of Ms. Sue's FTCA claim.  Ms. Sue's post-Claim surgeries, disability from work, pain level, and treatment needs were unknown circa January 9, 2002.  Therefore, the permanency of such conditions could surely not be known or reasonably discoverable on that date.  In fact, Ms. Sue reasonably expected that her physical condition would improve after January 9, 2002.  Dr. Patterson stated that "she will do well with a good physical therapist," and prescribed physical therapy. *Exhibit* 11 at 2.  As recently as May 1, 2003, Dr. Campbell stated that Ms. Sue "will gradually increase her activities and she will be back working in a couple of weeks." *Exhibit* 23.  If the permanency of Ms. Sue's work disability was unknown to her surgeon on May 1, 2003, it was certainly not reasonably knowable on January 9, 2002.

The October 11, 2001 report drafted by Dr. Wirtanen, which was unknown to Ms. Sue as of the date of her FTCA claim, is the sole source suggesting that Ms. Sue's injuries would have <u>any</u> permanence.  The October 11, 2001 report merely states that Ms. Sue "responded very well to chiropractic care," and that she would require "continued [chiropractic] care for the rest of her life to maintain" her status as of the date of the report. *Id*. at 11; Exhibit 10 at ¶9.  This statement could not possibly presage Ms. Sue's subsequent deterioration and treatment.  Dr. Wirtanen is a chiropractor, and is legally prevented from performing surgery or prescribing medications. *See Exhibit* 10 at ¶6-7.

His October 11, 2001 opinion was limited by his expertise, and pertained solely to Ms.

Sue's chiropractic injuries. <u>Even</u> assuming Ms. Sue did know of the October 11, 2001

report, Defendant cannot credibly assert that Ms. Sue should disbelieve the

contemporaneous opinions of eminently qualified neurosurgeons and orthopedic

surgeons, and rather rely on one chiropractor.

Dr. Wirtanen had no indication that Ms. Sue would require her eventual surgical

treatment, prescription drug treatment, or become permanently disabled from work.

*Exhibit* 10 at ¶10. Because these future events were unknown to Dr. Wirtanen circa

January 9, 2002, he was unable to communicate them to Ms. Sue. *See Id*.; *Exhibit 5* at

¶10. In fact, even if Dr. Wirtanen had somehow guessed that Ms. Sue's future

deterioration would occur, Ms. Sue would have properly disregarded his opinion in favor

of the more educated and more positive prognoses of her physicians, Drs. Delenick,

Lang, and Patterson.

### e. Ms. Sue's Post-Claim Surgeries Constitute "Newly Discovered Evidence" and "Intervening Facts."

Unforeseen post-claim surgeries are intervening facts and newly discovered

evidence within the meaning of the § 2675(b) exception. See, e.g., *Craig*, 2002 U.S.

Dist. LEXIS 17950 at 11 (plaintiff's post-claim anterior cervical discectomy qualifies as

an intervening fact); *Sullivan v. United States*, 173 F. Supp.2d 691, 694-95 (E.D. Mich.

2001) (second shoulder surgery performed after filing of administrative claim qualified as

newly discovered evidence); *Kenney v. United States*, 298 F. Supp.2d 139, 145 (D. Me.

2003) (allowing recovery of increased damages when the need for post-claim surgery was

not contemplated at the time the administrative claim was filed); *United States v.*

*Alexander*, 238 F.2d 314, 317 (5th Cir. 1956) (subsequently performed surgery was

newly discovered evidence when doctor did not know that plaintiff would require shoulder surgery to recover); *Michels*, 815 F. Supp. at 1263 (early onset of arthritis, performance of hip replacement surgery, and inability to pursue farming were intervening facts).

