Nos. 76-1533 and 76-1534

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

ANDREW A. HUSOVSKY,

Plaintiff-Appellee,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant
(No. 76-1533)

THE DISTRICT OF COLUMBIA,

Defendant-Appellant
(No. 76-1534)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

BRIEF FOR THE APPELLANT
UNITED STATES OF AMERICA

REX E. LEE
Assistant Attorney General

EARL J. SILBERT
United States Attorney

RONALD R. GLANCZ
Asst. Chief, Appellate Section

JOHN G. LAUGHLIN
Special Litigation Counsel
Civil Division
Department of Justice
Washington, D. C. 20530
Phone:  (202) 739-4437

United States Court of Appeals
for the District of Columbia Circuit

FILED  SEP 24 1976

GEORGE A. FISHER
CLERK

**EXHIBIT 1**

INDEX

                                                                    Page

Statement of Issues Presented --------------------------------    1

Statutes Involved --------------------------------------------    2

Reference to Parties and Rulings -----------------------------    4

Statement of the Case ----------------------------------------    4

    1.   The Proceedings Below ---------------------------------    5

    2.   The Relevant Facts ------------------------------------    8

    3.   The District Court's Decision ----------------------   16

Argument -----------------------------------------------------   17

    I   The District Court Erred In Holding That
        The United States Had A Duty To Inspect
        Tract 55/257 Or To Make Arrangements With
        The Government Of India With Respect To
        The Inspection and Maintenance Of The Tract --------   17

        A.   The Relationship Between The Commission
             And The Government Of India Did Not Give
             Rise To A Right Or Duty On The Part Of
             The United States To Inspect The Tract ---------   19

        B.   The United States, Through The National
             Capital Park and Planning Commission,
             Had No Legal Duty To Make "Some Arrange-
             ments With The Government Of India
             Respecting The Inspection and Maintenance"
             Of The Tract -----------------------------------   22

        C.   The United States Had No Possessory
             Interest In The Tract Which Gave Rise
             To A Duty To Inspect Or Maintain ---------------   24

    II   The District Court Exceeded Its Jurisdiction
         Under 28 U.S.C. 2675(b) In Awarding Damages
         In Excess Of Those Claimed Administratively --------   30

Conclusion ---------------------------------------------------   40

- i -

REPRODUCED AT THE NATIONAL ARCHIVES

CITATIONS

Page

Cases:

Bialowas v. United States, 443 F.2d 1047
  (C.A. 3, 1971) ------------------------------------------  31

Caton v. United States, 495 F.2d 635
  (C.A. 9, 1974) ------------------------------------------  31

Chambers v. Whelen, 44 F.2d 340 (C.A. 4, 1930) -----------  26

Dalehite v. United States, 346 U.S. 15 (1953) -----------  24

*Davis v. United States, 395 F. Supp. 793 (D. Neb.,
  1975), aff'd 536 F.2d 738 (C.A. 8, 1976) ---------------  24

*Devlin Lumber and Supply Corp. v. United
  States, 488 F.2d 88 (C.A. 4, 1973) ---------------------  24

Dudley v. Meadowbrook, Inc., 166 A.2d 743
  (D.C. Mun. App. 1961) ---------------------------------  25

Feres v. United States, 340 U.S. 135 (1950) -------------  18

Hart v. All Persons, 26 Cal. App. 664,
  148 P. 236 (1915) ------------------------------------  29

Hay v. Norwalk Lodge No. 730, B.P.O.E.,
  92 Ohio App. 14, 109 N.E.2d 481 ----------------------  25

Kentucky Union Co. v. Gilliam, 235 Ky. 316,
  31 S.W.2d 388 (1930) ---------------------------------  29

*Kielwein v. United States, 54 0 F.2d 676, cert. den.
  No. 74-1696, C.A. 4, decided April 22, 1976,
  Slip Op., Addendum, p. 8 ---------------------  31, 32, 37, 38

Meeker v. United States, 435 F.2d 1219
  (C.A. 8, 1970) --------------------------------------  31

Morgan v. United States, 123 F. Supp. 794
  (S.D.N.Y., 1954) ------------------------------------  37

*Nichols v. United States, 147 F. Supp. 6
  (E.D. Va., 1957) -----------------------------------  37, 39

*O'Brien v. United States, 275 F.2d 696
  (C.A. 9, 1960) --------------------------------------  26

*Cases chiefly relied upon are marked by asterisks.

Page

<u>Cases</u> (Cont'd):

Palsgraf v. Long Island R.R., 248 N.Y. 339,
    162 N.E. 99 (1928) ------------------------------------    24

Rosario v. Am. Export-Isbrandtsen Lines, Inc.
    v. United States, 531 F.2d 1227 (C.A. 3, 1976) ---------    31

Rudd v. United States, 233 F. Supp. 730
    (M.D. Ala. 1964) ------------------------------------    37

Smith v. United States, 239 F. Supp. 152
    (D. Md. 1965) ------------------------------------ 32, 37

Turner v. Ridley, 144 A.2d 269
    (D.C. Mun. App. 1958) ------------------------------------    25

United States v. Alexander, 238 F.2d 314
    (C.A. 5, 1956) ------------------------------------    37

United States v. Allegheny County,
    322 U.S. 174 (1944) ------------------------------------    23

*United States v. Smith, 324 F.2d 622
    (C.A. 5, 1963) ------------------------------------    24

Whetzel v. Jess Fisher Management Co.,
    108 U.S. App. D.C. 385, 282 F.2d 943 (1960) -----------    24

W. T. Carter & Brother v. Ruth,
    275 S.W.2d 126 (Tex. 1955) ------------------------------    29


<u>Statutes and Regulations</u>:

The Federal Tort Claims Act (28 U.S.C.
    1346(b), 2671-2680) ------------------------------------ passim

28 U.S.C. 2672 ------------------------------------ 3, 31, 35
          2675 ------------------------------------    3
          2675(a) ------------------------------------    30
          2675(b) ------------------------------ 2, 8, 17, 30,
                                                  31, 36, 38, 39

43 Stat. 463 ------------------------------------    22
          464 ------------------------------------    23

28 C.F.R. Part 14 ------------------------------------    31
          § 14.2(b) ------------------------------------    35

Page

Miscellaneous:

Act of June 6, 1924, P.L. 202, 68th Cong.,
  1st Sess., 43 Stat. 463 ----------------------------------- 9

Act of April 30, 1926, P.L. 158, 69th Cong.,
  1st Sess., 44 Stat. 374 ----------------------------------- 9

National Capital Planning Act of 1952,
  P.L. 592, 82d Cong., 2d Sess., 66 Stat. 781,
  as amended, 40 U.S.C. 71 et seq. ------------------------- 10

*Restatement of the Law, Property,
  § 450 ----------------------------------------------------- 20
  § 452 ----------------------------------------------------- 21

*Tiffany, The Law of Real Property (3d ed.),
  Vol. 3, § 756 ---------------------------------------- 20, 21

*Prosser, Law of Torts (3d ed.) § 30 ----------------------- 24
              (4th ed.), p. 351 ---------------------------- 27

*Restatement of the Law of Torts, 2d,
  § 4, Comment, pp. 7-9, § 281 ----------------------------- 24
  § 157 ----------------------------------------------------- 27
  § 158 ----------------------------------------------------- 28
  § 363 ----------------------------------------------------- 25

3 Am. Jur.2d, Adverse Possession § 34 --------------------- 29

Public Law 89-506, 80 Stat. 306 (1966) -------------------- 30

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

Nos. 76-1533 and 76-1534 *

---

ANDREW A. HUSOVSKY,

Plaintiff-Appellee,

v.

UNITED STATES OF AMERICA,

Defendant-Appellant
(No. 76-1533)

THE DISTRICT OF COLUMBIA,

Defendant-Appellant
(No. 76-1534)

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

BRIEF FOR THE APPELLANT
UNITED STATES OF AMERICA

---

STATEMENT OF ISSUES PRESENTED

1.  Whether the district court erred in imposing a legally actionable duty upon the United States to make reasonable inspections of the premises owned by the Government of India or

---

*  Consolidated "for consideration on the merits" by Order of July 26, 1976.

to make arrangements with the Government of India to inspect and maintain the premises in order to assure the safety of persons utilizing Klingle Road, a public roadway owned and maintained by the District of Columbia.

