# TYSONS CORNER CHIROPRACTIC

October 11, 2001

## AUTO ACCIDENT FINAL REPORT ON MARGARET S. SUE

Following is a report on the above-named patient with regard to an automobile accident sustained on 4/10/00. Due to acute symptomotology, this patient sought care at this office on the 1/19/2001. The following is the information I have on file relative to her condition.

An initial examination was conducted on 1/19/2001. The following information is a result of that examination:

History of Injury:
Ms. Margaret S. Sue was injured in an automobile accident on the date described above. The patient denies any other injuries sustained since the accident.

Subjective Complaints:
Ms. Sue stated that she is experiencing:
1: Constant (76 to 100% of awake time) stiffness in the neck which is increased by backward movement. She rated the pain 9/10 using a visual analog scale with 10 being extreme pain. The symptoms seem to be aggregated by any activity of daily living. The patient stated that the pain is radiating into the head.

2: Constant (76 to 100% of awake time) dull headaches located in the back of the head and forehead. She rated the pain 8/10. The symptoms seem to be aggregated by any activity of daily living. The quality of the pain is aching, burning and stabbing.

3: Constant (76 to 100% of awake time) pain in the upper mid back. She rated the pain 2/10. The symptoms seem to be aggregated by any activity of daily living. The quality of the pain is aching, burning and stabbing.

4: Constant (76 to 100% of awake time) pain in the lower mid back., radiating down the right leg. She rated the pain on a visual analog scale rating of 4/10. The symptoms seem to be aggravated by any activity of daily living.

5: Increased irritability and abnormal fatigue and depression and loss of normal sleep

8206 LEESBURG PIKE, SUITE # 304 • VIENNA, VA • 22182
PHONE: 703-288-1702 • FAX: 703-288-1704
WWW.YOURBACKDOC.COM

**EXHIBIT 9**

and increased tension throughout the body. She rated the symptomotology a 6/10.

Visual Evaluation:
The patient appeared to have an mesomorphic-Balanced body type. Her carriage and gait displayed noticeable difficulty. The patient's movements seem to be guarded. Visual evaluation noted an antalgic position at Ms. Sue's mid back and neck forward. Minor's Sign was found to be negative.

Postural Evaluation:
Visual evaluation of the patient's posture revealed a head tilt to the right.

Deep Tendon Reflex Testing:
Right Biceps- +1-hypo; Left Biceps- +1-hypo; Right Triceps- +2-normal; Left Triceps- +2-normal; Right Brachioradialis- +2-normal; Left Brachioradialis- +2-normal; Right Patellar- +2-normal; Left Patellar- +2-normal; Right Achilles- +2-normal; Left Achilles- +2-normal.

Pathological Reflex Testing:
Pathological Reflexes were tested and indicated Upper Extremity Hoffman's is not present. Lower Extremity Babinski's is not present. Chaddock's is not present.

Coordination Testing (Proprioceptive System):
Rhomberg test was performed normal. Finger to nose test was performed normal. Finger to finger test was performed normal. Heel walking was performed normal. Toe Walking test was performed normal.

Cranial Nerve Testing:
Examination of the cranial nerves revealed the following: A normal sense of smell. There was a normal response to both direct and indirect light as well as accommodation reflexes. All extraoccular movements, including superior and inferior recti, the two oblique muscles and the medial and lateral recti, were intact with no evidence of any diplopia or scotomata. The fifth cranial nerve (trigeminal) revealed no abnormalities. The patient was able to perform the normal range of facial movements, no asymmetry or other abnormalities were noted. The tuning fork test showed the eighth cranial nerve (acoustic) to be normal. Examination of the throat revealed no abnormality of the pharyngeal musculature. Examination of the throat revealed the laryngeal musculature to be normal. The shoulder shrug was poorly performed indicating a possible involvement of the eleventh cranial nerve. Examination of the throat revealed no deviation, atrophy or asymmetry of the tongue.

Orthopedic Tests:
Jackson's Comp. for nerve root compression positive bilateral.

[This test is conducted while the patient is seated. The patient is directed to flex the cervical spine laterally toward the shoulder as far as tolerable. The examiner then exerts downward, axial pressure over the cranium. The test is repeated to the opposite side. A test result is positive if pain/discomfort, and/or radiation along a nerve pathway occurs on the side being compressed. The distribution of pain and altered sensation can give some indication as to which nerve root is involved. It is not uncommon to have a positive test on the side being compressed and pain "finding" on the opposite side.] {Significance of Jackson Compression Test:} [Nerve root compression.]

