TO: Heather Phillips
    Ast. U.S. Attorney
FR: Dr. Brad Schiller *[signature]*
RE: <u>Sue v. USA: Income Loss</u>                    November 30, 2005

    As you requested, I have reviewed the economic-loss report prepared by plaintiff's expert, Dr. Richard Edelman. It is difficult to assess, since it provides no substantive foundation for its central assumptions. Dr. Edelman apparently accepts without hesitation assertions about Ms. Margaret Sue's employment and health status that are ostensibly contradicted by her own post-accident experience. In effect, he simply regurgitates whatever assumptions a plaintiff's lawyer tells him to embrace, without any critical, much less "expert" analysis of those assumptions. Beyond that he employs a methodology that exaggerates the dollar losses that would be attached to those unsubstantiated assumptions. When all is said and done, Dr. Edelman's "expert" report is not worthy of judicial consideration.

<u>Disputed Causality</u>

    The central premise of Dr. Edelman's report is that Ms. Sue was so severely damaged by the accident of April 10, 2000 that she would never be able to work again. In other words, she was totally and permanently disabled by that event. In adopting this premise, Dr. Edelman is apparently unfazed by the fact that Ms. Sue did in fact continue working after the accident. According to the federal income tax returns he himself cites, Ms. Sue earned over $100,000 in 2000, over $90,000 the following year, and over $50,000 in the first half of 2002. So clearly, she wasn't permanently and totally disabled after the accident. Indeed, there is no evidence of <u>any</u> income loss for more than two years after the accident.

    Available records indicate that Ms. Sue's pains and disabilities worsened in 2003, two and a half years after the referenced accident. At that time, she was evidently carrying for her elderly mother, a task that may have exasperated her ailments (Sampec report). Moreover, virtually all of the medical experts in this case point to the link between her post-accident symptoms and her pre-existing ailments (including disc surgery). Three experts explicitly reject the alleged causal link between the April 2000 accident and continuing physical impairments. Dr. Rodriguez states, for example, that

"patient's chronic pain syndrome...is not related to the...injuries she suffered in the motor vehicle accident of April 10, 2000." Drs. Kobrine and Fechter concur.

It would appear from these expert medical opinions that any employment impairment Ms. Sue now suffers is <u>at best</u> only partially attributable to the accident of April 2000.

Extent of Disability

The extent of Ms. Sue's current and future employment impairment is also much less certain than Dr. Edelman has assumed. Dr. Edelman is effectively projecting <u>total</u> and <u>permanent</u> disability for Ms. Sue. Yet, there is no basis for that projection in the voluminous medical records generated in this case. Several of her own medical experts explicitly acknowledge this by qualifying their projections with conditional statements about her recovery prospects. As recently as June 16, 2005 her primary surgeon, Dr. James Campbell noted that Ms. Sue had made substantial progress, was feeling "full engaged," and was even exercising (Flannery report, p.11). He proposed decreasing her medications. In his later report of October 19, 2005, Dr. Campbell said it was "not possible to give an opinion regarding the degree of permanent disability at the moment" since Ms. Sue was still recovering from her multiple surgeries (April 9, 2003; March 31, 2004; June 1, 2004, December 7, 2004), a process that could last a year. Ms. Sue recently purchased a bicycle for outdoor riding (Flannery, p. 12). Dr.DeLateur recently recommended she engage in Pilates exercises.

Defendant's medical experts likewise perceive prospects for future employment. In his examination of November 21, 2005, Dr.Kobrine observed that Ms. Sue was "healthy appearing," "gets up easily from the chair," and is "able to walk on heels and toes in a normal fashion." Kathy Sampec opines that Ms. Sue "may be capable of performing some type of nonarduous work activity in the future."

Several doctors express the view that Ms. Sue may need less medication or therapy as the recovery process continues. Most make diagnostic projections for only 2-5 years. As her own Life-Care Planner summed it up, "her prognosis is not medically clear" (Flanner, p.15).

What <u>is</u> clear from these reports is that her future employment impairments are highly uncertain. The only certain conclusion here is that Dr. Edelman's assumption of

total and permanent disability is entirely speculative and probabilistically remote. At most, one should contemplate a partial (not total) permanent disability that would limit Ms. Sue's earnings potential. In view of Ms. Sue's computer-and telephone-based technical expertise (management information systems) and at-home experience, and that earnings impairment might not be severe.

Given the uncertainties attached to her future impairments, a range of potential income losses is more appropriate at this point than a single point estimate. To that end, partial impairments of 25, 50, and 75 percent are explored here.

Discount Rate

Because any potential impairments will affect future earnings, two steps are required to assess the economic value of related losses. The first step is to project a stream of future earnings. The second step is to discount those future earnings into a single present value.

Using the $94,841 benchmark for annual earning stipulated by Dr. Edelman, future earnings can be projected in real (inflation-adjusted) terms for outlying years by projecting an annual rate of wage escalation. For the average worker, real wages increase at approximately 1.0 percent a year. Given Ms. Sue's age and occupational specialty, a higher rate of 1.5 percent is assumed here.

In 2003, Ms. Sue was 48 years old. According to the U.S. Bureau of Labor Statistics, she had a worklife expectancy of 12 years at that time. Accordingly, her real earnings are projected to increase by 1.5 percent a year over that time span.

