## Bussey, Davis & Associates, Inc.

Rehabilitation Counseling • Consulting Services
Lanham, Maryland • Staunton, Virginia
9500 Annapolis Road, Suite B-6
Lanham, MD 20706-2060
(301) 459-0700
Fax (301) 459-3457

Reply to: Lanham

October 21, 2005

Peter C. Grenier, Esquire
Bode & Grenier, LLP
Ninth Floor, Connecticut Building
1150 Connecticut Avenue, NW
Washington, DC 20036

Re:    Sue, Sandra M.
D/B:   04-30-54
D/I:   04-10-00

Dear Mr. Grenier,

You asked me to evaluate your client, Sandra M. Sue, for any changes in her employability and wage earning capacity that are attributable to the effects of her April 10, 2000 injuries. Ms. Sue was hurt in a motor vehicle accident on that date, and in spite of her medical care it is now clear that she is left with permanent restrictions on activity.

I evaluated Ms. Sue by following the usual and customary practices of my profession, rehabilitation counseling, which is the specialty area in counseling that deals with the interplay between disability and a person's ability to do important life activities, such as working and earning a living.

I had as background for my assessment what I understood was your full medical file on Ms. Sue's April 10, 2000 injuries, which I read for a history of her care, its outcome, her prognosis, and for medically defined statements of function preserved or lost. I also interviewed Ms. Sue for her personal, educational, and work history, and for her understanding of what are the problems she experiences on a day to day basis as a consequence of her April 10, 2000 injuries.

This information allowed me to formulate a range of hypothetical questions, which, when answered by research and analysis, allowed me to answer your questions to the court required standard of being held to a more likely than not level of professional certainty.

Ms. Sue is a 51 year old, 5'4" tall, Caucasian female who lives in McLean, VA. She has earned both a

Dr. Bussey                                                                October 21, 2005
Re: Ms. Sue
Page 2

BS degree in Biological Sciences from the University of Maryland (1976), and an MS degree in Information Systems from George Washington University (1996).

Ms. Sue reported that she is not presently working, and last worked during July, 2002, for IMS Health, where she had worked since 1995 as a Sales Representative, selling access to information sources that generally had to do with the manufacture and use of prescription drugs. These data bases were of interest to federal agencies and others as the information was useful to them in their work; and the sales work was long term, taking a year or more to sell the service to new customers.

In this job Ms. Sue sold to customers in the metropolitan Washington area, but travel was required, to Atlanta and other cities where her customers might be. Ms. Sue had come to this work from employment as a pharmaceutical sales representative for Fujisawa, a division of Smith Kline.

Ms. Sue reported that when she was obliged to leave work because of the pain and discomfort she experienced following her 2000 injuries.  She recalled when she left her base pay was in the $87,000-$88,000 per year range, with bonuses (annual and others), and reimbursement for expenses.  I understand your consultant economist has Ms. Sue's tax returns, so I will not attempt to detail her annual income here beyond this general figure.

When asked what problems she has that prevent her from working now, either at her former job or any other job, Ms. Sue described that her activities are so limited by pain that she can do very little without causing a flare-up of discomfort that is quite limiting to her, and that can last all day.

How Ms. Sue feels over the course of any given day is controlled by her pain, and when it is at its worst she is obliged to stay in bed, usually on the average of one day per week.  She reported about 2 bad to 3 better than bad days per week, plus the one day in bed. Extremes of weather also bother Ms. Sue, with hot days causing her to feel much worse than usual, and cold days somewhat worse than usual.

When asked about daily activities Ms. Sue reported that she gets quite uncomfortable sitting, even when using a special device that she has purchased, restricting her, for example, to 5-10 minutes of computer use at a time. At times she can do a little of most activities, but nothing on a predictable basis, and nothing predictably over the course of the day.

When asked what is her understanding of her prognosis, Ms. Sue said she understands that she is about as good as she will get, and she does not personally believe she will get better.  All of this is very distressing to her, and she said "I wish I could work. I miss work."