On May 8, 2000, Dr. Delenick stated that "surgical intervention does seem likely to be avoided." *Exhibit* 4 at 2. On May 10, 2000, Dr. Lang thoroughly examined Ms. Sue, and recommended "conservative measures." *Exhibit* 6. On May 31, 2000, Dr. Lang again examined Ms. Sue, stated that Ms. Sue "has shown significant improvement," and prescribed "continued conservative treatment," including physical therapy with heat and ultrasound. On January 9, 2002, Dr. Patterson stated that "[Ms. Sue] will do well with a good physical therapist," and prescribed physical therapy. *Exhibit* 11 at 2. Dr. Patterson did not recommend surgery. *See Exhibit 5* at ¶11. On September 12, 2002, Dr. Ammerman stated that he "would rather not proceed with [surgical intervention] at this time." *Exhibit* 15. On October 3, 2002, Dr. Patterson again noted that Ms. Sue "was not a surgical candidate." *Exhibit* 13. On October 16, 2002, Dr. Powers stated "I would not recommend <u>consideration</u> of surgical interventions." *Exhibit* 16 at 3 (emphasis added).

Between April 10, 2000 and March 7, 2003, Ms. Sue's physicians consistently diagnosed her as a non-surgical candidate. Not only did Ms. Sue's physicians fail to recommend surgery, they affirmatively advised against surgical intervention, and predicted positive outcomes from conservative treatment. Ms. Sue's eventual surgeries were therefore not reasonably foreseeable. It is telling that Ms. Sue's physicians continued to advise against surgery long after January 9, 2002. "If surgery was not a realistic possibility [post-claim], it was certainly not foreseeable when she [plaintiff] filed

her administrative claim." *Craig,* 2002 U.S. Dist. LEXIS 17950 at 11.  "As such, we view the progressive deterioration of the condition of her back as potentially an intervening fact not foreseeable at the time she filed her administrative claim." *Id.*  Ms. Sue's post-claim surgeries are therefore intervening facts pursuant to the § 2675(b) exception.

> **f.    As a Matter of Law, Ms. Sue Is Not Required to Anticipate the "Worst Case Scenario."**

The Motion incorrectly argues that a claimant is required to her "worst case scenario." *Motion* at 13.  *Husovsky*, the binding precedent in this Circuit, makes no mention of a requirement that claimants anticipate the "worst case scenario."  The Motion cites no binding precedent in support of this purported requirement, and Plaintiff is unable to identify any reference to such a "requirement" in the FTCA jurisprudence of the Supreme Court of the United States.

Such a requirement is antithetical to the language and purpose of the FTCA. *See Craig,* 2002 U.S. Dist. LEXIS 17950 at 15.  The FTCA does not contain the phrase "worst case scenario."  A requirement that claims be based on such a scenario "would do a disservice not only to [the federal agency] and its authority to evaluate independently tort claims, but also to the general principles underlying the FTCA itself." *Id.*

The Supreme Court of the United States notes that the FTCA's legislative history clearly states "settlement of meritorious claims" as the primary purpose of the statute. *Warrum v. United States*, 427 F.3d 1048, 1050 (7th Cir. 2005); *see also McNeil*, 508 U.S. at 112n7 (quoting the FTCA's legislative history, "'it can be expected that claims which are found to be meritorious can be settled more quickly without the need for filing suit and possible expensive and time-consuming litigation.' S. Rep. No. 1327, 89th Cong., 2d Sess., 3 (1966)").  A "worst case scenario " requirement would encourage plaintiffs to

"sho[o]t for the moon in [their] original claim," lest the plaintiff be "penalize[d] … for making apparent modest, good faith estimates of her damages." *Craig,* 2002 U.S. Dist. LEXIS 17950 at 10-15.  Such a requirement "would require that Plaintiff inflate his claim based on events that are, although arguably foreseeable, highly unlikely." *Milano v. United States*, 92 F. Supp. 2d 769, 776 (D. Ill. 2000) The resultant artificial inflation of claims would prevent federal agencies from accurately assessing claims, and thereby defeat the plainly articulated purpose of the FTCA – the  "settlement of meritorious claims." *Warrum*, 427 F.3d at 1050; *see also Milano*, 92 F. Supp. 2d at 776 (stating "Requiring that Plaintiff inflate his claim to account for the unlikely worst possible scenario places the government in no better position to realistically assess the value of the Plaintiff's claim").