2.    Whether the district court erred in concluding that there were "intervening facts" relating to the amount of the claim (28 U.S.C. 2675(b)) permitting suit and an award for a sum in excess of the amount of the claim presented to the Department of the Interior.

The case has not previously been before this Court and counsel is unaware of any cases presently pending in the Court or that may be presented to the Court in the future, which are in any way related.

STATUTES INVOLVED

The Federal Tort Claims Act (28 U.S.C. 1346(b), 2671-2680) provides in pertinent part:

28 U.S.C. 1346:

*              *              *

(b) Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of the Canal Zone, and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee

- 2 -

of the Government while acting within the scope of
his office or employment, under circumstances where
the United States, if a private person, would be
liable to the claimant in accordance with the law
of the place where the act or omission occurred.

*        *        *

28 U.S.C. 2672:

The head of each Federal agency or his designee,
in accordance with regulations prescribed by the
Attorney General, may consider, ascertain, adjust,
determine, compromise, and settle any claim for
money damages against the United States for injury
or loss of property or personal injury or death
caused by the negligent or wrongful act or omission
of any employee of the agency while acting within
the scope of his office or employment, under circum-
stances where the United States, if a private person,
would be liable to the claimant in accordance with
the law of the place where the act or omission
occurred:  Provided, That any award, compromise,
or settlement in excess of $25,000 shall be effected
only with the prior written approval of the Attorney
General or his designee.

*        *        *

28 U.S.C. 2675:

(a) An action shall not be instituted upon a
claim against the United States for money damages
for injury or loss of property or personal injury
or death caused by the negligent or wrongful act
or omission of any employee of the Government
while acting within the scope of his office or
employment, unless the claimant shall have first
presented the claim to the appropriate Federal
agency and his claim shall have been finally
denied by the agency in writing and sent by
certified or registered mail.  The failure of
an agency to make final disposition of a claim
within six months after it is filed shall, at
the option of the claimant any time thereafter,
be deemed a final denial of the claim for
purposes of this section.  The provisions of
this subsection shall not apply to such claims

- 3 -

as may be asserted under the Federal Rules of Civil Procedure by third party complaint, cross-claim, or counterclaim.

(b) Action under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim.

\*                    \*                    \*

## REFERENCE TO PARTIES AND RULINGS

The Motion to Dismiss the Complaint or in the alternative for Summary Judgment (App. 77) was denied on May 22, 1974 by Judge William B. Bryant without opinion. The Findings of Fact and Conclusions of Law filed by Judge Bryant on March 3, 1976 appear at pp. 1771-1787 of the Appendix and are not reported.

In addition to the United States, the District of Columbia was named as a party defendant and is an appellant in No. 76-1534 in this Court. The appeals by the United States and the District of Columbia have been consolidated "for consideration on the merits" by Order of July 26, 1976.

## STATEMENT OF THE CASE

This is a suit for personal injuries sustained by plaintiff-appellee in a one-car automobile accident which occurred on Klingle Road in the District of Columbia on August 19, 1968. As it pertains to the United States, the jurisdiction of the district court is predicated on the Federal Tort Claims Act,

- 4 -

28 U.S.C. 1346(b), 2671 et seq.  Trial before Judge William B. Bryant, conducted in 1975, culminated in a $975,000 judgment adverse to the United States entered on March 4, 1976 (App. 1788).  This appeal is from that judgment (App. 1790).

1.  The Proceedings Below:  On August 19, 1968, while traveling westward on Klingle Road as it traverses Rock Creek Park, the motor vehicle operated by Andrew Husovsky (plaintiff-appellee [1]) was struck by a falling tree situated on property titled in the name of the Governor General of India, in Council (App. 1770).  The tree's impact caused the vehicle to overturn, causing plaintiff-appellee to sustain critical and permanently paralyzing injuries to the spinal column (App. 1781-1783).

On July 10, 1969, Husovsky filed with the Department of the Interior an administrative claim in the amount of $501,000 for personal injury ($500,000) and property damage ($1,000).  App. Exh. U.S. # 10.  The claim asserted that the claimant "sustained fracture dislocation of lower portion of cervical vertebrae with crushing of the bony elements (broken neck) and underwent cervical laminectomy.  Substantial impairment of spinal cord function; paralysis of both legs and of bowel and bladder control.  Claimant 100% disabled."  App. Exh. U.S. # 10. (Though not a matter of record, this claim was denied by the Department of the Interior on October 1, 1969).  App. 1716.

---

[1] Hereinafter, appellee or plaintiff.

This action was commenced on November 5, 1969 (App. 2). The Complaint sought a joint and several judgment against the United States and the District of Columbia in the amount of $2,500,000 (App. 14-18). The Complaint alleges that defendants -- the United States and the District of Columbia -- "jointly, severally and in concert" maintained Klingle Road in the area where the accident occurred (App. 15, ¶ 4); that prior and subsequent to the occurrence Klingle Road was under the joint and several control, maintenance, supervision and inspection of the defendants (App. 15, ¶ 4); that, in addition, the land areas abutting Klingle Road were at all times prior and subsequent to the occurrence under the control, maintenance and supervision of the defendants. Alternatively and additionally it was alleged that the abutting land was titled in the name of the United States (App. 15, ¶ 5). Joint and several negligence was charged (App. 16-18, ¶ 9) in (1) the failure to properly supervise, inspect and maintain the land areas adjacent to and abutting Klingle Road in a safe condition for the passage of vehicular traffic; (2) the failure to take appropriate and reasonable action to maintain the roadway in a safe condition; (3) the failure to inspect and maintain the adjacent and abutting land areas to the roadway in a safe condition for vehicular traffic; (4) that having "assume[d] control" over the land areas, the defendants failed to maintain, detect or correct a dangerous condition consisting of a hazardous tree which fell on plaintiff's

- 6 -

vehicle, "the defendants having actual and/or constructive knowl-
edge of the hazardous condition of said tree" (App. 17, ¶ (4));
(5) the failure to take appropriate steps to maintain the trees
in a safe condition; (6) the failure to inspect, supervise and
maintain the trees immediately abutting Klingle Road in a safe
condition so as to avoid danger to passing motorists.

The United States, by Answer, filed a general denial (App.
22-23) and on October 30, 1972 moved to dismiss the Complaint or
in the alternative for Summary Judgment (App. 77) predicated
upon the asserted absence of any duty on the part of the United
States to maintain, inspect or supervise the premises upon which
the fallen tree was situated and the absence of any ownership or
control responsibility for Klingle Road or the District of Columbia
right-of-way on which it exists.

Following extensive discovery (see App. 24-76, 79-97) the
government's Motion was denied on May 22, 1974 (App. 134), and
the case proceeded to a jury and non-jury trial, commencing
April 9, 1975.

On April 25 the jury returned a verdict against the District
of Columbia and in favor of the plaintiff in the sum of $250,000
(App. 1577).  On July 21, 1975, the Court reopened the case
against the United States to permit plaintiff to adduce proof
that plaintiff's claim against the United States for $2,500,000
was not limited to the amount claimed administratively ($501,000)
because the increased ad damnum set out in the Complaint was based

upon evidence "not reasonably discoverable" at the time plaintiff presented his administrative claim to the Department of the Interior or that there were "intervening facts" relating to the amount of the claim (28 U.S.C. 2675(b), supra, p. 4).  App. 1604, 1606-1754. 2/

2.  The Relevant Facts:  The tree which fell was the southernmost stem of a triple-trunked tulip poplar, approximately ninety feet in height, with its uppermost branches extending over the District of Columbia right-of-way and the roadway (App. 1775). The base trunk of the tree was situated on Parcel 55/257 (a tract of land approximating five acres) four and one-half feet from the right-of-way (App. 1776) 3/ and approximately forty-six feet from the northernmost border of the asphalt or macadam roadway.  App. 335, 410; App. Exh. U.S. # 14.  The weather on August 19, 1968 was "fair", "sunny" with "no wind" (App. 326).  On August 19, 1968 the terrain between the roadway and the base of the tree was described by observers as being of two degrees of slope, beyond "a little gravel swale", "a steep embankment" -- "a 45 degree

_____

2/  The proscription in 28 U.S.C. 2675(b) against commencement of suit for a sum in excess of the amount of a claim asserted administratively, was raised by the United States at a bench conference prior to the voir dire.  App. 1606.  The post-trial pleadings and memoranda which led to the July 21, 1975 hearing appear at App. 1578-1582; 1587-1594; 1595-1599; 1600-1603.