Max. Compression for cervical nerve root compression positive bilateral.
[This test is performed with the patient seated. The patient is then instructed to first laterally flex the cervical spine (maximally) and then simultaneously rotate the head ipsilaterally to the shoulder. Eliciting radicular pain constitutes a positive test. (This test can be performed passively).] {Significance of Maximum Cervical Compression Test:} [Root compression secondary to narrowing of the IVF.]

Cervical Distraction for nerve root compression positive bilateral decreases the patient's pain.
[This test is performed while the patient is seated. Upward pressure is exerted to the cervical spine by pulling firmly upwards on the cranium. Relief of upper extremity pain is a positive finding.] {Significance of Cervical Distraction:} [Foraminal stenosis or nerve root compression.]

Spurling's Comp. for nerve root irritation positive bilateral.
[This test is conducted with the patient seated. The patient maximally rotates and laterally flexes the head ipsilaterally. The examiner then delivers a firm blow to the back of his hand that he had previously placed on the patient's cranium. A positive test is indicated when a significant increase of neck-shoulder-arm pain is experienced by the patient. Caution should be used not to employ too heavy of a blow.  Reviewing oblique x-rays prior to performing this test may be advisable.] {Significance of Spurling's Test:} [This test should stimulate any pain provocative tissues of spondylitic or discal material.]

Valsalva for disk occlusion negative.
[The Valsalva test is conducted by requesting the patient to bear down as if straining at stool by way of forcible exhalation against a closed glottis. If this action caused increase of spinal pain and radicular neuralgia, the test is positive.]

Costoclavicular Man. negative.
[Procedure: The patient stands, arms at right angles to the body and forearms at right angles to the arms (hostage position) with the hands in same coronal plane as the head. The patient is then directed to externally rotate the arms to maximal backward p
Thoracic outlet syndrome, Costoclavicular type. The above procedure narrows the

- 4 -                                                    October 11, 2001

space between the clavicle and the first rib (the costoclavicular space or interval) thus compressing unduly the neurovascular tissues of the Subclavian artery and vein and th

Hibb's Test for sacroiliac lesion negative.
[The Hibb's test is performed with the patient prone. The examiner stabilizes the pelvis nearest him/her with one hand and with the other; the opposite leg is flexed to 90° and then externally rotated. In the absence of hip involvement, this test is positive when pelvic pain develops and suggests a sacroiliac lesion.]

Palpation:
Tenderness: C1 moderate; T1 moderate; T12, L1 moderate. Trigger Points: Posterior cervical active with radiation into head. Rhomboids active with radiation into upper back. Subluxations were found at: C1 ASLA; T1 PRI; T3-T9 multiple subluxations. Muscle Tone: Posterior cervical spasticity (grade +4); Suboccipital grade +3. Non-spinal Tend.: Posterior cervical revealed mild tenderness, revealed mild edema; Neck flexors revealed mild tenderness.  Muscle Strength: Trapezius normal (grade +5); Rhomboids poor (grade +2).

Muscle Testing:
Ms. Sue was tested for bilateral muscular symmetry and strengths.  It is apparent from the tests performed that Ms. Sue exhibits neurological motor deficits in her left side, as opposed to her right side.  Simple tests, such as toe walk and heal walk failed on the left side.  In addition, a multitude of tests revealed the left side was always weaker than the right side.

X-ray report:  See attached.

Roland –Morris Low Back Pain and Disability Questionnaire:
1/19/2001          83%   Rating = Severe Disability
2/19/2001          79%   Rating = Severe Disability

Cervical R.O.M. testing:
Flexion: (Normal = 50°)            50 due to muscle spasm at neck.
Extension: (Normal = 60°)          35 due to sharp pain at neck.
Left lat. flex: (Normal = 45°)     15 due to muscle spasm at neck.
Right lat. flex: (Normal = 45°)    20 due to muscle spasm at neck.
Left Rotation: (Normal = 80°)      25 due to sharp pain at neck.
Right Rotation: (Normal = 80°)     25 due to sharp pain at neck.

Lumbosacral R.O.M. Testing:
Flexion: (Normal = 60°)            35 due to muscle spasm.
Extension: (Normal = 25°)          10 due to muscle spasm.
Left lat. flex: (Normal = 25°)     10 due to muscle spasm.

– 5 –                                      October 11, 2001

Right lat. flex: (Normal = 25°)        10 due to muscle spasm.
Left Rotation: (Normal = 30°)          15 due to muscle spasm.
Right Rotation: (Normal = 30°)         15 due to muscle spasm.