When future earning are projected in real terms, a real discount rate is required in present value computations. Historically, the real rate of interest has hovered around 3.0 percent. (Dr. Edelman assumes real discount rates in the vicinity of 1.0 percent, about one-third their historical average. This serves only to exaggerate present values).

Using a wage escalator of 1.5 percent and a discount rate of 3.0 percent generates a present value of $1,034,478 for Ms. Sue's future earnings potential as of 2003. This is the value of her gross wages, before any taxes are paid. Applying a cumulative tax rate of 26 percent to those earnings yields an after-tax earnings potential of $766,514. This is the present value of Ms. Sue's disposable income from employment, absent any physical impairment.

Loss Range

If the accident of April 2000 did not in fact cause any permanent, partial disability, there is no related income loss. If a causal link is established, reasonable benchmarks for her future losses would be:

| Degree of Impairment | Net Income Loss |
|---|---|
| 25% | $191,379 |
| 50% | 382.757 |
| 75% | 574,135 |

These figures represent the amounts that Ms. Sue would be entitled to as compensation for lost future income if a permanent, partial disability is established and causally linked to the April 2000 auto accident.

TO: Heather Phillips
FR: Dr. Brad Schiller
RE: <u>Sue: Medical Expenses</u>                                                November 30, 2005

    Projected health-care costs are by far the larger component of the loss claim put forth by the plaintiff. [As an economist, I have no expertise in assessing the validity or appropriateness of health-care diagnoses proffered by plaintiff's experts.] At the same time, however, I can say with certainty that all such health-care projections are uncertain. No one knows when or to what degree Ms. Sue's pain and disabilities will recede, if ever. As discussed in my accompanying memo on Income Losses, none of the numerous medical experts in this case has projected the kind of permanent and increasing disability envisioned in the life care plan advanced by plaintiff. In view of these uncertainties, it would be inappropriate to proffer cost estimates for Dr. Flannery's <u>contingent</u> life-care plans as if there were medically certain, as Dr. Edelman has done. Instead, one must recognize that the Flannery life-care plan is one of many possible scenarios Ms. Sue's future development. In fact, it might well be regarded as the <u>worst-case</u> scenario, especially since it contemplates a complete loss of ambulatory ability and the need for constant home and health care. As Kathy Sampec has pointed out, there is no foundation for such a scenario.

    In attaching a cost valuation to the Flannery plan, Dr. Edelman makes no allowance for its probabilistic (rather than certain) foundation. Furthermore, he does not examine the parameters of that plan and their likely evolution over time. For how many years into the future, for example, has he projected psychotherapy sessions? Ms. Sue's medical experts prescribe 3-5 years of such therapy. What timeline does Dr. Edelman incorporate into his cost analysis? He does not provide such details, instead just referring to the life-care plan prepared by Dr. Flannery (which doesn't go into that much detail).

    Dr. Edelman also fails to assess the unit costs associated with various activities. An allowance is included in the life-care plan for taxi rides, for example, at the rate of one $200 per trip each week (a total of $10,400 per year!) For that much money, Ms. Sue could travel far and wide every week (despite her alleged inability to sit for more than 15 minutes at a time and the need for 1-2 hour naps each day). The transportation allowance includes an additional $1,600 in taxi rides for visits to her doctors. [These projections

seem excessive, both on their own unit basis and in view of the fact that Ms. Sue continues to drive herself and her daughter on a regular basis. Kathy Sampec has also documented the inflated unit-cost for medicines and therapies contained in the cost analysis put forth by Dr. Edelman.

In view of all these considerations, it is difficult to construct an alternative, and more realistic cost estimate for Ms. Sue's future health care needs. At a minimum, plaintiff's experts should provide a year-by-year projection of those needs, so that they can be assessed with respect to both medical necessity and economic validity. Until such information is made available, only an outline of the cost revision can be provided. In the simplest terms, the amended cost formula is

Expected Cost = Probability of Occurrence x (1-Cost inflation factor) Claimed Loss

The "cost inflation factor" refers to the inclusion in the Life Care Plan of unnecessary or duplicative treatments (e.g. substitute drug therapies) as well as bloated unit input prices (e.g. $200 taxi rides). The probability variable incorporates the uncertainty of Ms. Sue's ultimate prognosis. Dr. Edelman, of course, sees a 100 percent probability of total and permanent disability and a zero cost-inflation factor. That is scientific nonsense.

Dr. Edelman further inflates Ms. Sue's damage claim by exaggerating the present value of (adjusted) future health-care costs. As discussed above, Dr. Edelman routinely utilizes an artificially low discount rate to convert future costs to present values. There is no scientific bases for such a distortion. The use of a more credible discount rate would reduce the present value of future health-care costs by at least a third.

At this juncture I cannot provide a specific cost estimate for future health-care costs. Although a realistic number would be a small fraction of the value Dr. Edelman proffers, that alternative can't be computed until an amended Life-Care plan is prepared.

TO: Heather Phillips  
FR: Dr. Brad Schiller  *B/Achilles*  
RE: <u>Sue: Invoice #1</u>

December 1, 2005

I have prepared and transmitted to you economic loss estimates for the Margaret Sue case. The cost of all activity to date includes:

| <u>Item</u> | <u>Amount</u> |
|---|---|
| Professional Services 16.5 hours @ $300 | $4,875 |

Please remit the above balance to

Capitol Research, Inc.
Attn: Brad Schiller
4323 Hawthorne St. NW
Washington DC 20016