Dr. Bussey                                                October 21, 2005
Re: Ms. Sue
Page 3

When asked about preexisting health problems Ms. Sue said that she had incurred an L5-S1 disc injury about 10 or so years ago when lifting a propane tank out of an auto, which required her to have a back surgery, which was successful. Ms. Sue was able to resume normal activities after about 6 months, and returned to work, and other than experiencing some minor back discomfort she reported no difficulty working until her April, 2000 injuries, which is what she believes is the cause of her being obliged to stop work altogether in 2002.

Ms. Sue also reported that she had applied for and was granted a disability benefit from the Social Security Administration as a wage earner filing on her own account, something that I know from my consulting with this agency to be unusual for someone of her age and level of education, particularly in view that the standard applied is that the person applying must be determined to be unable to do their past job or any other job in the national economy, even unskilled work of a sedentary nature.

This filing was apparently a requirement for a short term disability benefit that she got from Cigna through her employer, and it is not clear to me if she continues to get any payment from them or not. Paperwork in the file showed that Ms. Sue was found by the Social Security Administration to have become disabled under their rules on July 22, 2002.

Although the medical data provided me was extensive, and outlines in detail what has been Ms. Sue's medical treatment, it is the more recent treatment and consultative records are the most informative for my analysis when addressing her current and likely future medical and functional status from the perspective of my analysis, so I will primarily address those in my report.

In an October 19, 2005 letter to Mr. Verdi in your office, Dr. James N. Campbell, a local neurosurgeon, reported that he had treated Ms. Sue starting in March 2003 for her April, 2000 injuries. This care involved 4 surgeries; and it is reported that her neck is fused from C3 to C7. Dr. Campbell reports that further surgery may be required, that Ms. Sue experiences "...severe pain in multiple areas of the body due to injuries sustained in the accident of April 2000," and that he believes Ms. Sue is currently unable to work.

In an October 19, 2005 letter to your office Dr. Lisa Lilienfield, a treating physician, outlined her diagnoses related to Ms. Sue's April 10, 2000 injuries and described the treatment provided. Residual functional capacities are described as very limited, for example including that Ms. Sue is only able to sit for 5 minutes without an increase in pain, unable to walk on an incline, and unable to carry objects, or bend or stoop. Lifting is restricted to 5 pounds or less.

Dr. Bussey                                                                                    October 21, 2005
Re: Ms. Sue
Page 4

Dr. Lilienfield opined that Ms. Sue's status is not anticipated to change over the years to come, that her limitations are such she does not believe that Ms. Sue is capable of work, and that ongoing treatment will be required ever time.

In an October 11, 2005 Independent Medical Evaluation report, Dr. Susan B. Trachman, a local psychiatrist, reported that Ms. Sue is diagnosed as having a major depression that is related to her 2000 injuries, with an Axis V (Global Assessment of Function, or GAF) scale score of 60 as applicable to both Ms. Sue's present and past year's level of function.

This GAF score is described in the American Psychiatric Association's publication titled Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, (page 32) as involving "Moderate Symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."

An orthopedic independent medical examination conducted this month by Dr. Steven S. Hughes of the Anderson Orthopaedic Clinic identified by way of disability ratings permanent medical problems for Ms. Sue's cervical spine, low back, and coccyx area, all attributed to her April 10, 2000 injuries. Consideration was given to preexisting conditions, and to Ms. Sue's pain, loss of function, loss of endurance, and weakness and atrophy. Effects noted included impaired activities of daily living.

In summary, Ms. Sue is described in her medical records as having impairments to the use she can make of her body that limit what she can do, and it has been opined that she is unable to work because of them. Depression is also a problem for her. Ms. Sue reported that she was obliged to discontinue her employment in 2002 because she was not able to do her day to day job duties because of the pain and loss of use of her body brought about by her April 10, 2000 injuries.