This United States has previously and unsuccessfully argued that claimants must anticipate their "worst-case scenario."  In *Craig*, a case remarkably similar to the present litigation, the Illinois federal court wholly rejected the Government's argument regarding the purported "worst case scenario" requirement: "Indeed, we are astonished by the attempt of the [Defendant] to penalize the plaintiff for making apparent modest, good faith estimates of her damages." *Craig,* 2002 U.S. Dist. LEXIS 17950 at 10.  Similarly, *Milano* rejects the purported "worst case scenario" requirement on the basis that such a requirement is legally unsupported and practically . *Id*. at 776.  In *Craig*, the court permitted the plaintiff, Stacey Craig, to recover $850,000.00, which was well in excess of her $50,000.00 administrative claim.  Though the Ms. Craig was rear-ended by a government employee, and eventually required anterior cervical discectomy surgery[6], her

---

[6] Even the particular surgery involved in Craig was the same in this case.

need for surgery was not known or reasonably discoverable on the date of her FTCA claim. See *Craig,* 2002 U.S. Dist. LEXIS 17950 at 5-10.

*Calva-Cerqueira v. United States*[7], the authority cited in the Motion, does not bind this Court.  In fact, *Calva-Cerqueira* merely mentions the purported "worst case scenario" requirement in dicta.  In *Calva-Cerqueira*, the court denied the plaintiff compensation in excess of the claim amount because "the plaintiff has not argued that <u>any</u> evidence could qualify as 'newly discovered evidence' or 'intervening facts.'  Indeed, the plaintiff's condition <u>has</u> <u>improved</u> since he filed his administrative claim." *Calva-Cerqueira*, 281 F. Supp. 2d at 302 (emphases added).  In *Calva-Cerqueira*, the dispositive issues were: 1) the complete lack of argument in support of the § 2675(b) exception; and 2) the fact that the plaintiff's condition had <u>improved</u> post-claim.  *Calva-Cerqueira* mentions the purported "worst case scenario" requirement in passing, and does not apply it to the facts of the case.  Insofar as this Court finds non-binding precedent informative, *Calva-Cerqueira*'s reference to the purported "worst case scenario" requirement should be disregarded on the basis that the reference is mere dicta.

Even if Ms. Sue were required to anticipate her worst-case scenario, she would be entitled to recover pursuant to the § 2675(b) exception.  As of January 9, 2002, none of Ms. Sue's treatment providers predicted that Ms. Sue's condition would deteriorate as it did in mid-2002.  None of Ms. Sue's physicians knew that she would require future surgery, or be forced to curtail her athletic lifestyle.  Prior to January 9, 2002, Dr. Lang stated that Ms. Sue "has shown significant improvement," and prescribed "continued conservative treatment," including physical therapy with heat and ultrasound. *Exhibit* 7. On the very day she presented her FTCA claim, Ms. Sue was informed by Dr. Patterson

---

[7] 281 F. Supp. 2d 279 (D.D.C. 2003)

that "she will do well with a good physical therapist." *Exhibit* 11 at 2.  Ms. Sue "should

not be charged with knowing what the doctors could not tell [her]." *Fraysier*, 766 F.2d at

481; *Cole*, 861 F.2d at 1262 (11th Cir. 1988).  On January 9, 2002, Ms. Sue was working

full-time in her pre-Crash capacity.  She had no indication that she would eventually

become permanently disabled from work.  *Exhibit* 5 at ¶10.

      The law of this circuit does not require that Ms. Sue anticipate her worst-case

scenario when presenting her administrative claim.  Ms. Sue's worst-case scenario circa

January 9, 2002 did not include future surgery, permanent disability from work, major

prescription drug treatment, and permanent debilitating pain.