3/  Six and one-half feet according to the Plat of Survey dated March 3, 1971.  App. Exh. U.S. # 14.

incline -- the incline becoming more gradual as one approaches the tree from the south." App. 586. Facing west on Klingle Road and to the right, "it is wooded area -- a steep embankment coming from the road, heavily wooded with a thick growth of underbrush, and its dirt. * * * The asphalt [macadam] stopped and the dirt began." App. 325; see also, App. 392-394; App. Exhs. ## 1, 2, 5, 6, 7.

Parcel 55/257 was conveyed to the Governor General of India, In Council, by Deed of Conveyance, on May 18, 1945. App. Exh. U.S. # 12. In conjunction with a Klingle Valley Parkway road improvement program in 1945, the National Capital Park and Planning Commission (hereinafter the Commission) undertook a land purchase program which in August 1945 included parts of Parcels 55/121, 55/167, 55/256, 55/257 and 55/220 needed to provide a new park access road to a proposed new Klingle Bridge. [4]/ The desired

---

[4]/ By the Act of June 6, 1924, Public Law 202, 68th Cong., 1st Sess., 43 Stat. 463, Congress established the National Capital Park Commission, "to preserve the flow of water in Rock Creek, to prevent pollution of Rock Creek and the Potomac and Anacostia Rivers, [and] to preserve forests and natural scenery in and about Washington, and to provide for the comprehensive, systematic and continuous development of the park, parkway and playground system of the National Capital, . . ." The Commission was authorized and directed to acquire such lands "as in its judgment shall be necessary and desirable in the District of Columbia and adjacent areas in Maryland and Virginia, . . ." The acquisition of such lands was authorized to be either by purchase or by condemnation proceedings. Land so acquired "within the District of Columbia shall be a part of the park system of the District of Columbia . . ." 43 Stat. 464.

Public Law 202 was amended by the Act of April 30, 1926, Public Law 158, 69th Cong., 1st Sess., 44 Stat. 374. This Act established the National Capital Park and Planning Commission,

(Cont'd)

- 9 -

parts of all the parcels, each privately owned, were surveyed by the D. C. Surveyor's Office for appraisal purposes.  App. 88-89, 902.  Parcel 55/257 (redesignated as Lot 804) and the adjoining Parcel 55/220 were surveyed on October 12, 1945 "to mark corners, locate any improvements and compute and show area [of proposed acquisition] in accordance with sketch furnished."  App. Exh. U.S. # 11.  The Plat of Survey is dated October 15, 1945.  The area of proposed acquisition -- 18,977.14 sq. ft. -- is irregular in shape; as it fronts the Klingle Road right-of-way it extends irregularly for 459.56 feet.  App. Exhs. U.S. ## 11, 13, 14.

By the terms of the Act of June 6, 1924 (supra, fn. 4) land acquired by the Commission in the District of Columbia "shall be a part of the park system" (43 Stat. 464).  In anticipation of acquiring a part of Parcel 55/257, a land record of the National Park Service reflects that a Field Survey team, on or shortly after October 29, 1945, surveyed the land, removed the surveyor hubs placed by the D. C. Surveyor on October 12 and replaced them with six granite boundary monuments bearing the insignia of the

---

4/  (Cont'd) which succeeded to all authority, powers, and duties conferred and imposed by law on the National Capital Park Commission with the additional responsibility of developing a comprehensive, consistent and coordinated plan for the National Capital and its environs in the States of Maryland and Virginia.

The National Capital Park and Planning Commission was the predecessor to the present National Capital Planning Commission created by the National Capital Planning Act of 1952, Public Law 592, 82d Cong., 2d Sess., 66 Stat. 781, as amended, 40 U.S.C. 71 et seq.

REPRODUCED AT THE NATIONAL ARCHIVES

United States of America and placed wooden stake markers[5] on the tract designating the locations of the monuments.[6]    App. 1777; App. Exh. U.S. # 8 (Pltf. # 12), pp. 37-38, 40-48, 58, 60;[7] App. 555-563.

On December 13, 1945, the Commission adopted a resolution authorizing the Executive Officer "to employ all practical means to maintain the integrity of the area to be acquired."  App. Exh. U.S. 15-32.  With title to Parcel 55/257 in the Governor General of India and cognizant of international implications, on February 28, 1946, the Commission solicited the assistance of the Department of State relative to the proposed acquisition of the 18,977.14 sq. ft. fronting on the Klingle Road right-of-way.  The letter to the Secretary of State recited the Commission's authority to acquire land by purchase or by right of eminent domain and by restrictive covenants over the land "providing assurance that it will not be

---

[5]  Approximately 4" x 4" pyramidal topped stakes bearing the letters "USP".

[6]  Although the anticipated acquisition of the tract never materialized, the monuments were not removed and were present on the land on August 19, 1968.  App. 1779-1780.  The court found that "from time to time, employees of the National Park Service went upon the tract to repaint the wooden markers, replace such markers as required replacement and restencil the insignia of the National Park Service on the markers."  App. 1780; 564-568.

[7]  U.S. Exh. # 8 (Pltf. # 12) is not susceptible to legible reproduction.  The original exhibit has been lodged with the Clerk of the Court.

- 11 -

REPRODUCED AT THE NATIONAL ARCHIVES

built upon or defaced so as to become incompatible with the ad-
joining park land." App. Exh. U.S. # 15-31. There followed a
series of meetings by Commission representatives and State
Department personnel and the Indian Agent General at which the
acquisition of the tract or an interest therein were discussed.
App. Exh. U.S. # 15-12, 15-13. The Commission's position and
interest in the tract were formalized by letter dated January 20,
1947 to the Indian Charge d'Affaires. The letter, in part, stated
(App. Exh. U.S. # 15-22):

> "The Commission would prefer to purchase the
> area in question, at a price to be mutually agreed
> upon, thereby obtaining fee simple title for the
> United States.
>
> "If your Government is not disposed to sell
> the strip along Klingle Road at the foot of the
> hill, the Commission would then like to obtain
> certain 'rights in land', as per copy of form
> attached. This type of covenant would be recorded
> and run with the land.
>
> "If neither of these two suggestions is
> acceptable, it would be appreciated if your
> Government would perhaps consider giving this
> Commission a letter to the general effect that
> as long as your Government owns the property,
> it will preserve the present natural park-like
> character of the strip in question, and not
> permit building, dumping or filling thereon,
> or any other injury thereto."

The proposed covenant, accompanying the letter, was as follows
(App. Exh. U.S. # 15-23):

"RIGHTS IN LAND AGREEMENT

> The said party hereto of the first part,
> being the owner of Parcel 55/257, of caption,
> doth hereby covenant, promise and agree for

- 12 -

REPRODUCED AT THE NATIONAL ARCHIVES

itself, its heirs and assigns, that no building or structure of any kind whatsoever shall be erected or caused to be erected on the said described part of Parcel 55/257 of land or any part thereof; that no trees with trunks of 6 inches in diameter or over, measured 12 inches above the ground, shall be cut, destroyed or removed; that no dumps of ashes, debris or other unsightly material shall be placed on said part of Parcel 55/257; that no signs, advertisements or posters shall be displayed upon said part of Parcel 55/257, unless the written consent of the Director of the National Park Service is first had and obtained for each and any exception to above agreement."