Diagnosis:
E 929.9 Late Effect of a motor vehicle accident, 847.0 Cervical Sprain / Strain whiplash injury, 739.2, 842.09, 839.08, 844.8, 839.08, 724.2.

The patient's condition as a result of the bony/soft tissue injury has resulted in an impairment. The patient is unable to perform many activities of daily living such as exercising, sitting, and driving without pain. With time and treatment, as measured by current objective standards, it will be determined if this impairment can be resolved or is permanent.

Treatment Plan:
After completing an initial examination and evaluation of Ms. Sue, I selected an aggressive plan of treatment designed to return this patient to a pre-injury status and minimize the possibility of future residuals.

The patient will be seen daily for a period of 2 weeks. The patient's treatment program will include a Gonstead adjustive technique at C1 T1 L1, sacrum. Therapy will include E.M.S. on the neck region to reduce pain. Additional therapy will include hot packs on the neck region to reduce pain, massage and physical therapy.

Final Evaluation:  Dated 5 October 2001

After seeing Ms. Sue for several months and monitoring her progress, I determined that she reached maximum medical improvement, although she will have to receive care to maintain her pain levels, for the rest of her life.

## FINAL PROGNOSIS

**OBJECTIVE SCALES OF PROGNOSIS:** Foreman and Croft are two researchers who have compiled a system of rating the prognosis or degrees of injury with regards to future pain and suffering as a result of the Cervical Acceleration/Deceleration (C.A.D.) injury.

Foreman and Croft have developed a number system, in the form of a scale, which is used to objectively quantify and classify mechanisms of the whiplash trauma resulting in the injuries. The examiner utilizes his findings to ascertain the information which allows the patients to be classified into these categories.

October 11, 2001

The explanation of a rating system based on "Scales" (Scales of Objective Data), or "Prognosis Scales", utilizes a numerical point value classification system, along with modifiers from objective date based on: radiographic findings, patient history and examination findings. The purpose is to accurately assess the probability of long term residuals and the need for medication or surgery.

The reference of the Norris and Watt study from 1983 can be found on pages 608 through 611 in the British Journal of Bone and Joint Surgery (1983), copies of which may be obtained at the Rutgers or Harvard Medical Schools, Med-line Computer Systems, local libraries or Universities Medical Libraries.

Cervical acceleration/deceleration injuries are classified by these authors as belonging to one of three initial groups. These groups are termed "Major Injury Categories" or MIC's.

**MIC 1 Major Injury Category 1:** patients sustain only subjective symptoms. No objective findings found upon physical examination. (10 points)
**MIC 2 Major Injury Category 2:** patients experience subjective signs and present a loss in range of motion (cervical). (50 points)
**MIC 3 Major Injury Category 3:** patients bear subjective signs and symptoms, a loss in the range of motion and objective neurological deficit seen as sensory or motor impairment. (90 points)

These Major Injury Categories are modified by the following conditions, which present a statistically poorer prognosis:

1. Canal size 10-12mm: Narrowed spinal canals have been shown to heighten neurological involvement. Larger canal size offers the spinal cord component of the Central Nervous System more protection, in light of it's increased diameter. (20 points)
2. Canal size 13-15mm: These parameters offer more space, however degenerative changes may lead to future stenosis and additional problems. (15 points)
3. Straight Cervical Spine: Whether a result of spasm, muscular or ligamentous damage, or both, researchers Norris and Watt found this to be aligned with a poorer prognosis. (10 points)
4. Kyphotic Cervical Curve: Affiliated with residual pain, increased degenerative changes, a poor prognosis often accompanies this. (15 points)
5. Fixated Segments: Whether a corollary affect due to congenital blocks or degenerative changes, these consequences impart a poorer clinical recovery and a significantly higher incidence of degenerative changes after the accident. (15 points)
6. Pre-existing Degenerative Changes: As visualized upon inspection of radiographic views. Due to eminent arthropathy of the joints and associated laxity of ligaments, this pre-existing condition may amplify the consequences of the injury. It has been

– 7 –                                                    October 11, 2001

shown that "no matter how slight," these changes adversely affect the prognosis. (10 points)

7. Loss of Consciousness: As an aftermath of he ad injury, this represents a separate additional form of injury. Patients who suffer this state statistically yield a far greater incidence of future degenerative changes. (15 points)

In their study published on the Journal of Bone and Joint Surgery, pages 608 through 611, researchers Norris and Watt found a significant relationship between the Major Injury Category (MIC) and the presence of residual pain. They further related:

ξ   MIC #1 = 56% of injured patients
ξ   MIC #2 = 81 % of injured patients
ξ   MIC #3 = 90% of injured patients

**Prognosis Group 1 (10-30 points):** This is an excellent prognosis. This means that there is little or no chance of a need for long term medication or surgery. However, there is a 50/50 chance of long term residuals such as mild muscle pain, neck stiffness, headaches and paresthesia.