A review of the published data regarding rates of labor force participation for persons in Ms. Sue's age range and educational level reflect that her circumstance is unusual: in the most recent data available,[1] developed by the U.S. Census Bureau for 2004, it was estimated that of the 5,764,000 females age 45-54 who hold a Bachelor's degree or more, 69% of those without a work disability are employed full time, and only 12.6% are not in the labor force. For this group the term work disability mostly means that they do not have a health problem or disability which prevents them from working or which limits the kind or amount of work they can do.

---

[1] Disability Labor Force Status -- Work Disability Status of Civilians 16 to 74 Years Old, by Educational Attainment and Sex: 2004. U. S. Census Bureau, http://www.census.gov/hhes/www/disability/cps/cps204.html, Last Revised December 15, 2004, Accessed October 20, 2005.

Dr. Bussey                                                    October 21, 2005
Re: Ms. Sue
Page 5

The same study identifies those who have not worked in the past year because of illness or disability as having a 'severe' work disability, a group identified for Ms. Sue's age and level of educational attainment as an estimated 242,000 persons, of whom only 5% are working full time and 82.7% are not in the labor force.

This Census data is accompanied by some cautions on its use, mostly related to the fact that the term 'disability' varies because of law and regulation, but the data is statistically sound and does not significantly vary from other studies on the issue,[2] so I believe it to be a reasonable benchmark for a measure of those who are or are not working in a segment of the population reporting health problems that affect work.

In view that it is generally accepted in my profession that the standards required to get and keep competitive work are fairly stringent, involving, for example, successfully meeting time, attendance, and production standards when compared to one's coworkers, I next analyzed the technical question of what are the elements in Ms. Sue's background that would support the view that over time she is more likely to to be in the larger age-related group of those who are employed rather than the smaller group of those who are not working and not in the labor force because of health problems that limit their capacity to work.

In spite of a number of positive factors, including a good work history and much better than average education, I concluded that the limitations on activity placed on Ms. Sue because of the residual effects of her April 10, 2000 injuries were the controlling factor. As limited, for example as described by her treating physician, Dr. Lilienfield, and by others, I concluded there was no reasonable expectation that Ms. Sue could be expected to show up at a job about as much as others, turn out about as much work and of the same quality as her coworkers, and over time not miss any more time from work than them, all of which is required to get and keep competitive employment. Consequently I concluded that it was the 'severe work disability' group, where only 5% were employed full time, which best represents Ms. Sue's status, both now and in the future.

I therefore concluded that Ms. Sue is indeed unemployable as a consequence of the effects of her April 10, 2000 injuries, and that unless her physical status changes significantly for the better, we can expect her to continue to be unemployable for the indefinite future.

---

[2] See, for example, Landmark Disability Survey Finds Persuasive Disadvantages, National Organization on Disability,
http://www.nod.org/index.cfm?fuseaction=page.viewPage&pageID=1430&nodeID=1&FeatureID=1422&redirected=1&CFID=5204702&CFTOKEN=3271105, June 25, 2004, Accessed October 20, 2005.

Dr. Bussey                                                          October 21, 2005
Re: Ms. Sue
Page 6

Unfortunately this is not a circumstance that lends itself to being offset by other professional services,
such as vocational rehabilitation sponsored job retraining, as it is not a shortage of skills that keeps
Ms. Sue from working, but rather it is that the residual effects of her April 10, 2000 injuries are so
limiting to her that there is no reasonable likelihood that she can be expected to meet the standards
necessary for her to get and keep competitive employment. Consequently her status of being
unemployable in any meaningful sense of that term must be considered to be permanent and
irreversible.

Finally, I agree with Dr. Lilienfield that Ms. Sue's situation is complex, so I reserve the right to
consider any other information that may become available about her situation, and if necessary modify
my findings. Consequently I ask that you continue to forward to me any other information about her as
it becomes available.

That concludes my report. Thank you for referring Ms. Sue for services, and please call if you have
any questions.

Sincerely,

Phillip Bussey, Ph.D., CRC

enclosures