### g.  January 9, 2002 is the Relevant Date for Purposes of the § 2675(b) Analysis

      The § 2675(b) exception requires that the "newly discovered evidence" and

"intervening facts" not be "reasonably discoverable at the time of <u>presenting</u> the claim to

the federal agency." *Id*. (emphasis added).  "... an FTCA claim shall be deemed

'presented' when a federal agency receives an SF-95 …" *Bembenista v. United States*,

866 F.2d 493, 499 (D.C. Cir. 1989); *see also Husovsky*, 590 F.2d at 954 n24 (holding that

the § 2675(b) exception relates to facts in the interim between the <u>filing</u> of the

administrative claim – not other administrative events – and the institution of suit).

      28 C.F.R. § 14.2(c) permits, but does not mandate, amendment of FTCA claims.

Authority for the enactment of § 14.2(c) is derived from 28 U.S.C. § 2672.  The

provisions of § 2672 govern the settlement, not the presentment, of claims.  "We must

distinguish between the presentment filing mandated by Section 2675(a) and the

settlement procedures of Section 2672." *GAF Corporation v. United States of America, et

al.*, 818 F.2d 901, 919 (D.C. Cir. 1987).  The distinction drawn by *GAF Corporation*

between presentation and the substantiation of claims for settlement purposes "finds ample support in the committee reports, where Congress repeatedly characterized presentment as a simple requirement of notice." *Id*.

On January 9, 2002, Ms. Sue, through her then-counsel, filed a Standard Form 95 Claim for Damage, Injury, or Death ("Form 95"). *Exhibit* 32; *Defendant's Statement of Material Facts Not In Genuine Dispute* at 1; *Motion* at 2. Therefore, January 9, 2002 is the date Ms. Sue's FTCA claim was "presented." The plain language of the statutory scheme is clear. The § 2675(b) exception states that "newly discovered evidence" and "intervening facts" must be unknown at the date of presenting, not amending, the claim. *See Id*. *Husovsky*, the binding precedent in this Circuit, concurs: "the statutory exception to the Ad damnum provision relates to facts between the Filing … of the administrative claim and the institution of suit." *Id*. at 954n24 (emphasis added). *GAF Corporation* clearly distinguishes between "the presentment filing mandated by Section 2675(a) and the settlement procedures of Section 2672." *Id*. at 919. The two processes are distinct, and Section 2672 requirements cannot be imposed upon the Section 2675(a) claim presentation. *Id*. Likewise, Section 2672-dreived provisions (including the provisions governing amendment) cannot be imposed on the § 2675(b) exception.

The date of presentation, January 9, 2002, is the relevant date for the purpose of construing the § 2675(b) exception. The Motion cites *Robison v. United States*,[8] which is a rogue out-of-Circuit district court decision that neither binds nor informs this Court. *Robison* does not alter the analysis and binding nature of the statutory provisions, *Husovsky*, and *GAF Corporation*. Post-presentment knowledge cannot be retroactively imputed to a claimant for § 2675(b) purposes. Such a result would be contrary to the

---

[8] 746 F. Supp. 1059 (D. Kan. 1990)

plain language of the law, as well as to the legislative intent of the FTCA, wherein

"Congress manifested no interest whatsoever in restricting claimants' rights under the

Federal Tort Claims Act or in restricting their access to the courts." *GAF Corporation*,

818 F.2d at 917-918.

On January 9, 2002, Ms. Sue's then-counsel, Kenneth J. Annis, did not know, nor

could have reasonably discovered, that Ms. Sue would become permanently disabled

from work, that Ms. Sue would require surgery, that Ms. Sue's pain and limitations

would significantly worsen, that Ms. Sue's injuries were permanent, that Ms. Sue would

require extensive future prescription drug treatment and physical therapy, or that Ms. Sue

would incur special damages in excess of $5,000,000.00. *See* Affidavit of Kenneth J.