It had been previously indicated to the State Department that the Government of India would not consider "either a sale of the strip nor any type of covenant of record which might be enforceable in a United States Court." App. Exh. U.S. # 15-21. The Indian response to the January 23, 1947 letter was as follows (App. Exh. U.S. # 15-18):

"Dear Mr. Brown,

I am desired to refer to my letter No. F.48/47 dated 23rd January, 1947, and to inform you that as long as the Government of India owns the property at 2700 Macomb Street, N.W., it will preserve the present natural park-like character of the strip referred to in your letter, dated the 20th January, 1947, to Sir G. S. Bajpai, and will not permit building, dumping or filling thereon, or any other injury thereto.

Yours sincerely,

M. O. A. Baig,
First Secretary.

Mr. Norman C. Brown,
Land Purchasing Officer,
National Capital Park and
          Planning Commission,
Interior Building,
Washington, D. C."

- 13 -

The March 17 letter was acknowledged by the Commission on
April 1, 1947 (App. Exh. U.S. # 15-17) and on May 5, 1947 the
following letter was sent to the Indian Government (App. Exh.
U.S. # 15-15):

> "Mr. M. O. A. Baig
> First Secretary
> Embassy of India
> 2107 Massachusetts Avenue, N.W.
> Washington, D. C.
>
>                    Subject:   Klingle Valley Parkway
>                               Part of Parcel 55/257.
>
> My dear Mr. Baig:
>
>      Absence from this city last week prevented my
> thanking you sooner for your letter of 17 March
> 1947 and for the assurance contained therein.  It
> was presented to the National Capital Park and
> Planning Commission at its meeting on 17 April
> and the Commission desired that I express to you
> its appreciation of the cooperation of your
> Embassy.
>
>      "In case this property should be offered for
> sale at any time in the future, the Commission
> requests that it be given early information of
> the fact in order that appropriate arrangements
> can be initiated with the purchaser.
>
>                    Sincerely yours,
>
>                    U. S. Grant, 3rd
>                    Major General, U.S.A., Ret.
>                    Chairman"

The Indian response to the May 5 letter stated that ". . . a note
has been made to the effect that, should the Embassy property at
2700 Macomb Street, N.W., be offered for sale, the Commission
will be informed of the fact in order to enable them to make the

- 14 -

REPRODUCED AT THE NATIONAL ARCHIVES

desired arrangements with the purchaser."  App. Exh. U.S. # 15-14. [8]

Subsequent to the letter of May 5, 1947, there were no com-
munications between the Indian Government and the United States.
Other than to repaint, restencil or replace the wooden markers,
at some undeterminable time (App. 1780) there is no evidence that
any employee of the National Park Service, or other employee of
the United States, from 1945 through August 19, 1968 exercised
control, maintenance, or supervisory responsibility over the
18,977.14 sq. ft. tract proposed to be acquired in 1945.  No
on-site inspections of the tree which fell on August 19, 1968
or any other tree on the densely wooded tract were conducted.
National Park Service employees from automobiles routinely
observed areas immediate to the Rock Creek Park sections of the
District of Columbia including Klingle Valley Parkway.  Park
Service employees observed and serviced all land areas owned
by the United States and performed limited maintenance on the
land area proximate to the roadway -- routine sanitation cover-
age, picking up trash and litter, cutting of noxious weeds and
natural growth approaching Klingle Road.  App. 518-524, 663-666,
1775.  In addition National Capital Parks, in conjunction with
the Trees and Parking Division of the District of Columbia High-
way Department, cooperated in performing limited tree services
on the Klingle Road right-of-way owned by the District of

---

[8]  Parts of additional Parcels covered by the Commission's
Klingle Valley Parkway land purchase program were acquired by
purchase agreement or condemnation.  See App. Exh. U.S. # 15-1 -
15-9, 15-33 - 15-92.

- 15 -

REPRODUCED AT THE NATIONAL ARCHIVES

Columbia.  When necessary Park Service employees trimmed, repaired, and removed trees on property owned by the United States and the public street right-of-way owned by the District of Columbia. App. 1775.  Employees of the National Park Service in their vehicular observation of the Klingle Valley Parkway did not distinguish Parcel 55/257 from Government-owned parkland located to the north or south of Klingle Road when driving through the Klingle Road area.  App. 491-505, 507-524; 1775.

3.  The District Court's Decision:  The Court's Findings of Fact and Conclusions of Law were filed on March 3, 1976.  App. 1771-1787.  It being undisputed that the tree which fell on August 19, 1968 was situated on property titled to the Government of India, the Court concluded that the relationship and discussions between the Indian Government and the United States (through the National Capital Parks and Planning Commission) in 1946 and 1947 gave rise to an "obligation on the part of the United States to make reasonable inspections of the tract of land in question and/or some arrangements with the Government of India with respect to inspection and maintenance in order to assure some degree of safety for those utilizing Klingle Road in that area."  App. 1786. The failure to meet these obligations, the Court held, constitutes negligence and a breach of duty, resulting in the failure to inspect the large triple trunk tree which grew within four and one-half feet of the Klingle Road right-of-way.  "These combined acts of negligence on the part of the defendant [United States] constituted a proximate cause of plaintiff's injuries."  App. 1786-1787.

- 16 -

REPRODUCED AT THE NATIONAL ARCHIVES

With respect to the proscription in 28 U.S.C. 2675(b) the
Court's "Conclusions of Law" state as follows at App. 1787:

> "The Court believes that encouraging obser-
> vations of plaintiff's strength, his apparent
> adjustment to a tragic existence and Dr. Duvall's
> September 1969 characterization of his progress
> as highly surprising, all constitute sufficient
> intervening facts to warrant reassessment of
> plaintiff's life expectancy, and a consequent
> claim for an amount in excess of the adminis-
> trative claim of Five Hundred One Thousand
> Dollars ($501,000.00), thus satisfying the
> requirement of 26 U.S.C. 2675(b)." [sic]

Judgment was, accordingly, awarded in the amount of $975,000
(App. 1788).

ARGUMENT

I

THE DISTRICT COURT ERRED IN HOLDING THAT
THE UNITED STATES HAD A DUTY TO INSPECT
TRACT 55/257 OR TO MAKE ARRANGEMENTS WITH
THE GOVERNMENT OF INDIA WITH RESPECT TO
THE INSPECTION AND MAINTENANCE OF THE TRACT

The jurisdiction of the District Court is predicated upon
the Federal Tort Claims Act (28 U.S.C. 1346(b), 2671-2680) which,
with exceptions, generally equates governmental liability in tort
with that of a private person "in accordance with the law of the
place where the [negligent or wrongful] act or omission occurred.
28 U.S.C. 1346(b), supra, p. 2. Liability must rest upon the
"negligent or wrongful act or omission" of a government employee
which under applicable local law would permit the imposition of
liability on a private person. The Act did not create new causes

- 17 -

of action and may not be used as a vehicle "to visit the Government with novel and unprecedented liabilities." Feres v. United States, 340 U.S. 135 at 142 (1950).

The decision of the district court, imposing liability upon the United States for appellee's injuries is, we submit, both novel and unprecedented. The theory of governmental responsibility for the fallen tree does not comport with established concepts of private liability nor does the case law, in our research, provide analogous factual circumstances or decisions which might serve to support the decision. Rather, the United States has, in effect, been saddled with a possible legal duty and obligation of a land owner with respect to a condition on land that it did not own or occupy on August 19, 1968, and in which the United States had no legally cognizable interest which would permit, much less require, the inspection and maintenance of property belonging to the Government of India. The novelty of the decision is accentuated by the extension of the duty to inspect, on site, non-owned premises to a member of the public, traveling a public roadway, owned and maintained by the District of Columbia. App. 1565. 9/

9/  The duty to inspect a part of Parcel 55/257 imposed upon the United States bears contrast with the Court's charge to the jury at App. 1565-1566: ". . . You are instructed that the District of Columbia had no right or duty to enter onto land belonging to either the Government of India or the United States of America to take action with respect to the tree in question without permission . . ."