**Prognosis Group 2 (35-70 points):** The prognosis is considered to be GOOD. This means that there is a slight chance of need for long term medication or surgery. However, there is a 50 to 80% chance of long term residuals such as mild to moderate muscle pain, neck stiffness, headaches and paresthesia.

**Prognosis Group 3 (75-100 points):** The prognosis is considered to be POOR. This means that there is a moderate chance of a need for long term medication or surgery. However, there is 50-80% chance of long term residuals such as moderate muscle pain, neck stiffness, headaches and paresthesia.

**Prognosis Group 4 (105-125 points):** The prognosis is considered to be GUARDED. This means that there is a marked chance of a need for long term medication or surgery. However, there is an 80-90% chance of long term residuals such as persistent muscle pain, neck stiffness, headaches and paresthesia.

**Prognosis Group 5 (130-165 points):** The prognosis is considered to be CLINICALLY UNSTABLE. The probability of future surgery and persistent neurological deficits are indicated.

In Ms. Sue, the typical residual pain presented primarily as neck and thoracic pain, headaches, lower back pain, muscle weakness unilaterally, and paresthesia. In regard to the above named patient, they fit the following categories:

– 8 –                                    October 11, 2001

Major Injury Category #3          (90 points)
Kyphotic Cervical Spine:          (15 points)
Pre-existing Degeneration         (10 points)
Fixated Segments                  (15 points)

TOTAL POINTS 130

PROGNOSIS GROUP CLINICALLY UNSTABLE


IMPAIRMENT RATING SECTION AND RESIDUALS:

Ms. Sue has reached a medical stationary condition. Statistically, she has over an 80-90% chance of long term residuals such as persistent muscle pain, neck stiffness, headaches, and paresthesia. As a result of the previously mentioned accident the patient has an altered ligamentous structure in that although it has healed it is less than optimal. When ligaments are torn, the body replaces a rather neat, organized network of a combination of yellow elastic, and dense white non-elastic collagen fibers, with a rather haphazard array of dense white connective scar tissue. This scar tissue helps hold bones together, but doesn't have the resiliency that the original connective tissue had. It causes a loss of range of motion at the joint level and therefore increases the stress upon that joint. The joints above and below that joint are also stressed to a greater degree since they must compensate for the loss of motion of the injured joint.

The injury to the spine resulted in a stretching and tearing of the paraspinal ligaments. These ligaments are a combination of white and yellow fibers. The yellow fibers are more specialized a fiber and are more elastic, and allow more flexibility than the white. Since the white is produced at a greater rate than the yellow the normal yellow/white ratio is thrown off resulting in a less than optimum ligament. The increased amount of white fibers results in a scar formation within the ligament.

The resultant "scarred" ligament does not have the same resiliency as a normal ligament and results in a greater amount of stress at the level of the injured joints and at the level of the joints above and below the injury, because those joints must now compensate for the loss of function of the involved joints.

The trauma to her spine has caused a general weakening of the soft tissue structure. The ligaments involved have become over stretched and torn giving rise to, even in its healed state, spinal instability. This unstable condition allows the vertebral motor units to be somewhat hypermobile. They are more prone to re-injury, even slight trauma, which otherwise would have caused no incident, may cause muscular splinting to occur.

October 11, 2001

Muscular splinting is a term given to muscles which have gone into spasm to act as a restrictive agent, like a natural cast. This natural cast is formed to restrict motion of the spine and to protect the spine from further injury. Chronic muscular splinting or spasming may lead to myofibrositis. This was evidenced during Ms. Sue's treatment when myofacial release treatments were provided to reduce spasms.

Myofibrositis has occurred in the above mentioned areas in this patient. The long-term effects of myofibrositis may include calcification of the damaged muscular tissue. This would obviously cause a loss of function in the muscle and would result in pain and discomfort.

Arthritis

Major arthritic changes are expected as a result of these injuries. According to Wolf's law, the above described joints are likely to become arthritic since calcium infiltrates areas of stress.

It is well documented that strain and sprain type injuries to the spine cause post-traumatic osteoarthritis. In view of this, the degree of post-traumatic pathology will be more severe in this particular patient. Ms. Sue will, therefore, continue to have occasional flare-ups of her symptomatology and this will be proportionate to her activity.