Annis, Esquire (attached hereto as *Exhibit* 33) at ¶¶4-10. These future occurrences were

unknown and not reasonably discoverable by Mr. Annis circa January 9, 2002 despite the

fact that he undertook "all reasonable measures to ascertain the nature and extent of [Ms.

Sue's] damages as far as they were knowable at that point in time." *Exhibit* 33 at ¶11

The Motion observes that the primary purpose of the FTCA is the furtherance of

settlement. *See Motion* at 13n2. The United States Department of Commerce was never

deprived of the opportunity to assess and settle this meritorious claim. In fact, Defendant

had ample opportunity to settle this clear liability matter on the basis of Ms. Sue's initial

$100,000.00 claim. Defendant made no formal settlement offer. Defendant was notified

that Ms. Sue's Crash-related special damages later increased dramatically via Mr. Peter

C. Grenier's May 4, 2005 letter. The letter states that Ms. Sue's damages were "quite

substantial," and that Ms. Sue intended to seek "well in excess of $4,000,000.00." *Exhibit*

34. Defendant made no settlement offer. Throughout the course of this litigation,

Defendant has presumably become intimately familiar with the injuries caused by its employee, as well as Ms. Sue's damages.  No settlement offer has been made.  Ms. Sue is entitled to proceed pursuant to the § 2675(b) exception, and her recovery should not be limited to $100,000.00 on the basis of the Motion's spurious argument regarding the date of claim presentment.  The Motion's argument is contrary to the plain language of the relevant statutes and the binding precedent of this Circuit.

Even if the Court finds that the date of presentment for purposes of the § 2675(b) exception is of last amendment, Ms. Sue's recovery should not be limited to $100,000.00.  First, Ms. Sue never amended her claim.  She never filed an amended Form 95, which is the normal procedure of claim amendment.  The letters cited by the Motion were merely updates provided by Ms. Sue's former counsel in hope of furthering a resolution.  None of the letters contain the words "claim amendment" or anything similar. *See Exhibits* 35-40.  In addition, the letters fail to meet the basic requirements of an administrative claim, because they do not provide a sum-certain damages claim. *See GAF Corporation*, 818 F.2d at 919 (holding that a valid FTCA claim must contain "(1) a written statement sufficiently describing the injury to enable the agency to begin its own investigation, and (2) a sum-certain damages claim." 28 C.F.R. § 14.2(c) provides for claim <u>amendment</u>, not claim <u>supplementation</u>.  The letters cited by the Motion are simply not amended claims.  If every written communication between a claimant and the United States were construed as an amended claim, claimants who responsibly attempt keep the United States apprised of their condition would be trapped in an unending administrative black hole, as each amendment renewed the FTCA's six-month post-claim prohibition on filing suit.  Such a result is simply illogical and unsupported by the purpose of the FTCA.

Even if the Court finds that the date of presentment for purposes of the § 2675(b) exception is of last amendment, and finds that Ms. Sue's counsels' correspondence with Defendant constitutes an amendment of her claim, Ms. Sue's recovery should not be limited to $100,000.00. If the letters sent by Ms. Sue's former counsel constitute amended claims, then the May 4, 2005 letter from Peter C. Grenier to Defendant is also an amended claim, and serves to amend the sum certain amount of Ms. Sue's claim to "in excess of" $4,000,000.00.

The May 4, 2005 letter clearly states that Ms. Sue's "past special damages … exclusive of lost wages, now exceeds $330,000.00." *Exhibit* 34 at 1. The letter also states that "the amount of this claim is quite substantial, given the combined totals of the (1) past and future medical expenses; (2) past lost wages: (3) lost future earnings capacity; (4) lost future household services and consequential damages; and (5) non-economic damages." *Id*. The letter also states that Ms. Sue seeks "well in excess of $4,000,000.00." *Id*. at 2.