A.  The Relationship Between The Commission
    And The Government Of India Did Not Give
    Rise To A Right Or Duty On The Part Of
    The United States To Inspect The Tract

Boundary monuments and markers were placed upon the 18,977.14 sq. ft. of Parcel 55/257 by the National Park Service on or shortly after October 29, 1945 in anticipation of purchase by the Commission or condemnation by the United States.  Neither purchase nor condemnation materialized and the Indian Government declined to encumber the tract with a Rights in Land Agreement which would have been recorded and run with the land.  See, App. Exh. U.S. # 15-23, 15-21, supra, pp. 12-13.  Rather, the culmination of discussions (approximately seventeen months after the tract was surveyed and marked) between Indian and Commission representatives was a letter informing the Commission that the Government of India would "preserve the present natural park-like character of the strip . . . and will not permit building, dumping or filling thereon, or any other injury thereto."  App. Exh. U.S. # 15-18.  This assurance was consistent with the December 13, 1945, resolution of the Commission authorizing the executive officer "to employ all practical means to maintain the integrity of the area to be acquired [the 18,977.14 sq. ft.]".  App. Exh. U.S. # 15-32.

There has been no suggestion that the Government of India, between March 17, 1947 and August 19, 1968 failed to honor its gratuitous assurance -- the "natural park-like" character of the tract obtained on August 19, 1968; and we suggest that it must

- 19 -

come as a surprise to the Indian Government (having declined to sell or encumber the tract) that it nonetheless in 1947 relinquished a portion of its national sovereignty over the tract and yielded to the United States a right, and correlative duty to third persons cognizable by the courts, to conduct on-site inspections in search of potential hazards to the public traveling on the District of Columbia's Klingle Road.  The right or duty to inspect Indian land is clearly not to be found within the four corners of the March 17, 1947 letter nor within the history of the Commission's efforts to maintain the park-like integrity of the tract.

The right and duty the Court held to exist is not, moreover, created by the district court's conclusion that the Indian Government's March 17, 1947, assurance to the Commission "constituted a benefit to the United States of America in the nature of an easement."  App. 1786.  Accepting, _arguendo_, that the letter to the Commission granted the United States an easement in the tract,[10] it was at most a "negative easement" whereby India agreed "to preserve the park-like character of the strip . . . and not to permit building, dumping or filling thereon, or any other injury thereto."  App. Exh. U.S. # 15-18.

10/  See, Restatement of the Law, Property, § 450; Tiffany, The Law of Real Property (3d ed.), Vol. 3, § 756.

". . . [A] negative easement is one the effect of which is not to authorize the doing of an act by the person entitled to the easement, but merely to pre-clude the owner of the land subject to the easement from the doing of an act which, if no easement existed, he would be entitled to do . . ." 11/ (Emphasis added)

A negative easement, it is uniformly recognized, "does not entitle the owner thereof to any use or enjoyment of the land subject to the easement to which he would not be entitled did the easement not exist."  Restatement of the Law, Property, § 452 Comment:  a; Tiffany, The Law of Real Property (3d ed.), Vol. 3, § 756, p. 201; American Law of Property (1952), Vol. II, § 8.12, pp. 236-237:

"A negative easement does not entitle the owner of it to enter upon the servient tenement, but it does en-title him to compel the possessor of the servient tenement to refrain from doing things upon the servient tenement that he would otherwise be entitled to do . . ."

By no stretch of the law of real property, it is submitted, did the United States acquire a privilege, a right, or incur or assume an obligation or legal duty to go upon the tract to conduct on-site inspections of trees on the premises for possible hazards to the District of Columbia roadway.  To label the outgrowth of

---

11/  Tiffany, The Law of Real Property (3d ed.), Vol. 3, § 756, p. 201; see also, Restatement of the Law, Property, § 452:

"A negative easement assures to the owner thereof a particular use or enjoyment of the land subject to the easement by enabling him to prevent the possessor of the land from doing acts upon it which, were it not for the easement, he would be privileged to do."

- 21 -

the relationship between India and the Commission in 1947 as
constituting something "in the nature of an easement", thus adds
nothing to the legal soundness of the Court's imposition of a
duty upon the United States to inspect the tract for potential
hazards to the traveling public.

    B.  The United States, Through The National
        Capital Park and Planning Commission,
        Had No Legal Duty To Make "Some Arrange-
        ments With The Government Of India
        Respecting The Inspection and Maintenance"
        Of The Tract

The Court's alternative conclusion that the Commission
should have made "some arrangements with the Government of India
with respect to inspection and maintenance" (App. 1786) is
equally unsound.— 12/    The Commission's statutory mandate was (as
is set out in fn. 4 supra, p. 9), "to preserve the flow of water
in Rock Creek, to prevent pollution of Rock Creek and the Potomac
and Anacostia Rivers, [and] to preserve forests and natural
scenery in and about Washington, and to provide comprehensive,
systematic and continuous development of the park, parkway and
playground system in the National Capital, . . ." 43 Stat. 463.
While, for these purposes, the Commission had authority to
acquire private lands by purchase or condemnation (43 Stat. 463)
it had no statutory responsibility to assume the maintenance and

_____

12/  We note that plaintiff in the court below does not appear
to have placed any reliance upon this theory of liability.

- 22 -

inspection responsibility for such lands once acquired, much less
authority to negotiate or arrange with a private party or foreign
government as to land not so acquired.  To imply, as does the
District Court's conclusion, that the Commission should have
negotiated an arrangement with the Indian Government concerning
the maintenance and inspection of the tract thus pre-supposes an
authority and responsibility on the part of the Commission that
has no statutory foundation.  Cf. United States v. Allegheny
County, 322 U.S. 174, 182 (1944).

Only if land were purchased or condemned within the District
of Columbia did it become "part of the park system of the District
of Columbia . . ." (43 Stat. 464) with such attendant duties which
may come with ownership and possession.  Acquisition, title, owner-
ship and actual possession are, therefore, prerequisities to the
proper imposition or recognition of any legal duty upon the
National Park Service (or any other government agency) to inspect
or maintain such property to assure some degree of safety for
those utilizing a public roadway which the United States does
not own or maintain.  Absent these prerequisites, to find a duty
to negotiate an arrangement with a foreign government, or any
private owner of land adjoining Rock Creek Park, with respect to
inspection and maintenance, flies in the teeth of logic and reason;
a duty to negotiate with a foreign government, if any existed,
would be governmental by nature without counterpart in the private
sector and cannot properly serve as a basis for governmental

- 23 -

REPRODUCED AT THE NATIONAL ARCHIVES

liability under the Federal Tort Claims Act. Dalehite v. United States, 346 U.S. 15, 27-28 (1953); Devlin Lumber and Supply Corp. v. United States, 488 F.2d 88, 89 (C.A. 4, 1973); United States v. Smith, 324 F.2d 622, 624-625 (C.A. 5, 1963); Davis v. United States, 395 F. Supp. 793 (D. Neb., 1975), aff'd, 536 F.2d 758 (C.A. 8, 1976).

In sum, we urge that the duty (to inspect the premises or to make other arrangements with the Government of India with respect to inspection and maintenance) which the district court concluded arose in 1947, has no basis in fact or law. And therein lies the fundamental infirmity underlying the adverse judgment imposed on the United States. It is, of course, an elementary concept of tort law, in the District of Columbia and elsewhere generally, that for conduct to be actionable in tort there must exist a duty or obligation recognized by the law and owing to the complaining party. Whetzel v. Jess Fisher Management Co., 108 U.S. App. D.C. 385, 388, 282 F.2d 943 (1960); Palsgraf v. Long Island R.R., 248 N.Y. 339, 162 N.E. 99 (1928); Prosser, Law of Torts (3d ed.) § 30; Restatement of the Law, Torts 2d, § 4, Comment, pp. 7-9, § 281. The plaintiff and the district court have failed to establish, by fact or law, this essential element requisite to maintaining a cause of action or to sustain the judgment below.