Exacerbations:

While the treatment has been remarkably effective in the treatment of this patient there are some residuals which will undoubtedly give Ms. Sue periodic grief. Through Chiropractic manipulation and treatment of this patient an attempt was made to restore normal function to the involved joints, and I feel we have succeeded fairly well in this endeavor, especially considering the initial amount of injury. However, I can say with certainty that the involved ligaments are not "as good as new and that Ms. Sue may expect to have periods of exacerbations of pain and stiffness in the involved joints. This has been evident during her periodic flair ups.

This patient has made sporadic improvement, obtaining progressive general relief of symptoms. However, these type injuries are subject to episodes of remission and exacerbations caused by various aggravations usually caused by ADL. Although pain and discomfort ease after each visit, they recur necessitating the use of lengthy and intense chiropractic treatment.

It is felt, considering the patient's symptomatology, results of comparative tests and examinations, and past experience with similar cases, that this weakness will predispose the patient to further problems in the injured area from aggravation or trauma which might not have otherwise bothered her prior to the accident. Of particular concern is the unilateral weakening of her left side.

Due to the nature of the injuries traumatically induced and the reduced functional capacity manifested as a result. It is likely that the areas of injury may remain areas of greater risk of future trouble from aggravation and trauma which may not have had the same effect prior to the accident.

It is a common observation in cases such as these to see remissions and exacerbations for no apparent external reason. Due to a structural weakening of the spinal column, traumatically induced, Ms. Sue can anticipate future recurrence of the pain and discomfort from time to time, especially prevalent at times of stress, fatigue or emotional upset. There is little anyone can do to prevent this and these issues were seen in Ms. Sue during her course of treatment.

Remissions and exacerbations of complaints on an alternate basis are quite prevalent following injuries of this nature. Symptoms may remain dormant for some period of time only to resume through insidious onset.

Ms. Sue responded well to treatment. However, due to the nature of the injuries traumatically induced and the reduced functional capacity manifested as a result, it is likely that the areas of injury may remain areas of greater risk of future injury. This weakness will predispose those areas to further trouble from aggravation and trauma, which may not have had the same effect prior to the accident.

Muscle spasms

Muscle spasms are a recurrent problem for Ms. Sue. Treatment has been effective in reducing the severity of the spasms, and the number of muscle fibers involved, but the fact that they persist, indicates the injuries are of a permanent nature.

Muscle spasms and persistent trigger points point to a poorer long term recovery for Ms. Sue. Muscle spasms affect her activities and lifestyle and she has had to alter the way she does things so as not to aggravate her pain and symptoms. In Ms. Sue's case, nerve root compression caused radicular pain. The subsequent pain causes muscles supporting the injured area to go into spasm and to splint in an effort to immobilize the area and relieve pain, in addition to acting as a protective mechanism to keep the area from further possible aggravation and re-injury.

Activities of Daily Living

This patient had been a very active person. The injuries she sustained, particularly in the neck region certainly reduced the quality of his lifestyle. Exacerbation and remissions are common and may be provoked by ordinary activities of daily living. Precipitating factors are muscular exertion and/or increased muscular activity.

Ortho neuro ROM etc...

The positive neurological and orthopedic findings, along with the positive X-ray findings, and her loss of range of motion and symptomatology, point to a poor recovery.

The persistence of motion and mobility alteration of the (cervical and/or lumbar) spine indicates the relative permanency of the residual kinetic disturbance. This is characteristic of actual sprain-type injuries if the ligamentous tissues have been torn, as is apparent in this case.

CONCLUSION:

Ms. Sue responded very well to chiropractic care. When she first arrived at the office, she was in a constant state of pain and decreased mobility. Her ADL were greatly affected by her injury. Although she had experienced lower back pain in the past due to surgery, this traumatic injury, due to the accident, undoubtedly exacerbated pre-existing conditions and are the causal factor in accelerating of the degeneration of her cervical spine.

Although her extensive care allowed her to be pain free for short periods of time, her relief from pain and discomfort is only temporary and will reoccur whenever she is stressed, fatigued or during normal ADL's.

Ms. Sue has reached maximum medical improvement, however, she will require continued care for the rest of her life to maintain a satisfactory quality of life and to conduct her ADL's.

At this point in time, it is with reasonable medical certainty that this injury is permanent in nature and that a permanent disability has been sustained by Ms. Sue.

Sincerely,

Dr. Richard A. Wirtanen D.C.