Courts commonly find that such language qualifies as a "sum certain" for the purpose of FTCA claim presentment. *See, e.g., Martinez v. United States*, 728 F.2d 694, 697 (5th Cir. 1984) (stating "we hold that the presentation of an administrative claim 'in excess of $100,000' is a reasonable compliance with the 'sum certain' requirement."); *Erxleben v. United States*, 668 F.2d 268, 272 (7th Cir. 1981) (holding "where a claim filed with a federal agency contains definite figures rendered uncertain by the use of qualifying words, there seems to be no valid reason why the agencies and the courts cannot treat the additional words as surplusage, leaving the certain amounts stated as the claim.") (internal quotations omitted); *Adams v. United States Dep't of Housing & Urban*

37

*Development*, 807 F.2d 318, 321 (2d Cir. 1986) (stating "we do not believe an otherwise adequate request for a specific dollar amount should be deemed fatally uncertain by reason of the claimant's mere inclusion of the words 'in excess of.'").  Therefore, if the Court finds that the date of presentment for purposes of the § 2675(b) exception is of last amendment, and finds that Ms. Sue's counsels' correspondence with Defendant constitutes an amendment of her claim, Ms. Sue's recovery should be limited to $4,000,000.00, not $100,000.00.

### III.    CONCLUSION

As a result of the foregoing, Defendant's Motion to Dismiss and Motion for Summary Judgment should be denied.  In addition, Plaintiff's Cross-Motion for Summary Judgment should be granted, as Plaintiff is entitled to recover a sum in excess of $100,000.00 pursuant to the FTCA's § 2675(b) exception.

In the alternative, if the Court rules that Plaintiff is not entitled to summary judgment, the Court should defer determination of this issue until trial.  At a minimum, Plaintiff has demonstrated that there are genuine issues as to the material facts relating to what was known and reasonably discoverable to Ms. Sue at the time her administrative claim was presented.  It is clear that Ms. Sue's physical condition has dramatically changed between January 9, 2002 and July 7, 2005.  It is also clear that Ms. Sue was able to work full-time, engage in some athletic activities, and care for herself and her young daughter circa January 9, 2002.  In the years after presenting her administrative claim, she became unable to perform these tasks.  Finally, it is clear that Ms. Sue's physicians failed to predict her post-Claim deterioration, and predicted that conservative treatment would have a good likelihood of success up to the very <u>day</u> that Ms. Sue presented her

administrative claim.  Therefore, the Court should deny Defendant's motion to dismiss and motion for summary judgment if it finds that Plaintiff is not entitled to summary judgment.

Respectfully submitted,

MARGARET SANDRA SUE

By:  _____*Peter C. Grenier /s/*_____
Peter C. Grenier (D.C. Bar No. 418570)
Bode & Grenier, L.L.P.
1150 Connecticut Avenue, N.W.
Ninth Floor
Washington, D.C.  20036
(202) 828-4100
(202) 828-4130 (fax)
*Counsel for Plaintiff*

Dated: January 5, 2006

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 5th day of January 2006, I served a true and accurate copy of PLAINTIFF'S MEMORANDUM IN (1) OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR IN THE ALTERNATIVE FOR SUMMARY JUDGMENT ON THE ISSUE OF LIMITING  PLAINTIFF'S DAMAGES TO $100,000, THE AMOUNT OF HER ADMINISTRATIVE CLAIM AND (2) SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF PERMITTING RECOVERY IN EXCESS OF $100,000, as well as all exhibits and attachments, by electronic case filing and U.S. Mail, postage-prepaid upon:

> Heather R. Phillips, Esquire
> Assistant United States Attorney
> Judiciary Center Building
> Civil Division
> 555 4th Street, N.W., Room E-4212
> Washington, D.C. 20530
> (202) 514-7139
> (202) 514-8780 (fax)
> *Counsel for Defendant*

_____ *Peter C. Grenier /s/* _____
                Peter C. Grenier