C. The United States Had No Possessory
   Interest In The Tract Which Gave Rise
   To A duty To Inspect Or Maintain

The courts of the District of Columbia have sustained liability on the part of an owner of property to an adjoining

- 24 -

property owner and to a traveler on a public highway for damage
caused by the falling of a defective tree.  Turner v. Ridley,
144 A.2d 269 (D.C. Mun. App. 1958); 13/ Dudley v. Meadowbrook,
Inc., 166 A.2d 743 (D.C. Mun. App. 1961). 14/   These decisions
are in accord with the law, generally, as applied to urban areas
where tracts of land are small and the duty to inspect is not
unreasonable when weighed against the risk to adjoining property
owners, or to the traveling public where private land abuts a
public thoroughfare.  The general law is reflected in the Restate-
ment of the Law of Torts, 2d, § 363 where the Institute expresses
no opinion as to rural areas but opines that:

$$*\qquad*\qquad*$$

> (2)  A possessor of land in an urban area
> is subject to liability to persons using a
> public highway for physical harm resulting from
> his failure to exercise reasonable care to pre-
> vent an unreasonable risk of harm arising from
> the condition of trees on the land near the
> highway.  [Emphasis added]

---

13/  "An owner of property having knowledge of a patently de-
fective condition of a tree which may result in injury to a
traveler on a highway must exercise reasonable care to prevent
harm from the falling of such tree or its branches on a person
lawfully using the highway."  Turner v. Ridley, 144 A.2d 269,
270, quoting Hay v. Norwalk Lodge No. 730, B.P.O.E., 92 Ohio
App. 14, 109 N.E.2d 481, 486.

14/  ". . . [A] landowner should be held to the duty of common
prudence in maintaining his property, including trees thereon,
in such a way as to prevent injury to his neighbor's property."
Dudley v. Meadowbrook, Inc., 166 A.2d 743, 744 (D.C. App. 1961).

- 25 -

REPRODUCED AT THE NATIONAL ARCHIVES

The Comment on Subsection (2) states:

> e. <u>Trees</u>.  The rule stated in Subsection (2)
> is an exception which has developed as to trees
> near a public highway.  It requires no more than
> reasonable care on the part of the possessor of the
> land to prevent an unreasonable risk of harm to
> those in the highway, arising from the condition
> of the trees.  In an urban area, where traffic is
> relatively frequent, land is less heavily wooded,
> and acreage is small, reasonable care for the pro-
> tection of travelers on the highway may require
> the possessor to inspect all trees which may be
> in such dangerous condition as to endanger
> travelers.  It will at least require him to take
> reasonable steps to prevent harm when he is in
> fact aware of the dangerous condition of the tree.

Considering the vastness of Rock Creek Park and its densely wooded character, it is arguable that it would be totally un-reasonable to impose a duty upon the National Park Service to inspect each and every tree within the Park to avoid the minimal risk to the public availing itself of park facilities or public thoroughfares traversing the Park.  See, <u>O'Brien</u> v. <u>United States</u>, 275 F.2d 696 (C.A. 9, 1960); 15/ see also, <u>Chambers</u> v. <u>Whelen</u>, 44 F.2d 340, 341 (C.A. 4, 1930). 16/  But we need not go so far.

---

15/  United States held not to be liable under the Federal Tort Claims Act for injuries sustained by a motorist traveling a public thoroughfare whose vehicle was struck by a tree which fell from a United States National Forest adjoining the thorough-fare.  Under applicable law there was no duty upon the part of the United States to inspect trees in a sparsely settled area adjoining a little-used highway.

16/  "The question here is . . . whether it is the duty of the owner to inspect trees growing naturally upon rural lands, for the purpose of determining whether, through natural processes of decay, they have become dangerous by reason of their proximity to a highway . . . ."

"This danger, in the case of rural lands upon a country road, is, to say the most, a very remote one; and in view of

(Cont'd)

The duty recognized and imposed with respect to trees in-
variably applies only to the owner or possessor of land upon which
trees are situated "for the obvious reason that the man in pos-
session is in a position of control, and normally best able to
prevent any harm to others." Prosser, Law of Torts (4th ed.) at
p. 351.

At the instance of the Embassy of India, Parcel 55/257 was
surveyed on July 14, 1964. Other than to reflect the presence
of U. S. Park monuments, the Plat of Survey reflects that the
Parcel in its entirety was the property of India. App. Exh.
U.S. # 13. Confronted with a title to Parcel 55/257 in fee
simple in the Government of India plaintiff nonetheless argued
below that the United States had a possessory interest in the
part of the Parcel from which the tree fell such as to give rise
to a duty to inspect owing to the traveling public on Klingle
Road. The district court implicitly rejected this theory of
liability and rightly so. The facts as found by the Court permit
no other result.

As defined in the Restatement of the Law of Torts, 2d, § 157,
a person who is "in possession of land" includes only one who

> (a) is in occupancy of land with intent to
> control it, or

---

16/ (Cont'd) the burden which the requirement of inspection
would impose, it is too remote, we think, to justify a holding
that the landowner is charged with such a duty."

REPRODUCED AT THE NATIONAL ARCHIVES

(b) has been but no longer is in occupancy of land with intent to control it, if, after he has ceased his occupancy without abandoning the land, no other person has obtained possession as stated in Clause (a), or

(c) has the right as against all persons to immediate occupancy of land, if no other person is in possession as stated in Clauses (a) and (b).

The United States comes within none of these criteria:  as the district court found, the United States (through the Commission) "sought to acquire [this] particular tract" (App. 1776); it never acquired the tract because of international implications and because India declined to sell or encumber the land by a covenant (App. 1777-1779); as a matter of international comity and without monetary consideration, the Indian Government assured the Commission that the park-like character of the "strip" would be preserved (App. Exh. U.S. # 15-18).  This gratuitous gesture followed by approximately seventeen months the placement, presumptive to acquisition, of monuments and markers on the tract on or shortly after October 29, 1945.  This initial trespass upon Indian property (App. 1777)[17] was subsequently repeated

---

17/  Restatement of the Law of Torts, 2d, § 158:

One is subject to liability to another for trespass, irrespective of whether he thereby causes harm to any legally protected interest of the other, if he intentionally

(a) enters land in the possession of the other, or causes a thing or a third person to do so, or

(b) remains on the land, or

(c) fails to remove from the land a thing which he is under a duty to remove.

REPRODUCED AT THE NATIONAL ARCHIVES

when National Park Service employees (at least once) "from time to time" (App. 1780) went upon the tract to repaint, replace or restencil the markers placed in October, 1945 (App. 1780).

Beyond these facts and the circumstance that Park Service employees over the years observed the tract in like manner as the contiguous parkland located to the north side of Klingle Road (App. 1780) when making vehicular inspections from the roadway, the record is barren of any indicia of ownership, occupancy or possession. To the contrary, (1) title to the property was never in the United States; (2) the United States never occupied the property; (3) employees of the United States, other than through ignorance of the rightful and legal owner of the property, were never upon the tract; (4) the United States never controlled or intended to control the property or a part thereof or knowingly to infringe upon the sovereign rights of the Government of India. [18]/

_____

[18]/  Merely surveying land, marking lines or boundaries, or surveying and marking boundaries, does not constitute actual possession.  W. T. Carter & Brother v. Ruth, 275 S.W.2d 126, 131 (Tex. 1955); Hart v. All Persons, 26 Cal. App. 664, 148 P. 236, 240 (1915); Kentucky Union Co. v. Gilliam, 235 Ky. 316, 31 S.W.2d 388, 389 (1930).  "Adverse possession consists of outward acts and inward intention.  Indeed, the intention is the controlling factor."  3 Am. Jur.2d, Adverse Possession § 34.  Here there were no outward acts sufficient even to create a claim of right by adverse possession.  Moreover, there was no inward intention to possess or exercise control over the tract.  The original intent was the expectation to acquire the tract by purchase.  That intent dissolved when India refused to convey any rights to the tract in 1947.

II

THE DISTRICT COURT EXCEEDED ITS JURISDICTION
UNDER 28 U.S.C. 2675(b) IN AWARDING DAMAGES
IN EXCESS OF THOSE CLAIMED ADMINISTRATIVELY

As a result of spinal injuries sustained on August 19, 1968, plaintiff was, and remains, afflicted with the life-long neurological and physiological disabilities set out in the Court's Findings of Fact at App. 1781-1782. The magnitude of the personal injuries was essentially apparent from and established by the trauma of August 19. In this part of the Brief, we in no sense intend to minimize the personal tragedy that plaintiff has experienced. We are obliged nonetheless to challenge the ruling below that plaintiff's recovery is <u>not</u> limited jurisdictionally to the sum claimed administratively for his personal injuries -- $500,000. [19]

As amended in 1966, [20] the Tort Claims Act provides that: "An action shall not be instituted upon a claim against the United States . . . unless the claimant shall have first presented the claim to the appropriate Federal agency . . ." 28 U.S.C. 2675(a). By this requirement Congress effectively imposed a limitation upon the jurisdiction of the district courts to

---

[19] The judgment in the sum of $975,000 consists of special damages aggregating $173,843. App. 1784-1785. The balance -- $801.157 -- apparently reflects the Court's evaluation of the compensatory value of plaintiff's general damages.

[20] Public Law 89-506, 80 Stat. 306 (1966).

- 30 -

REPRODUCED AT THE NATIONAL ARCHIVES

entertain suits against the United States under the Act.[21/]    In

requiring, as a prerequisite to the commencement of suit, the

presentment of an administrative claim, the Congress removed all

limitations upon the authority of agency heads to consider

administrative claims in accordance with regulations prescribed

by the Attorney General (28 C.F.R. Part 14); thus the Act au-

thorizes the agency to effect awards, compromises and settlement

in unlimited sums, subject only to the provision that sums to be

paid in excess of $25,000 shall have the prior written approval

of the Attorney General.  28 U.S.C. 2672.

As part and parcel of 28 U.S.C. 2675, subparagraph (b) pro-

vides that an action "shall not be instituted for any sum in

excess of the amount of the claim presented to the federal agency,

except where the increased amount is based upon newly discovered

evidence not reasonably discoverable at the time of presenting

the claim to the federal agency, or upon allegation and proof

of intervening facts, relating to the amount of the claim."

28 U.S.C. 2675(b) thus permits a claimant in a subsequent

suit to exceed the administrative claim limit but only within

the terms of the stated statutory exceptions.  The burden of

---

21/  As to the jurisdictional character of the claim requirement,
see, e.g. Rosario v. Am. Export-Isbrandtsen Lines, Inc. v.
United States, 531 F.2d 1227 (C.A. 3, 1976); Kielwein v.
United States,    F.2d   , No. 74-1696, C.A. 4, decided
April 22, 1976, Slip Op., Addendum, p. 8, and cases there
cited; Bialowas v. United States, 443 F.2d 1047 (C.A. 3, 1971);
Caton v. United States, 495 F.2d 635 (C.A. 9, 1974); Meeker v.
United States, 435 F.2d 1219 (C.A. 8, 1970).

- 31 -

REPRODUCED AT THE NATIONAL ARCHIVES

proving "newly discovered evidence not reasonably discoverable" or facts "intervening" after the filing of a claim, rests upon the plaintiff.  <u>Kielwein</u> v. <u>United States</u>, ___ F.2d ___, No. 74-1696, C.A. 4, decided April 22, 1976, Slip Op., Addendum, pp. 8-9; <u>Smith</u> v. <u>United States</u>, 239 F. Supp. 152, 154 (D. Md. 1965).  Absent evidence rising to the dignity of proof of "intervening facts" the courts lack jurisdiction to award a sum in excess of the amount claimed administratively.  <u>Kielwein</u> v. <u>United States</u>, <u>supra</u>, and cases cited, Addendum, p. 12.  The decision below does violence to the statutory proscription and to these concepts.

Plaintiff was hospitalized on August 19, 1968, and remained hospitalized until late in March 1969, when he was discharged and assumed residence with Dr. Lawrence Morganthaler, an Assistant Professor of Chemistry, Georgetown University.  App. 1684-1685. Prior to plaintiff's discharge, Dr. Charles P. Duvall, an internist, had been called in on a medical consultation basis, to acquaint Dr. Duvall with plaintiff's medical case and to provide plaintiff with a physician to serve as his personal physician upon his discharge on March 17, 1969.  App. 1647-1648, 1702. Secondary to his spinal cord injury, plaintiff is susceptible to recurrent episodes of urinary tract infections.  App. 1782.  On April 2, 1969, Dr. Duvall was called upon to treat this condition on a continuing basis for approximately a two-week period.  App. 1650-1651.  There was a recurrent episode of infection on May 16, 1969.  App. 1651-1652.

On July 10, 1969, Mr. Husovsky filed with the Department of the Interior a signed "CLAIM FOR DAMAGE OR INJURY" presenting a claim for personal injury in the amount of $500,000. App. Exh. U.S. # 10. The claim, submitted on the government's Standard Form 95, recited under Item No. 11 -- "Personal Injury" -- the following (Exh. # 10):

> Claimant sustained fracture dislocation of lower portion of cervical vertebrae with crushing of the bony elements (broken neck) and underwent cervical laminectomy. Substantial impairment of spinal cord function; paralysis of both legs and of bowel and bladder control. Claimant 100% disabled.

At the time the claim was filed an attorney in Wilkes-Barre, Pennsylvania had received a letter dated September 27, 1968 from plaintiff's treating neurosurgeon, Dr. Jonathan Williams. App. 1581-1582, 1714-1715. This letter, solicited by the attorney, recounts to that date the circumstances of plaintiff's injury, the nature thereof, the hospital and surgical procedures employed, the extent of his physical disability and handicap -- described as "profoundly severe" -- "100%". The concluding paragraph of the letter states (App. 1582):

> "In summary I can state that as the result of an accident suffered by Andrew Husovsky, Jr., on August 19, 1968, in which his neck was broken he has suffered profound and lasting neurologic disabilities which at the present represent 100% total disability and in the long run are likely to diminish his longevity to between three and eight years."

Plaintiff was seen by Dr. Duvall for a general physical exam on September 4, 1969. His condition on that date was described by

Dr. Duvall (App. 1652-1653):

 "Well, his temperature was normal, his blood pressure was 130 over 70. He had a hoarse voice which was something he had had long before, with a slight drooping of the right eyelid. The main abnormalities, were restricted to the neurological examination and things related to that. There was some swelling of the right thigh. There was an absence of sensation to about the level of the belly button or a little above that. The left hand was much weaker than the right.

 "The muscles of both hands were wasted and shriveled, particularly on the left side.

 "He had involuntary spasms of the muscles, particularly of the leg.

 "My impression was that he had paraplegia of the nerve ending cord and partial paralysis of the upper extremeties."

On September 26, 1969, plaintiff again suffered a severe renal infection and was treated by Dr. Duvall. (App. 1664, 1674-1679).

 The administrative claim was denied by the Department of the Interior on October 1, 1969. App. 1716. Suit against the United States and the District of Columbia was commenced on November 5, 1969 (App. 2) in which damages in the sum of $2,500,000 were claimed for personal injuries described in paragraph 7 of the Complaint as:

 ". . . including but not limited to, a fracture dislocation of the lower portion of the cervical vertebrae, a crushing of the bony elements of the spine, and other critical injuries. As a result of said injuries the Plaintiff was hospitalized for many months and underwent surgical procedures. He has been unable to pursue his education and is totally disabled from all activities by virtue of substantial impairment of spinal cord function,

which has resulted in paralysis of both legs, as well as loss of bowel and bladder control. Plaintiff is totally and permanently disabled." App. 16. 22/

Plaintiff's "proof" of "newly discovered evidence" or "intervening facts" justifying a five-fold increase in the claim was taken on July 21, 1975 and appears at pp. 1604-1720 of the Appendix. 23/   On this evidence the Court found (App. 1785):

> "Plaintiff was so severely injured that early medical opinion indicated that he could expect to survive for not more than a few years (three to eight years). However, sometime in the fall of the year after his injury, i.e. September 1969, Dr. Duvall described what appeared to be substantial improvement in his physical and mental condition as 'highly surprising'. This characterization by Dr. Duvall along with the plaintiff's own expressions of improved feeling and confidence constituted a valid basis for reassessment of the original dire prognosis as to life expectancy, and for a reasonable expectation that he will live much longer."

These facts, the Court concluded (App. 1787), "all constitute sufficient intervening facts to warrant reassessment of plain-

---

22/  The claim was pending with the Department of the Interior between July 10, 1969 and October 1, 1969 when it was denied. During this period it was common practice among government agencies, during the pendency of claims, to accept and entertain requests for a sum in excess of the original amount claimed. This practice, since 1970, has been formally authorized in the Attorney General's regulations promulgated pursuant to 28 U.S.C. 2672. 28 C.F.R. § 14.2(b). Neither plaintiff nor counsel ever notified the Department of the Interior of an increased evaluation of the claim.

23/  There is no testimony that the five-fold increase was based upon plaintiff's own re-evaluation of his damages between July 10 and November 5, 1969. See App. 1644-1646, 1701-1713; cf., App. 1715-1720.

tiff's life expectancy, and a consequent claim for an amount in excess of the administrative claim . . ." [24/]

The findings and conclusion essentially render the pro-scription in 28 U.S.C. 2675(b) a dead letter and present the anomaly that an asserted improvement in plaintiff's physical condition, a changed mental attitude, and the adjustment to a tragic existence (to a physician's surprise) added to the value of the claim.  Common sense would seem to dictate that these circumstances would tend to mitigate or minimize plaintiff's damages.  The findings also connote the cynical implication that plaintiff's physical improvement and the possibility of a comparatively useful life, gainfully employed, have a damage value greater than the dire (and misguided) 1968 forecast by Dr. Williams that plaintiff had an expectancy of three to eight years of relative uselessness, as a helpless invalid and subject to an impending early death. [25/]

We think it can safely be posited that in 28 U.S.C. 2675(b) Congress, in referring to facts intervening between presenting an administrative claim and the commencement of suit, "relating

---

24/  The court made no finding or conclusion that the $2,500,000 claim and $975,000 award were justified by "newly discovered evidence not reasonably discoverable at the time" the claim was presented.  We think it clear that the record evidence would not permit or sustain such a finding or conclusion.

25/  Plaintiff's counsel did not consult with Dr. Williams be-tween July 10 and November 5, 1969.  App. 1719-1720; and see App. 1720-1754.

- 36 -

REPRODUCED AT THE NATIONAL ARCHIVES

to the amount of the claim", means <u>facts</u> that would enhance or increase a claimant's damage. This is the plain import of the case law: The <u>fact</u> must intervene between the claim and suit and must, where personal injury is involved, be a <u>fact</u> relating to a deterioration, exacerbation or aggravation of the claimant's physical condition or a fact establishing a new condition or a permanency of a condition existing at the time the claim is filed. See, <u>e.g.</u> <u>Kielwein</u> v. <u>United States</u>, ___ F.2d ___, <u>supra</u>, Addendum; <u>United States</u> v. <u>Alexander</u>, 238 F.2d 314 (C.A. 5, 1956); <u>Smith</u> v. <u>United States</u>, 239 F. Supp. 152 (D. Md. 1965); <u>Rudd</u> v. <u>United States</u>, 233 F. Supp. 730 (M.D. Ala., 1964); <u>Nichols</u> v. <u>United States</u>, 147 F. Supp. 6 (E.D. Va., 1957); <u>Morgan</u> v. <u>United States</u>, 123 F. Supp. 794 (S.D.N.Y., 1954). Neither plaintiff's proof nor the Court's findings meet these criteria.

The Fourth Circuit's recent decision points up the error of the district court's ways. <u>Kielwein</u> v. <u>United States</u>, <u>supra</u>, Addendum. There the Court of Appeals held "clearly erroneous" a district court determination that plaintiff had proved "intervening facts" which would justify suit and judgment for a sum in excess of the amount of the plaintiff's administrative claim. The claim in <u>Kielwein</u> for personal injury was filed with the Navy Department on October 1, 1971 and suit was filed on August 24, 1972. While the claim was pending, plaintiff was seen by physicians at Bethesda Naval Hospital. There she was advised that neither neck surgery nor muscle surgery would help her.

This advice, the district court held, was an intervening fact "relating to the amount of the claim."  28 U.S.C. 2675(b). Holding that the advice was essentially confirmatory of advice plaintiff had received prior to filing her claim -- "that she had a permanent disability, that she was paralyzed and that there was no form of surgery that, . . . offered 'a very practical procedure'" (Addendum, pp. 9-10) -- the Court reversed and re-manded, directing that recovery be limited to the maximum amount claimed administratively.  Addendum, p. 13.

In this case, as in Kielwein, the injuries for which damages were claimed administratively were the same as those for which suit was filed.  There was no intervening material change in plaintiff's condition, and no medical opinion was obtained be-tween July 10 and November 5, 1969, bearing upon the permanency of his condition or upon his life expectancy.

The plaintiff's administrative claim was not for impending wrongful death but for personal injury; as of July 10, 1969 the severity and permanency of the injuries were known to and appreci-ated by plaintiff and counsel, as was the totality of his handi-caps and disability.  No fact of a substantive nature intervened between July 10 and November 5, 1969 relating to the extent of the injury, the permanency thereof, or the "amount of the claim." 28 U.S.C. 2675(b).

Plaintiff's arguments below to the contrary defy credulity and the concluding observation of the Fourth Circuit in Kielwein is, we submit, equally apt here (Addendum, pp. 12-13):  "The

Federal Tort Claims Act is remedial and should be liberally con-
strued to grant the relief contemplated by Congress; but, as the
Court said in Nichols v. United States, supra [147 F. Supp. 6],
at p. 10, '[t]he statute, 28 U.S.C. § 2675(b), would be meaning-
less if claimants, after rejection of their claim, could institute
actions for amounts in excess of the claim filed merely because
they, or their attorneys, are of the opinion that the claim has
a greater value' and that is about the extent of the proof of an
'intervening fact, relating to the amount of the claim' in this
case." (Emphasis added)

The Court's calculation and award of special damages --
$173,843 -- includes the present value of plaintiff's lost future
earnings to age 62 ($63,223) plus the present value of proposed
future hospital care, medical visits and drugs ($24,517) and
$35,000 for the present value of proposed dialysis care.  App.
1784-1785.  To apply the proscription of 28 U.S.C. 2675(b) and
limit total recovery to $500,000 would deprive plaintiff of no
past or future out-of-pocket loss and/or expense and would yield
$326,157 in present 1976 dollars for general damages for past and
an undeterminable future lifetime of pain, suffering, disfigure-
ment and deprivation of life's pleasures, as compared to the
Court's apparent evaluation of these subjective elements of
damage at $801,157.$\frac{26/}{}$   Plaintiff's recovery should be limited
to $500,000.

26/  Recognizing the subjective value of these elements of damage
and the broad latitude in this area accorded the fact finder, we
elect not to raise an issue as to the excessiveness of the $801,157
factor in the Court's award.  Compare the $250,000 jury verdict
against the District of Columbia.  App. 1577.

CONCLUSION

For the foregoing reasons, the judgment of the district court should be reversed.

Respectfully submitted,

REX E. LEE
    Assistant Attorney General

EARL J. SILBERT
    United States Attorney

RONALD R. GLANCZ
    Assistant Chief
    Appellate Section

JOHN G. LAUGHLIN
    Special Litigation Counsel
    Civil Division
    Department of Justice
    Washington, D. C. 20530
    Phone:  (202) 739-4437