LEXSEE 2005 U.S. DIST. LEXIS 37879

**JEFFREY T. BELL, Plaintiff, v. ALBERTO GONZALES, Attorney General, U.S. Department of Justice, et al., Defendants.**

Civil Action No. 03-163 (JDB)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

*2005 U.S. Dist. LEXIS 37879*

December 23, 2005, Decided
December 23, 2005, Filed

**COUNSEL:** [*1] For JEFFREY T. BELL, Plaintiff: Edith S. Marshall, POWERS PYLES SUTTER & VERVILLE, P.C., Washington, DC.

For JOHN D. ASHCROFT, Attorney General of the United States, ALBERTO GONZALES, Attorney General of the United States, Defendants: Paul A. Mussenden, ASSISTANT UNITED STATES ATTORNEY, Washington, DC; Peter Blumberg, UNITED STATES ATTORNEY'S OFFICE, Civil Division, Washington, DC.

For ROBERT S. MUELLER, III, Director, Federal Bureau of Investigation, Defendant: Paul A. Mussenden, ASSISTANT UNITED STATES ATTORNEY, Washington, DC.

**JUDGES:** JOHN D. BATES, United States District Judge.

**OPINIONBY:** JOHN D. BATES

**OPINION:**

### MEMORANDUM OPINION

Plaintiff, a photographer with the Federal Bureau of Investigation Special Photographics Unit ("SPU"), alleges that defendants retaliated against him in violation of the Rehabilitation Act of 1973, as amended, *29 U.S.C. § § 701 et seq.*, by reassigning him to another subunit after he met with an EEO counselor regarding his potential claim of discrimination based on his Tourette's Syndrome ("TS"). He seeks to recover damages for lost overtime pay and monetary awards, medical expenses, and emotional pain and suffering, mental anguish, [*2] and aggravation of TS symptoms. Joint Pretrial Statement at 20. The background of this action, including the now-dismissed disability discrimination claim, is set forth in the Court's decision on cross-motions for summary judgment. See *Bell v. Gonzales, 2005 U.S. Dist. LEXIS 4913, 2005 WL 691865 (D.D.C. 2005)*. A jury trial on plaintiff's retaliation claim is scheduled to commence on January 6, 2006. Pending before the Court are four motions in limine to exclude evidence relating to the retaliation claim. Defendants move to exclude: (1) evidence of an agency decision finding that plaintiffs supervisor, Athena Varounis, retaliated against another FBI employee for pursuing a discrimination claim; (2) testimony from an FBI EEO counselor, Bryan (Ben) Holliday; and (3) testimony from plaintiff's expert witnesses, Dr. Anthony Rostain and Dr. Susan Calkins. Plaintiff moves to exclude evidence pertaining to two disciplinary proceedings involving plaintiff by the FBI Office of Professional Responsibility.

### DISCUSSION

#### A. Evidence Pertaining to Prior Finding of Retaliation by Athena Varounis

Plaintiff intends to introduce evidence that Varounis retaliated against another employee subject [*3] to her supervision. This evidence consists of a final agency decision issued in April 2003 by a Department of Justice Complaint Adjudication Officer ("CAO"), finding that Varounis had retaliated against another SPU employee (Russell Kidd) on or about January 12, 2001, for contacting an EEO counselor and filing an EEO grievance against her. See Department of

Case 1:05-cv-01355-JR   Document 22-13   Filed 01/30/2006   Page 2 of 18

Page 2
2005 U.S. Dist. LEXIS 37879, *

Justice Final Agency Decision at 15-19 (Apr. 11, 2003) (Defs. Mot. in Limine [# 86], Ex. 1) ("DOJ Final Agency Decision"); see also Mem. from Kidd to Holliday at 1 (Jan. 12, 2001) (Defs. Mot. in Limine [# 86], Ex. 2). n1 Kidd had applied for another position within SPU offering greater pay, was not selected, and then met with an EEO counselor and filed a grievance alleging disability discrimination. DOJ Final Agency Decision at 1-2. The retaliation consisted of cancellation of two training trips that Kidd had been scheduled to attend. Id. at 15. Plaintiff also intends to question Varounis about the prior finding of retaliation. Plaintiff proffers that the evidence is relevant to show Varounis' retaliatory intent and motive as to those persons who engage in protected EEO activity.

n1 Because there are four pending motions in limine, the court will refer to the briefs by docket number in brackets to facilitate identification of the referenced motions and exhibits.

[*4]

Defendants contend that the evidence should be excluded pursuant to *Rule 404(b)* because it is offered only to show that Varounis has a propensity to retaliate against others, rather than to show motive or intent. In the alternative, defendants assert that even if the final agency decision is legitimate "other acts" evidence showing her motive or intent, it should be excluded because it fails to meet the requirement that the "other acts" be of the same character and type of discrimination and also because it lacks probative value under *Rule 403* due to factual weaknesses in the decision.

It is well-established that other acts of discrimination or retaliation by an employer similar to the discrimination or retaliation charged are admissible to show an employer's motive or intent in a separate case. See *Fredrick v. District of Columbia, 349 U.S. App. D.C. 79, 254 F.3d 156, 158-59 (D.C. Cir. 2001)* (evidence that a supervisor had conducted other duties in a racially biased fashion was probative of whether supervisor's present action was motivated by racial discrimination); *Miller v. Poretsky, 193 U.S. App. D.C. 395, 595 F.2d 780, 784-85, 788-96 (D.C. Cir. 1978)* ("past acts of racial discrimination [*5] [are] relevant to prove [defendant's] motive in his actions towards [a different complainant]," notwithstanding "the risk of time-consuming collateral inquiries"); *Coles v. Perry, 217 F.R.D. 1, 9-10 & n.5 (D.D.C. 2003)* (applying this same principle to retaliation cases); see also *Duckworth v. Ford, 83 F.3d 999, 1002 (8th Cir. 1996)* ("Evidence that [defendant] had retaliated against someone else at about the same time and under similar circumstances is evidence from which the jury could reasonably infer that [defendant] had a similar motive or intent to retaliate against [plaintiff]"). But see *Schrand v. Federal Pac. Elec. Co., 851 F.2d 152, 156 (6th Cir. 1988)* (testimony by other employees of similar discriminatory acts by employer must be excluded because it is unfairly prejudicial). Here, plaintiff has articulated the motive and intent purposes for which he proffers the evidence to show Varounis' motive and purpose, during the relevant time period, for taking actions against employees resorting to the EEO process. This is distinct from use of the evidence to show that Varounis simply has a propensity to retaliate against [*6] such employees. See *Miller, 595 F.2d at 783 n.1* (recognizing distinction between other discriminatory acts as propensity evidence in contrast to evidence showing motive of racial bias).

Although *Rule 404(b)* allows evidence of other acts of retaliation to show motive or intent, the proffered evidence must meet a threshold level of similarity. *United States v. Long, 356 U.S. App. D.C. 117, 328 F.3d 655, 660-61 (D.C. Cir. 2003)*; see *Coles, 217 F.R.D. at 10* ("other acts of discrimination, similar to the discrimination charged, perpetrated by a person accused of the same discrimination in the case on trial are admissible to prove motive and intent"); see also *Duckworth, 83 F.3d at 1001* (holding, in *First Amendment* retaliation case, that evidence of "other acts" must be "similar in kind" to the events at issue). "What matters is that the evidence be relevant to show a pattern of operation that would suggest intent and that tends to undermine the defendant's innocent explanation." *Long, 328 F.3d at 661* (quotations omitted). Thus, the acts need only be closely related to the claim at issue, not identical. Id.

Here, the character [*7] and type of the retaliation in the Kidd matter is similar and close in time to the retaliation alleged by plaintiff in several respects. Kidd was an employee in the SPU who, like plaintiff, alleged disability discrimination, and met with an EEO counselor on the claim. DOJ Final Agency Decision at 16. Varounis was the supervisory official who took the alleged adverse action in Kidd's' case, as well as in plaintiffs case. Id. at 15. The alleged retaliatory actions were also roughly contemporaneous, taking place within three months of each other -- January 2001 in Kidd's case, and October 2000 in plaintiff's case. However, there are also significant differences in the two matters. In the Kidd matter, Varounis was the target of Kidd's disability discrimination complaint. In plaintiff's EEO matter, he identified his direct supervisor, Wayne Feyerherm, as the source of discriminatory treatment. See Bell Decl. P 21 (Oct. 20, 2004) (Pl.s' Reply [# 97], Ex. 4) ("I recounted my problems with Mr. Feyerherm to the EEO Counselor and asked for his reaction and advice."). Because Varounis was not the target of the disability discrimination allegations in plaintiff's initial

Case 1:05-cv-01355-JR    Document 22-13    Filed 01/30/2006    Page 3 of 18

Page 3
2005 U.S. Dist. LEXIS 37879, *

EEO matter, [*8] she would be far less likely to have a motive to retaliate against plaintiff, thus diminishing the probative value of the Kidd matter in this case. Additionally, prior to the retaliation in the Kidd matter, Kidd had formalized his allegations by filing an EEO grievance against Varounis, whereas plaintiffs protected EEO activity was more preliminary in nature, n2 consisting only of an informal meeting with the EEO counselor. This difference in the type of protected EEO activity -- one evincing a serious intent to pursue legal recourse, the other being exploratory -- also somewhat undermines the probative value of the Kidd matter in discerning Varounis' intent as to the reassignment of plaintiff. On balance, the Court finds the evidence of retaliation in the Kidd matter sufficiently similar to the retaliation alleged by plaintiff to make it, at least at first glance, probative of Varounis' state of mind toward employees engaging in EEO activity.

> n2 Plaintiff's contention that Kidd did not file an EEO grievance until after the alleged retaliation is contradicted by Kidd's own account of his actions. Mem. from Kidd to Holliday at 1 (Jan. 12, 2001) (Defs. Mot. in Limine [# 86], Ex. 2) ("I sincerely believe that this action [denial of training-related travel] was in reprisal due to my filing of an EEO grievance on 12/21/2000 concerning alleged discrimination by UC Varounis."). The record does indicate, as plaintiff notes, that Kidd also filed a "formal complaint of discrimination" on January 24, 2001 (DOJ Final Agency Decision at 1), but that is not inconsistent with Kidd's statement to the EEO counselor -- signed the date of the alleged retaliation -- that he had filed an earlier grievance as well.

[*9]

The probative value of the evidence pertaining to the Kidd matter, however, is diminished by deficiencies in the final agency decision. Before addressing those deficiencies, the Court first considers plaintiff's contention that an inquiry into the merits of the final agency decision is inappropriate because the decision is binding on the Department of Justice. Plaintiff and defendants both focus on the case law addressing the role of final agency decisions in federal civil actions that are brought by a complainant-turned-plaintiff as a result of the agency decision. Plaintiff relies on cases holding that a federal agency may not relitigate liability findings where a plaintiff seeks to enforce the administrative relief awarded by the agency. See *Malcolm v. Reno, 129 F. Supp. 2d 1, 5 (D.D.C. 2000)*; *Rochon v. Attorney General of the United States, 710 F. Supp. 377, 379 (D.D.C. 1989)*. Defendants rely on cases holding that final agency determinations of liability are not conclusive in the complainant's subsequent judicial action where the complainant contests the sufficiency of the administrative order -- either as to liability or scope of relief -- rather [*10] than seeking enforcement. See *Scott v. Johanns, 409 F.3d 466, 469-70 (D.C. Cir. 2005)*; *Chandler v. Roudebusch, 425 U.S. 840, 863, 96 S. Ct. 1949, 48 L. Ed. 2d 416 & n.39 (1976)*.

These cases do not provide direct authority on the scope of judicial inquiry into a final agency decision used as "other acts" evidence in collateral cases brought by separate plaintiffs, although the reasoning in these cases does provide some guidance. In Scott, the court of appeals explained, in the context of a plaintiff's challenge to the remedy portion of a Title VII final agency decision, that administrative findings of liability are not "conclusive," but rather may only be admitted as evidence at a trial de novo so that a "judicial finding" of liability can be made. *409 F.3d at 470*. The court in Scott further explained that this result is reinforced by the Supreme Court's decision in *Chandler, 425 U.S. at 863 & n.39*, rejecting a deferential standard of review for final agency decisions adverse to complainants. See *Scott, 409 F.3d at 470*. Pursuant to Chandler, final agency decisions in favor of a federal employer may only be admitted [*11] as evidence subject to de novo review in the federal case involving plaintiff's allegations. n3 Id. This strongly suggests that a judge (and later a jury) should have the opportunity to consider independently whether the agency decision in a collateral federal civil action is supported by the evidence. Thus, consistent with Scott and Chandler, it is appropriate to inquire into the evidentiary basis of the collateral final agency decision in determining whether it is sufficiently probative for use as "other acts" evidence in a federal trial alleging retaliation. n4

> n3 In Chandler, the weight to be given to final agency decisions regarding discrimination arose in the context of a district court's entry of summary judgment in favor of a federal employer, based on deference to the agency decision finding no discrimination. *425 U.S. at 842-43*.

> n4 The cases cited by plaintiff in support of giving the final agency decision preclusive effect do not warrant a different result. In both Malcolm and Rochon, the courts held that where employees seek solely to enforce a favorable final agency decision and the relief awarded to them, courts have authority to enforce such final decisions without engaging in a trial de novo. *129 F. Supp. 2d at 5*; *710 F. Supp. at 379*. As Scott later noted, the en-

Case 1:05-cv-01355-JR   Document 22-13   Filed 01/30/2006   Page 4 of 18

Page 4
2005 U.S. Dist. LEXIS 37879, *

forcement context is deemed to warrant a standard of review limited to determining simply whether the employing agency has complied with the administrative disposition. See *409 F.3d at 469*. Nothing in Malcolm or Rochon suggests extending that limited review to cases where another plaintiff seeks to use a distinct final agency decision as evidence of a discriminatory or retaliatory motive -- and indeed, the rationale of Scott, as discussed above, counsels against such an extension.

**[*12]**

Cases addressing *Rule 404(b)* evidence in other analogous contexts also suggest that a court must consider the reliability of a final agency decision in determining its admissibility. For example, in *Schneider v. City and County of Denver, 47 Fed. Appx. 517, 524-25 (10th Cir. 2002)* (unpublished opinion), the court of appeals examined whether the district court had properly admitted two verdict forms indicating judgments of liability against the employer in other civil rights cases, and considered significant whether the district court had "considered the underlying facts and procedural posture of each action." n5 *Id. at 524*. In Coles v. Perry, the district court excluded a recommended EEOC decision because, inter alia, the jury would be "asked to accept the EEOC's assessment of the credibility of witnesses . . . that the jury will never see or hear." *217 F.R.D. at 10*. This factor weighs even more heavily in the context of a final agency decision that plaintiff seeks to have treated as a concession by defendants. These cases thus further support the conclusion that the court may inquire into the evidentiary basis of a final agency **[*13]** decision in determining whether it is sufficiently probative for use as "other acts" evidence in a collateral federal civil action.

> n5 Although the district court had done so, the Tenth Circuit nonetheless found the admission of the verdict forms to be error, reasoning that "a verdict form, standing alone" is not direct or circumstantial evidence of liability. *Schneider, 47 Fed. Appx. at 524*.

Turning now to the merits of the Kidd final agency decision that plaintiff seeks to introduce, the Court focuses on the CAO's heavy reliance on one employee's statement that Varounis had once said, in reference to Kidd's EEO activity, "if he wants to play hardball, so can I." DOJ Final Agency Decision at 15, 17, 18. The employee, Mark Waddell, however, was not present when Varounis allegedly made the statement, and the person he identified as his source, Barry King, submitted a sworn statement that "Varounis did not say this to me," and that he "did not recall telling Mr. Waddell" that Varounis made **[*14]** such a statement. King Affidavit at 3 (Defs. Mot. in Limine [# 86], Ex. 3) (emphasis added). The CAO acknowledged that King "did not recall" telling Waddell of such a statement, but did not address King's explicit denial that Varounis made the statement to him. On the contrary, the CAO appears to have rendered its decision based on the erroneous belief that the evidence showed King had not denied that Varounis made the statement. See DOJ Final Agency Decision at 18 ("It would stand to reason that King would deny that Varounis made the statement, rather than say he did not remember telling it to Waddell."). The CAO thus relied on King's statement that he "did not recall" telling this to Waddell as consistent with a finding that Varounis made the statement. See id. at 18 ("Nothing in the record except Varounis' denial contradicted Waddell [about the hardball' statement attributed to Varounis]. King merely stated that he did not recall' telling Waddell that Varounis made a retaliatory statement."). Yet the only person in a position to have direct knowledge of the "hardball" statement (other than Varounis) was King, who denies that she said it. Although the agency decision **[*15]** relied on other factors to support the finding of retaliation, n6 it suggests that the case was a close call. See id. (noting that the evidence "is not overwhelmingly in favor of complainant's reprisal allegations," but "it does offer more support for complainant's contentions than for management's explanations"). In light of the CAO's failure to weigh King's express denial, the Court finds that the probative value of the final agency decision is substantially undermined. Considering the limited similarity of the prior finding of retaliation, and the significant deficiencies in the CAO's consideration of the evidence, the Court finds that the probative value of the Kidd final agency decision is minimal.

> n6 The other factors were the timing of Varounis's decision to cancel Kidd's training trips and the lack of corroboration for Varounis's stated legitimate reason for the cancellation. DOJ Final Agency Decision at 18.

The Court next considers whether the minimal probative value of the Kidd decision is sufficient **[*16]** to justify its admission into evidence under *Fed. R. Evid. 403*. In Title VII cases, as in other cases, relevant evidence may be excluded if the probative value is "'substantially outweighed by the danger of unfair prejudice, confusion of the issues, or

Case 1:05-cv-01355-JR   Document 22-13   Filed 01/30/2006   Page 5 of 18

Page 5
2005 U.S. Dist. LEXIS 37879, *

misleading the jury.'" *Fredrick, 254 F.3d at 159* (quoting *Fed. R. Evid. 403*). The danger of unfair prejudice is substantial where final agency decisions on Title VII liability are presented because a jury may find it "difficult to evaluate independently evidence of discrimination after being informed of the investigating agency's final results." *Beachy v. Boise Cascade Corp., 191 F.3d 1010, 1015 (9th Cir. 1999)*; see *EEOC v. Manville Sales Corp., 27 F.3d 1089, 1094 (5th Cir. 1994)* (final agency determinations "stating the categorical legal conclusion that a violation has taken place" heighten the risk of unfair prejudice); see also *Lang v. Kohl's Food Stores, Inc., 217 F.3d 919, 927 (7th Cir. 2000)* (noting that there is "doubtless . . . a risk that the jury would overestimate the significance of the [*17] EEOC's ruling; this is why such conclusions generally are not admitted (on behalf of either side) in jury trials"). There is, of course, no per se rule of exclusion of final agency decisions in discrimination or retaliation cases -- indeed, Chandler and Scott contemplate that courts may admit such evidence. However, on these facts, the Court finds that the danger of unfair prejudice is significant and outweighs the minimal probative value of the decision. The decision attributes a statement to Varounis that is highly inflammatory -- her intent to play "hardball" because an employee engaged in EEO activity. This is evidence any reasonable jury would find difficult to ignore, despite the analytically and factually flawed basis for that conclusion. Accordingly, the Court concludes that the final agency decision in the Kidd matter will be excluded under *Rule 403*, along with any other evidence pertaining to it (e.g., testimony from Varounis about the decision).

### B. Testimony of Bryan (Ben) Holliday

Plaintiff intends to call Holliday, the FBI EEO counselor whom plaintiff contacted on August 25, 2000, to testify as to (1) the content of his meetings in late 2000 with plaintiff [*18] and, separately, with SPU managers Athena Varounis and Tod Hildebrand, (2) "communications [Holliday] has had with plaintiff's counsel since this case was initiated," and (3) "as to whether, and if so why, he felt that he might be retaliated against or disadvantaged if he cooperated in executing a signed statement in support of plaintiffs case." Joint Pretrial Statement at 12. Plaintiff contends that the latter two categories of testimony are relevant to an atmosphere of retaliation at the FBI that would explain the prolonged nature of plaintiff's reassignment (three years) and also shed light on the credibility of any FBI employee called as a witness. n7 As to the first category, plaintiff contends that the content of the 2000 meetings is relevant to establish that Hildebrand and Varounis were aware of his protected EEO activity at the time Varounis reassigned him -- a matter that is in dispute.

> n7 Plaintiff has clarified that he would not seek to elicit "lay opinion" or "prior bad acts" testimony based on Holliday's involvement, as an EEO counselor, in other cases. Pl.'s Opp.[# 88] at 5 n.4.

[*19]
Defendants move to exclude the entirety of Holliday's testimony as irrelevant and unfairly prejudicial pursuant to *Fed. R. Evid. 402, 403, 404* and *701*, and also contend that it should be excluded for untimely disclosure and because much of it constitutes inadmissible hearsay. The Court first addresses whether testimony regarding an atmosphere of retaliation or Holliday's subjective fear of retaliation is admissible as "other acts" evidence under *Rule 404(b)*, and concludes it is not. As indicated by the discussion of the case law above, evidence of specific incidents of retaliation by the same supervisor against persons engaging in protected activity may be relevant to show motive. However, to be relevant to prove motive or intent, the "other acts" evidence also must be similar to the retaliation alleged.

Here, the proffered Holliday testimony does not address any specific incident or threat of retaliation, much less one that is similar to the alleged retaliation against plaintiff. It addresses only a generalized subjective fear of retaliation [*20] if he assists in plaintiffs case -- a fear not tied to any specific person or office. See Email from Holliday to Marshall (Sept. 11, 2004) (Pl. Opp. [# 88], Ex. 3) (declining to sign declaration despite counsel's assurance of legal protection from retaliation, stating "you may be wise in the ways of the world but not in the ways of the federal system"). Indeed, Holliday has never worked in plaintiffs office (the Special Photographics Unit, or SPU) nor for Varounis, and he has submitted a declaration stating that he has not been threatened with retaliation. Holliday Decl. PP 19-20 (dated Sept. 27, 2005) (Defs. Mot. in Limine [# 83], Ex. 1). Having read Holliday's email and declaration, the Court concludes that Holliday's generalized subjective fear is not probative of whether Varounis or others in her management chain acted with a retaliatory motive in the reassignment at issue. Therefore, the Court excludes it as irrelevant under *Rules 401* and *404(b)*.

Defendants' remaining objection to Holliday focuses on his anticipated testimony regarding the contents of his meetings in late 2000 with plaintiff, Varounis, and Hildebrand. Defendants contend that the proffered testimony is [*21]

Case 1:05-cv-01355-JR    Document 22-13    Filed 01/30/2006    Page 6 of 18

Page 6
2005 U.S. Dist. LEXIS 37879, *

not relevant to whether plaintiff's reassignment was retaliatory because Holliday had no personal knowledge of the reassignment decision and had no contact with Varounis or Hildebrand until after the reassignment had already occurred. See Holliday Decl. PP 8-12. Plaintiff responds that Holliday's testimony about the meetings is relevant because it sheds light on whether Varounis had knowledge of plaintiff's protected EEO activity prior to making the reassignment decision on October 5, 2000, and thus whether she had a motive for retaliation. Holliday is expected to testify that, on August 25, 2000, he advised plaintiff to contact his supervisors, Varounis and Hildebrand, to work out his claims of unfair treatment informally, and that on the date of the reassignment, October 5, 2000, plaintiff contacted him again, discussing the details of his meeting with Hildebrand as a past event. This part of the Holliday testimony, combined with testimony from Hildebrand that his practice is to relay staff complaints to supervisors, would provide evidence upon which a jury could conclude that Varounis had knowledge of the protected EEO activity prior to the reassignment decision. The proffered [*22] testimony serves to fill an important void in how and when, according to plaintiff's theory of the case, Varounis acquired knowledge of plaintiff's protected activity prior to the reassignment decision. That Holliday was not involved in the reassignment decision is beside the point. The proffered testimony makes the existence of a fact -- the timing of Varounis's knowledge -- more probable than it would be without the evidence, and thus, it is relevant under *Fed. R. Evid. 401*.

Relevance alone, however, is not sufficient for its admissibility. Defendants also object to Holliday's testimony to the extent it calls for hearsay -- though not identifying which of Holliday's out-of-court statements would be hearsay. The Court presumes that the hearsay objection is to Holliday's proffered testimony about Bell's statement to him regarding Bell's meeting with Hildebrand, since most, if not all, of Holliday's testimony as to his own statements at the late 2000 meetings would not constitute hearsay under *Rule 801(d)(2)(C)* or *(D)*. n8 Bell's statements to Holliday are clearly hearsay, as plaintiff concedes, because they are Bell's out-of-court statements offered [*23] in evidence, through Holliday, to prove that Bell met with Hildebrand prior to the reassignment decision. Plaintiff contends, however, that Bell's hearsay statements fall within the residual hearsay exception of *Fed. R. Evid. 807* because Bell made those statements under circumstances that make fabrication unlikely -- Bell was agitated and upset, having just been informed of his reassignment that day, and he provided details (such as his learning of Hildebrand's autistic son) that further buttress its trustworthiness. *Rule 807*, however, has more stringent requirements beyond mere indicia of trustworthiness. It provides:

> n8 *Rule 801(d)* states: "A statement is not hearsay if -- (2) Admission by party-opponent. The statement is offered against a party and is . . . (C) a statement by a person authorized by the party to make a statement concerning the subject, or (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." Defendants already have submitted a declaration signed by Holliday recounting his own statements at the late 2000 meetings, indicating that they have authorized him to make a statement to the court on those subjects under subsection (C). See Holliday Decl. (dated Sept. 27, 2005). Moreover, Holliday is a "servant" of the defendants and his statements at those meetings concern a matter within the scope of his employment under subsection (D).

[*24]

> A statement not specifically covered by *Rule 803* or *804* but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

Here, plaintiff has established the materiality of the hearsay statement, and has pointed to some indicia of trustworthiness, but has not met his burden of establishing that "the statement is more probative on the point for which it is offered than any other evidence." Nor could he, considering that both plaintiff and Hildebrand may testify to the timing of plaintiff's meeting with Hildebrand, as well as to its substance. Furthermore, as this Circuit has held, the residual hearsay exception is "extremely narrow and require[s] testimony to be very important and very reliable.'" See *United States*

Case 1:05-cv-01355-JR    Document 22-13    Filed 01/30/2006    Page 7 of 18

Page 7
2005 U.S. Dist. LEXIS 37879, *

*v. Washington, 323 U.S. App. D.C. 175, 106 F.3d 983, 1001-02 (D.C. Cir. 1997)* [*25] (quoting *United States v. Kim, 193 U.S. App. D.C. 370, 595 F.2d 755, 766 (D.C. Cir. 1979)*). The court further cautioned in Washington that the exception should be used "sparingly." Id. Considering the availability of other witnesses with personal knowledge of plaintiff's meeting with Hildebrand, the Court finds that Holliday's testimony as to Bell's out-of-court statements about the meeting are not admissible under the residual hearsay exception.

With these limitations on Holliday's testimony now established, the Court considers defendant's request to exclude the testimony pursuant to *Fed. R. Civ. P. 37(c)(1)* because of plaintiff's failure to disclose Holliday as a witness until April 27, 2005, a year after the close of discovery. Exclusion of Holliday would be a significant sanction because it could diminish the persuasiveness of plaintiffs evidence in support of the timing of his meeting with Hildebrand-an important link in establishing Varounis' knowledge of his protected EEO activity. Factors that must be considered in determining the imposition of sanctions include "the resulting prejudice to the other party, any prejudice to the judicial [*26] system, and the need to deter similar misconduct in the future." *Bonds v. District of Columbia, 320 U.S. App. D.C. 138, 93 F.3d 801, 808 (D.C. Cir. 1996)*.

Plaintiff contends that the sanction of exclusion of Holliday's testimony is inappropriate because there has been no prejudice to defendants from the late disclosure. Plaintiff asserts that, since the inception of the litigation, both parties have been keenly aware of Holliday's role as the EEO counselor with whom Bell met and that the information known to Holliday is well-documented in the documents disclosed during discovery. He states that his omission of Holliday from his *Rule 26(a)(1)* disclosures was inadvertent, and went largely unnoticed because of the frequent mention of Holliday by both parties as one who had relevant information. Plaintiff also contends that he was unaware that defendants would dispute the timing of his meeting with Hildebrand until the briefing on the cross-motions for summary judgment, and plaintiff amended his *Rule 26* disclosures a month after the Court ruled on the summary judgment motions -- eight months before the trial date. Plaintiff also points out that Holliday is a current FBI employee to whom defendants [*27] have full access, as evidenced by Holliday's declaration in support of defendants' recent motion. Defendants do not dispute any of plaintiff's contentions. The Court agrees that the inadvertent nondisclosure caused no prejudice to defendants, and no delay in trial, and rejects defendant's request to exclude Holliday as a witness.

Accordingly, defendants' motion in limine to exclude Holliday's testimony is granted in part and denied in part. Holliday's testimony shall be limited to the subject of the late 2000 meetings and also shall exclude the hearsay statements discussed above.

**C. Evidence Pertaining to Disciplinary Proceedings**

Defendants intend to present evidence of two proceedings by the FBI's Office of Professional Responsibility ("OPR") involving plaintiff, one from the September 1991 to March 1992 period involving an adjudication of a sexual harassment claim against plaintiff, and the other from the December 1999 to December 2000 period arising from plaintiffs arrest on December 14, 1999 for solicitation of prostitution. Defendants contend that this evidence is relevant to the issue of damages for two reasons: first, because the 1999-2000 OPR proceeding shows that [*28] any lost opportunities to work overtime were due, at least in part, to travel restrictions associated with the OPR proceedings rather than the reassignment, and second, because both OPR proceedings show that events other than the reassignment substantially contributed to plaintiff's emotional distress and associated injuries. Defendants also contend that this evidence is relevant to show the absence of bad motive or intent from plaintiff's supervisor (insofar as she expressed support for plaintiff during the later investigation) and for impeachment purposes. n9

n9 Defendants have admitted that the alleged misconduct has no relevance to its decision to reassign plaintiff to another subunit. Defendants proffered separate and independent reasons for that decision. See *Bell, 2005 U.S. Dist. LEXIS 4913 at *56-67, 2005 WL 691865, at *17-18*.

Plaintiff seeks to exclude this evidence as irrelevant and unduly prejudicial pursuant to *Fed. R. Evid. 402, 403, 404* [*29] , and *608(b)*, although acknowledging relevance in one limited respect. Plaintiff concedes that evidence pertaining to the 1999-2000 OPR proceedings is relevant to the issue of lost overtime opportunities to the extent the proceedings resulted in the imposition of a travel restriction on plaintiff for the years 2000 and 2001. However, plaintiff believes that because there is no dispute between the parties as to the fact of the travel restriction, a stipulation regarding the travel restriction (but excluding mention of the OPR proceedings) is the proper manner for dealing with this evidentiary need without creating unfair prejudice. n10 Although that might be a way to address the relevance of the evidence

to lost overtime opportunities, it does not suffice here because, as discussed below, the 1999-2000 OPR proceeding is also relevant to the issue of emotional distress and associated injuries for which plaintiff seeks compensatory damages of $ 217,700.

---

n10 Plaintiff's proposed stipulation states: "For reasons that are not relevant to Plaintiff's claims in this case, and which Plaintiff has not claimed were discriminatory or retaliatory, Unit Chief Athena Varounis restricted Bell from assignments that involved travel during the years 2000 and 2001." Pl. Mot. in Limine [# 82] at 3.

---

[*30]

Plaintiff asserts that both the 1991-1992 and 1999-2000 OPR proceedings are irrelevant to the cause of plaintiff's emotional harm because they are too far removed in time from the period of the reassignment -- October 5, 2000 to September 22, 2003 -- and, in particular, the onset of aggravated depression and obsessive-compulsive symptoms requiring medication in January 2002. The Court agrees that the 1991-1992 OPR proceeding is too remote in time to be relevant to plaintiff's emotional state at the time of his reassignment in October 2000, over eight years later. Defendants' attempt to build a foundation for its relevance based on a "cumulative effect" theory, piggybacking it on the unrelated 1999-2000 proceeding, rings hollow. Accordingly, evidence pertaining to the 1991-1992 OPR proceeding will be excluded from trial.

The same cannot be said of the 1999-2000 proceeding, however. At the time of plaintiffs reassignment in October 2000, plaintiff remained under investigation by OPR and subject to a travel restriction. Two months after the reassignment, OPR issued an adjudication letter finding plaintiff in violation of agency regulations based on the conduct underlying the arrest, [*31] suspended plaintiff from duty for seven days without pay, and placed plaintiff on probation for one year, that is, until December 2001. See Letter from Lee to Bell (Dec. 6, 2000) (Defs. Mot. to Dismiss, Ex. 14). This resulted in a continuation of the travel restriction until that same date. A jury could reasonably infer that such an investigation and disciplinary measures caused significant stress, which would be relevant to an award (if any) of damages to plaintiff.

Plaintiff attempts to downplay the significance of the 1999-2000 proceedings by arguing that the disciplinary action was relatively benign, that his own evidence readily admits that there were multiple sources of stress in his life, and that plaintiffs witnesses -- in particular, Dr. Anthony Rostain -- can readily be questioned about the basis for the conclusion that plaintiff's emotional state was connected with the reassignment rather than one of the "other stresses of daily life." To describe the 1999-2000 OPR investigation, however, merely as one of the "other stresses of daily life" does not fairly characterize the evidence. By plaintiff's own account, his job as an FBI "shooting photographer" is "central to [*32] his self-esteem and to his very being." Joint Pretrial Statement at 7. He thus plans on presenting a case to the jury showing that the reassignment caused him, inter alia, emotional pain and suffering, mental anguish, and aggravation of his TS symptoms, warranting an award of $ 217,700 in compensatory damages. Id. But on that same theory, any serious threat to his employment as a shooting photographer -- including the 1999-2000 OPR investigation and subsequent period of probation -- could be the cause of significant emotional harm and associated injuries. n11 Evidence that an event other than his reassignment could have caused his emotional suffering is highly probative on the issue of damages. See *Lewis v. District of Columbia, 793 F.2d 361, 363 (D.C. Cir. 1986)* (holding that jury would be aided "in measuring fairly the extent of damages" by evidence of other causes of plaintiff's emotional suffering not attributable to defendant).

---

n11 Defendants contend that the OPR investigation is also relevant to show an absence of retaliatory motive by Varounis. They highlight her March 2000 statement to OPR recommending that plaintiff be allowed to perform the full scope of his duties as a photographer as evidence of her desire to help rather than punish plaintiff. Defs. Opp. [# 89] at 5 & Ex. 1. However, plaintiff had not engaged in any protected EEO activity at the time of Varounis's statement. Thus, her earlier statement has little probative value with respect to whether plaintiff's EEO activity affected Varounis' decision to reassign plaintiff after he had consulted an EEO counselor six months later.

---

[*33]

Plaintiff also cites *Rule 404(b)* in support of exclusion of the 1999-2000 OPR investigation. However, it is clear that this rule authorizes the admission of such evidence in appropriate circumstances. It provides that evidence of "other

Case 1:05-cv-01355-JR   Document 22-13   Filed 01/30/2006   Page 9 of 18

Page 9
2005 U.S. Dist. LEXIS 37879, *

crimes, wrongs, or acts" is "not admissible to prove the character of a person in order to show action in conformity therewith," but is "admissible for other purposes," and provides examples. Id. "Under the law of this circuit, *Rule 404(b)* is a rule of inclusion rather than exclusion, and it is quite permissive, excluding evidence only if it is offered for the sole purpose of proving that a person's actions conformed to his or her character." *Long, 328 F.3d at 660-61* (quotations and citation omitted); see also *United States v. Carney, 387 F.3d 436, 450 n.11 (6th Cir. 2004)* ("This [*Rule 404(b)*] is actually a rule of inclusion rather than exclusion. . . . The list of permissible uses is not exclusive."). Here, the evidence relating to the solicitation charge is quite plainly not being offered to show plaintiffs action in conformity therewith, but instead is being offered to show that events at work other than the [*34] reassignment may have caused plaintiff's emotional harm and associated damages. See *Lewis, 733 F.3d at 363* (affirming admission of plaintiff's past drug use as relevant to whether events other than defendants' conduct were the cause of his pain and suffering). Thus, *Rule 404(b)* does not preclude its admission.

Plaintiff next contends that, under *Rule 403*, evidence relating to the 1999-2000 OPR proceedings should nonetheless be excluded because any relevance is outweighed by unfair prejudice because the OPR charges involved -- solicitation of prostitution -- are of the kind likely to lead a jury to decide the case based on emotional factors or moral sensibilities that do not relate to the issues in the case. Plaintiff further posits that a mini-trial on the true facts and circumstances of the OPR charges will be necessary to explain the incident and alleviate any unfair prejudice, which would risk further confusing and distracting the jury and prolonging the trial. The Court finds that the probative value of the 1999-2000 OPR proceedings on the solicitation charge significantly outweighs any prejudice to plaintiff. The subjective importance of plaintiff's career as [*35] a shooting photographer is the centerpiece of his case for damages based on emotional harm and aggravation of his TS symptoms. This necessarily makes evidence of other threats to his employment highly probative of the extent of his pain and suffering, and hence to his damages. Thus, the probative value of the 1999-2000 OPR proceedings substantially outweighs any unfair prejudice to plaintiff. As to the other factors under *Rule 403*, efficient management of the evidence by counsel, and the Court's own management of the trial, will prevent unnecessarily protracted trial proceedings, and appropriate jury instructions will eliminate the risk of confusion of the issues and further reduce any prejudice to plaintiff. See *Fed. R. Evid. 403* advisory committee notes ("In reaching a decision whether to exclude on grounds of unfair prejudice, consideration should be given to the probable effectiveness or lack of effectiveness of a limiting instruction."). Evidence of "other crimes" often is admitted into evidence at trial, and readily dealt with in such a manner. See *United States v. Rogers, 287 U.S. App. D.C. 1, 918 F.2d 207, 211 (D.C. Cir. 1990)* (noting that [*36] "relevant evidence properly admitted over a *rule 404(b)* objection always poses the risk of unfair prejudice to some degree," but that the court may evaluate the risks against the probative value under *Rule 403*, taking into account limiting instructions).

Plaintiff also seeks to exclude any evidence pertaining to the OPR proceedings under *Rule 608(b)*, as impermissible "extrinsic evidence," to the extent defendants seek to use it to prove plaintiffs "character for truthfulness." Plaintiff further contends that the evidence does not meet the threshold requirement of being probative of truthfulness or untruthfulness because it relates to solicitation, which does not implicate veracity. Whether the evidence pertaining to OPR proceedings can be used to prove plaintiff's character for truthfulness is, of course, a separate and distinct issue from whether it can be used as substantive evidence to prove lack of damages.

*Rule 608(b)* provides that:

> Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' character for truthfulness, other than conviction of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, [*37] however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness. . . .

*Fed. R. Evid. 608(b)*. Defendants agree that, to the extent the evidence of the OPR investigations is used for impeachment purposes under *Rule 608(b)*, extrinsic evidence of specific instances of conduct are inadmissible. Whether the Court will permit defendants to "inquire into" the misconduct underlying the 1999-2000 OPR investigation on cross-examination of plaintiff to prove his character for truthfulness (i.e., based on inconsistent statements he made to investigators) -- or to use that evidence for other impeachment purposes pursuant to *Fed. R. Evid. 613* or otherwise -- will depend on the context and substance of plaintiffs testimony, and the Court thus reserves judgment on that issue. n12

Case 1:05-cv-01355-JR    Document 22-13    Filed 01/30/2006    Page 10 of 18

Page 10
2005 U.S. Dist. LEXIS 37879, *

> n12 As previously noted, evidence pertaining to the 1991-1992 OPR proceedings predates the reassignment at issue by eight years and will be excluded as substantive evidence. Because of the remoteness in time, the Court also concludes that this evidence, including the March 1992 finding that plaintiff "lacked candor" during the investigation, has little relevance to plaintiff's character for truthfulness presently or at the time of the events relevant to this case (that is, August 2000 to the present). Evidence pertaining to the 1991-1992 OPR proceedings will therefore be excluded for use in this capacity, as well.

[*38]

Accordingly, plaintiff's motion in limine to exclude evidence pertaining to OPR proceedings is granted in part and denied in part. Evidence pertaining to the 1991-1992 OPR proceedings is excluded. Evidence pertaining to the 1999-2000 OPR proceedings is admissible as substantive evidence relating to damages.

**D. Evidence Pertaining to Plaintiff's Treating Physician and Expert Witness**

Plaintiff intends to present the testimony of his treating physician, Dr. Susan Calkins, and his expert neuropsychiatrist, Dr. Anthony Rostain, on the subjects of Tourette's Syndrome generally, plaintiff's specific TS symptoms, and the relationship between TS and the injuries plaintiff allegedly suffered as a result of his reassignment. Plaintiff asserts that the proffered testimony is relevant to several matters, including establishment of background information necessary to facilitate the jury's understanding of the case and plaintiffs behavior during trial, and most significantly, the issue of damages -- that is, the exacerbation of plaintiffs TS symptoms as a result of the reassignment. Defendants contend that plaintiff failed to comply with the mandatory disclosure requirements under *Fed. R. Civ. P. 26(a)(2)* [*39] , and that, on the merits, the testimony fails to satisfy the reliability and relevance tests applicable to expert testimony under *Fed. R. Evid. 702* and *Daubert v. Merrell Dow Pharm., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*. The Court addresses the admissibility of each witness's testimony separately.

**1. Dr. Susan Calkins**

Defendants contend that plaintiff's failure to identify Calkins as an expert witness automatically precludes her from testifying as an expert, either formally or under the mantel of lay opinion, on the subjects proffered by plaintiff-most notably, the cause of plaintiff's pain and suffering. In response, plaintiff submits that he is calling Calkins only as a fact witness to provide testimony on the "facts of his disease, diagnosis, and treatment" based on Calkins' personal observations of him as his treating physician, and expressly disclaims that he will ask her to offer testimony on the source of plaintiff's stress or the cause of plaintiff's depression and other emotional harm. Pl. Opp. [# 91] at 1. Defendants contend, however, that the expert testimony issue remains a live one because plaintiff's own brief reveals that [*40] he nonetheless plans to elicit testimony on subjects based on her expertise (causes of depression and exacerbated TS symptoms) rather than her personal observations.

Whether plaintiff was required to disclose Calkins as an expert witness depends on whether her proffered testimony is properly characterized as lay testimony under *Rule 701* or expert testimony under *Rule 702*. A treating physician's testimony may be difficult to categorize in this manner because it involves the physician's personal observations in some respects, and the physician's specialized knowledge in others. See *United States v. Henderson, 409 F.3d 1293, 1299-1300 (11th Cir. 2005)*. *Rule 701* provides that:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of *Rule 702*.

*Fed. R. Evid. 701* (emphasis [*41] added). The addition of subsection (c) in the 2002 amendments was made to prevent lay testimony from crossing over into the realm of experts. *Henderson, 409 F.3d. at 1300* (discussing amendments to *Rule 701*); *Brandon v. Village of Maywood, 179 F. Supp. 2d 847, 859 (N.D. Ill. 2001)* (same). The advisory committee notes state that the amendment is "to eliminate the risk that the reliability requirements set forth in *Rule 702*," as well as the expert witness disclosure requirement set forth in *Fed. R. Civ. P. 26*, will be "evaded through the simple expedient of proffering an expert in lay witness clothing." *Fed. R. Evid. 701* advisory committee notes. Consistent with this approach, *Rule 702* provides that expert testimony includes opinions based on "scientific, technical, or other specialized

knowledge," regardless of whether those opinions were formed during the scope of interaction with a party prior to the litigation. See *Musser v. Gentiva Health Servs., 356 F.3d 751, 756-57 n.2 (7th Cir. 2004)*.

With these limitations in mind, the Court considers the proper characterization [*42] of Calkins' testimony. The Joint Pretrial Statement states that she may testify "[1] as to her diagnosis and treatment of Mr. Bell as a TS patient, [2] the information she has communicated to the FBI regarding Mr. Bell and his medication, [3] the extent to which his TS symptoms are exacerbated by stress and emotional upset, and [4] . . . her prescription of Paxil for his depressive symptoms in 2002." Joint Pretrial Statement at 14. As to the first and fourth matters -- diagnosis and treatment of TS, including prescription of Paxil for depression -- Calkins' testimony is properly characterized as expert testimony because it relies on "specialized medical training and knowledge that is outside of the average juror's sphere of knowledge." See *Brandon, 179 F. Supp. 2d at 859* (recognizing that physician's diagnosis will be based on specialized knowledge in some but not all cases, contrasting gunshot-wound diagnosis which any lay person could make to a diagnosis of inhalation anthrax). TS is, by plaintiffs own account, a neurological disorder that is difficult for a lay person to understand. See Rostain Amended Report at 5. Plaintiff has suffered from symptoms [*43] of TS since he was in grade school, but remained undiagnosed until he was 30 years old despite consultations with other doctors. Id. at 4. Thus, it is quite clear that a diagnosis of TS is based on highly specialized knowledge, which renders it expert, rather than lay, testimony under *Rules 701* and *702*. n13

> n13 The cases cited by plaintiff allowing a treating physician to testify as to diagnosis and treatment without being subject to expert testimony requirements pre-date the 2000 amendments or do not reference them. These cases are: *Davoll v. Webb, 194 F.3d 1116, 1138 (10th Cir. 1999)*; *DeSanto v. Rowan Univ., 224 F. Supp. 2d 819, 830 (D.N.J. 2002)*; and *Riddick v. Washington Hosp. Ctr., 183 F.R.D. 327, 330 (D.D.C. 1998)*.

The prescription of Paxil also requires specialized medical training and knowledge beyond a lay person's ken. Indeed, the record reflects that Calkins found it necessary to consult a psychiatric specialist in determining the [*44] appropriate treatment for the depressive symptoms she observed in plaintiff. Pl. Opp. [# 91] at 3. Plaintiffs characterization of the Paxil prescription as a factual occurrence, rather than testimony based on expert knowledge, lacks persuasiveness because it is clear that the testimony is being offered to prove that plaintiff's depressive symptoms were severe enough to warrant treatment with medication. See id. at 2 n.1 ("the fact that Calkins deemed his depressive . . . symptoms, for the first time in January, 2002, to be severe enough to warrant a psychiatric consult and prescription of Paxil to address these problems is highly relevant to Bell's claims . . ."). Whether a patient's depressive symptoms are severe enough to warrant treatment by prescription medication clearly requires specialized medical knowledge.

By contrast, Calkins could testify, as a lay witness, to the content and time of her observations of plaintiffs symptoms, including any worsening of symptoms and the dates on which those events occurred. Her personal observations may include the alleged onset of aggravated symptoms in 2002. Such testimony is based on personal observation, rather than specialized knowledge, [*45] and is thus within the scope of lay testimony.

With respect to the second category of proposed testimony -- the information Calkins communicated to the FBI regarding plaintiff and his medication -- that also is properly characterized as lay testimony because it requires no specialized knowledge to determine the substance of those communications. Plaintiff seeks to use this evidence to establish the fact of the FBI's knowledge of plaintiffs TS, including its knowledge of side-effects of medication -- rather than the medical correctness of Calkins' recommendations (a matter which would require specialized knowledge and thus, expert testimony). Hence, Calkins' testimony on this subject will be permitted.

As to the third matter -- the "exacerbation of plaintiff's TS symptoms by stress and emotional upset" -- the Court finds, based on the record, that Calkins has no direct personal knowledge of the cause of any exacerbation of plaintiff's symptoms, and plaintiff acknowledges this point. See Calkins Depo. at 46 (when asked about "any causal relationship between what was going on at the FBI and what [plaintiff] was feeling," Calkins responded "I wouldn't know for sure obviously because [*46] I don't know the facts."); Pl. Opp. [# 91] at 5 n.3 ("it might arguably flow over into the realm of expert opinion' if [Calkins] were to opine on the specific cause of the symptoms for which she prescribed Paxil"). "[A] lay opinion, purporting to claim, with a reasonable degree of scientific certainty, that one phenomenon was proximately caused by another is inadmissible for lack of foundation." See *Lightfoot v. Rosskopf, 377 F. Supp. 2d 31, 33 (D.D.C. 2005)*. Therefore, Calkins cannot testify with respect to what may have exacerbated plaintiff's TS symptoms.

Case 1:05-cv-01355-JR    Document 22-13    Filed 01/30/2006    Page 12 of 18

Page 12
2005 U.S. Dist. LEXIS 37879, *

Plaintiff contends, in the alternative, that to the extent Calkins' testimony is properly characterized as expert testimony, she should nonetheless be permitted to testify because plaintiff identified Calkins as a witness, and any failure to identify her as an expert is thus harmless error. The Court does not, however, take so cavalier an approach to the requirements of the Federal and Local Rules as reflected in the Court's pretrial requirements. Under plaintiff's proffered approach, parties would never have to designate treating physicians as experts. The Court declines to treat disclosure of experts **[*47]** as only a perfunctory exercise. As noted by the Seventh Circuit, "formal disclosure of experts is not pointless. Knowing the identity of the opponent's expert witnesses allows a party to properly prepare for trial. [An opponent] should not be made to assume that each witness disclosed . . . could be an expert witness at trial." *Musser, 356 F.3d at 757*. The Court also notes that much of Calkins' testimony is duplicative of plaintiff's designated expert -- e.g., plaintiff's TS diagnosis, his TS symptoms, and the medication he has taken. Under these circumstances, the Court finds it appropriate to exclude those aspects of Calkins' testimony that cross into the realm of expert testimony.

To recap, the only part of Calkins' testimony that is potentially admissible lay witness testimony under *Rule 701* is (1) her observation of plaintiffs symptoms and (2) the information she communicated to the FBI. The Court next considers defendants' contention that this evidence should nonetheless be excluded because it lacks relevance to the sole issue remaining in the case -- retaliation. The Court agrees with plaintiff that whether and how symptoms corresponded chronologically with **[*48]** events at work (to be testified to by other witnesses) is probative of whether plaintiff suffered damages caused by the reassignment. Proximity in time is one relevant fact in determining causation.

With respect to Calkins' communications to the FBI, the relevance is less transparent. Plaintiff asserts that this testimony will rebut defendants' proffered legitimate nondiscriminatory reason for the reassignment decision -- i.e., that plaintiff stated that he hated his direct supervisor, Feyerherm, and defendants believed that he would thus be happier in another office. Plaintiff seeks to challenge defendants' credibility on this point by presenting evidence that Calkins had informed plaintiff's supervisors that Clonadine, medication used to treat plaintiff's TS symptoms, causes increased irritability. Based on this testimony, plaintiff would argue to the jury that plaintiff's complaints about Feyerherm could not reasonably have been understood as a desire to transfer out of the Forensics Studio. The Court has reservations about the persuasive value of such testimony, but it may, in combination with other evidence, support plaintiffs case for pretext. For example, plaintiff has stated **[*49]** that, upon hearing of the reassignment, he immediately protested the decision, further indicating he would not, as defendants reason, be happier in another office. See *Bell, 2005 U.S. Dist. LEXIS at *56, 2005 WL 691865, at *17*. Therefore, the Court will not exclude this part of Calkins' testimony on relevance grounds. n14

> n14 In a footnote, plaintiff mentions that Calkins would also provide testimony to challenge the legitimacy of the FBI's decision to place plaintiff on a travel restriction because of his TS, referring to years pre-dating the unchallenged 2000 and 2001 travel restrictions. See Pl. Surreply at 8 n.10. Calkins' testimony on that subject is excluded because the Court has dismissed those claims. See *Bell, 2005 U.S. Dist. LEXIS 4913, 2005 WL 691865, at *4*. Plaintiff has failed to articulate a link between travel restrictions and the only claim now at issue -- the alleged retaliatory reassignment. Indeed, defendants have not relied on any travel restrictions as a justification for the reassignment, which makes those actions wholly irrelevant.

**[*50]**

### 2. Dr. Anthony Rostain

#### a. Disclosure Requirement Under *Rule 26(a)(2)*.

Defendants seek to exclude Rostain's testimony regarding TS -- in particular, the emotional harm and associated injuries plaintiff allegedly suffered as a result of the reassignment -- on the ground that Rostain's *Rule 26(a)(2)* expert report does not identify any opinions regarding a causal relationship between the reassignment and plaintiff's alleged injuries. In the alternative, defendants seek to exclude Rostain's testimony as failing to meet the reliability and relevance requirements of *Fed. R. Evid. 702* and Daubert.

The first issue can be quickly resolved by reference to Rostain's original and amended expert reports, which, on their face, identify his opinions as to causation. In the original report, served on defendants on December 5, 2003, Rostain stated:

> The central importance of work for [plaintiff] cannot be underestimated. When things are not going well in the workplace, he has little to fall back on in the way of internal resources. His continuing conflicts with the FBI, particularly his reassignment to a subunit where he did not perform [*51] active shooting photography assignments, have caused him a significant amount of emotional pain and distress manifested by depressive feelings, intermittent anxiety, sleep problems, and worsening back pain. These were all significant enough for him to seek medication treatments (e.g., paroxetine, robaxin and increased clonadine) that, in turn, may have occasionally negatively affected his behavior, mood and thinking process.

Rostain *Rule 26(a)(2)* Report at 6 (Def.'s Mot. in Limine [# 84], Ex. 3). Plaintiff then served an amended report on defendants in response to their request on December 31, 2003 for a more detailed report stating the basis of the opinion. The amended report provided further elaboration on Rostain's causation opinion:

> There is no doubt, in my opinion, that Mr. Bell has suffered severe emotional pain and some exacerbation of clinical symptoms as a result of what he perceived to be unfair treatment by his supervisors at the FBI, in particular his removal from the Forensics Studio and reassignment to a different operating subcomponent. The medical records and notes of his treating physician reflect that after this reassignment, Mr. Bell, for the first [*52] time, exhibited depression and increased obsessive-compulsive symptomatology to a degree that warranted prescription of additional medication (Paxil) to address those difficulties. These treatment notes also specifically reflect a contemporaneous relationship between this clinical development and the stress and frustration Mr. Bell was feeling in connection with his situation at work. In my interview with Mr. Bell, his severe level of distress over his lengthy reassignment away from the Forensic Studio and "shooting" photographic duties was also apparent.
>
> Two points are especially important in this regard. First, stress typically has an impact on the severity of TS symptoms such as motor tics and obsessive-compulsive conduct. Mr. Bell reports an increase in the severity/frequency of his motor tics as well as increased obsessive-compulsive tendencies in the aftermath of his reassignment by the FBI, and this is consistent with the pathology of his disease.
>
> Second, the impairments from which Mr. Bell suffers, particularly his obsessive-compulsive personality traits and Asperger's Syndrome, play a role in the extent of his emotional suffering. . . . Mr. Bell's photography is the consuming [*53] interest and activity in his life. He is devoted to his work to an obsessive degree, and has little else in his life that affords him satisfaction, enjoyment, or ego-support. . . . Consequently, to take Mr. Bell's status and work as a "shooting photographer" away from him in his job at the FBI was an extremely severe blow to his psychological well-being and caused him a level of emotional pain far beyond what would likely have been experienced by other less obsessive individuals in similar circumstances. Mr. Bell suffered especially severe emotional pain as a result of his removal from the Forensic Studio . . . because the status and activity of being a "shooting photographer" was and is central to Mr. Bell's life and being.

See Rostain Amended Report at 12-13 (Pl. Opp. [# 91], Ex. 2). The original December 2003 report, as supplemented on or about February 5, 2004, plainly sets forth the basis for Rostain's opinion that the reassignment caused plaintiff's damages.

Defendants' contention that the supplementation may not cure deficiencies in the original report is incorrect. *Rule 26(e)* authorizes supplementation, and the facts presented here indicate that supplementation [*54] was timely, coming only a month after defendants' request and two months after service of the original expert report. Indeed, the amended report was a direct response to defendants' request for a further explanation of the basis for Rostain's opinion. A party using an expert may "submit supplements to the report in response to assertions by opposing experts that there are gaps in the expert's chain of reasoning." See *Miller v. Pfizer, Inc., 356 F.3d 1326, 1332 (10th Cir. 2004)*. Of course, there may be factors warranting against supplementation, such as the expiration of the discovery deadline or an attempt by a party to wholly "rework [a] damages claim" or "change the substance of their contentions." See *Dag Enterprises, Inc. v. Exxon Mobil Corp., 226 F.R.D. 95, 110 (D.D.C. 2005)*. The amended report here fills gaps in Rostain's original reasoning, consistent with the theory proffered in the original report, in response to defendants' request, and based on facts

Case 1:05-cv-01355-JR   Document 22-13   Filed 01/30/2006   Page 14 of 18

Page 14
2005 U.S. Dist. LEXIS 37879, *

already known to the parties through written discovery and depositions. Therefore, the Court concludes that the amended report is properly considered in determining whether plaintiff complied [*55] with the requirement to disclose the basis of his expert opinion on causation.

### b. Reliability and Relevance under *Fed. R. Evid. 702*

Defendants also move to exclude the testimony of Rostain on the ground that the testimony is not reliable or relevant because it fails to consider alternative causes of plaintiff's mental and emotional injuries, and thus fails to meet the requirements of *Fed. R. Evid. 702*, n15 as interpreted in *Daubert v. Merrell Dow Pharm., 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)*. The Daubert standard requires a two-prong analysis that centers on evidentiary reliability and relevance. See *Meister v. Med. Eng'g Corp., 347 U.S. App. D.C. 361, 267 F.3d 1123, 1127 (D.C. Cir. 2001)*. n16 Under the reliability prong, a court must determine whether the expert testimony is based on "scientific knowledge," that is, "derived by the scientific method" and "supported by appropriate validation -- i.e., good grounds,' based on what is known." Id. (quoting *Daubert, 509 U.S. at 590*). Thus, as the term "scientific knowledge" suggests, the testimony must be "grounded in the methods and procedures [*56] of science," and constitute "more than subjective belief or unsupported speculation." *Ambrosini v. Labarraque, 322 U.S. App. D.C. 19, 101 F.3d 129, 133 (D.C. Cir. 1996)* (quoting *Daubert, 509 U.S. at 590*). Under the relevance prong, a court must determine whether the testimony "will assist the trier of fact to understand or determine a fact in issue." *Meister, 267 F.3d at 1127*.

   n15 *Fed. R. Evid. 702* states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

   n16 Defendant has not requested a Daubert hearing, and the Court finds that resolution of this issue does not require one. See *Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152-53, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999)* (holding that a trial court has "latitude in deciding how to test an expert's reliability, and to decide whether or when special briefing or other proceedings are needed to investigate reliability") (emphasis in original). Where, as here, the expert report, affidavits, and depositions provide the necessary information, and the matter is not unusually complex or novel, a hearing is unnecessary. *Cook v. Sheriff of Monroe County, 402 F.3d 1092, 1113 (11th Cir. 2005)* ("Daubert hearings are not required but may be helpful in complicated cases involving multiple expert witnesses") (citations and quotations omitted); *Oddi v. Ford Motor Co., 234 F.3d 136, 154 (3d Cir. 2000)* (Daubert hearing not required where depositions and affidavits of experts provided information sufficient to resolve the issue).

[*57]

The crux of defendants' Daubert motion is that Rostain did not conduct an independent investigation to rule out alternative or contributing sources of the emotional injury (and associated exacerbation of TS) that plaintiff allegedly suffered as a result of the reassignment. Defendants contend that the law of this Circuit requires elimination of alternative causes of injury -- a methodology referred to as "differential diagnosis" or "differential analysis" -- to establish causation, citing *Ambrosini, 101 F.3d at 141*. Defendants further challenge the reliability of Rostain's testimony based on his lack of experience with adult patients and an alleged weak informational foundation -- by defendants' account, only a 1.5 hour interview and a few questionnaires, all conducted three years after plaintiff's reassignment.

A review of the case law makes clear, however, that differential diagnosis is not required to establish causation in this Circuit; rather, it is only one permissible method for establishing causation, typically in product liability cases -- and even then, only where other evidence establishes a nexus between the product in question and the injury. [*58] See *Raynor v. Merrell Pharm., Inc., 104 F.3d 1371, 1376 (D.C. Cir. 1997)* ("Although we found testimony ruling out alternative causes admissible in *Ambrosini II, 101 F.3d at 139-40*, that testimony on specific causation had legitimacy only as follow-up to admissible evidence that the drug in question could in general cause birth defects.") (emphasis in original); *Ambrosini, 101 F.3d at 140-41* (holding expert testimony admissible where it relied, in part, on a differential analysis ruling out alternative sources of plaintiff's injury, where epidemiological studies also indicated causal nexus); see also *Meister, 267 F.3d at 1129* (rejecting plaintiff's expert testimony on differential analysis to eliminate alternative causes of injury from breast implants because expert failed to show any nexus between plaintiff's symptoms and implants). Even where expert testimony on differential analysis has been admitted in support of causation, this Circuit has

Case 1:05-cv-01355-JR   Document 22-13   Filed 01/30/2006   Page 15 of 18

Page 15
2005 U.S. Dist. LEXIS 37879, *

held that the failure to eliminate several possible causes "goes to the weight rather than the admissibility of [the] testimony." *Ambrosini, 101 F.3d at 140*; [*59] *Lakie v. Smith-Kline Beecham, 965 F. Supp. 49, 57 (D.D.C. 1997)* ("An expert must not eliminate each and every possible alternative cause.

This is especially true when a plaintiff can establish general causation, or a definitive "link" between the causative agent and the condition it allegedly produced."). This is not to say that alternative potential causes of a plaintiffs injuries are irrelevant. Indeed, alternative causes are relevant to the scope of a plaintiffs injuries, in particular, where damages relate to mental anguish and emotional pain and suffering -- injuries which rarely have only a single cause. *Lewis, 793 F.2d at 363*. Plaintiff concedes as much. However, expert testimony may not be excluded simply because multiple psychological stresses may have contributed to a plaintiff's pain and suffering. See *Jenson v. Eveleth Taconite Co., 130 F.3d 1287, 1297-99 (8th Cir. 1997)* (reversing lower court exclusion of expert testimony addressing emotional injuries where lower court justified exclusion based on experts' failure to distinguish between causal effect of "multiple psychological stresses"); see also *Webb v. Hyman, 861 F. Supp. 1094, 1114 (D.D.C. 1994)* [*60] (admitting expert testimony on psychological injury, even though other factors in plaintiff's life could have contributed to her psychological injuries, because testimony would assist the trier of fact in assessing injury issue and a "substantial" cause standard had no basis in law). There may be cases where an expert's disregard of alternative causes is so extreme as to warrant exclusion of his testimony as unreliable. See *Munafo v. Metro. Transp. Auth., 2003 U.S. Dist. LEXIS 13495, *57, 2003 WL 21799913, at *19 (E.D.N.Y 2003)* (excluding expert testimony where witness "utterly failed to investigate or even inquire as to how [other] factors may have contributed to his depression," including divorce, other failed relationships, murder of parents, and familial history of chemical imbalance). But this Circuit has given no indication that elimination of plausible alternative causes is a per se threshold requirement for the admission of expert testimony on causation.

With these standards in mind, the Court considers whether Rostain's testimony satisfies the reliability prong of the Daubert analysis -- that is, whether the testimony is based on scientific knowledge, rather than speculation. Rostain, [*61] a neuropsychiatrist treating children, adolescents, and adults, is an Associate Professor at the University of Pennsylvania School of Medicine and Director of Education for its Medical School Department of Psychiatry. See Rostain Curriculum Vitae (Pl. Opp. [# 91], Ex. 6); Rostain Amended Report at 1. He completed his adult psychiatry training at the Hospital of the University of Pennsylvania from 1985 to 1987, and is also a specialist in the field of pediatric neuropsychiatry. Rostain Amended Report at 1. He has presented dozens of clinical lectures on neuropsychiatry throughout the world since early 2000 on both adult and pediatric neuropsychiatry, including a workshop on "Cutting Edge Management of Tourette's Syndrome and Its Comorbidities" at the 2004 Annual Meeting of the American Psychiatric Association. Id.; CV at 6-11. As of late 2004, he was treating over 40 TS patients -- 6 to 7 adults, 20 adolescents, and 20 children. Rostain Depo. at 33 (Pl. Opp. [# 91], Ex. 3). Thus, to the extent that defendants object to Rostain as unqualified based on the characterization of Rostain as a pediatrics specialist, the objection is unfounded. Indeed, an expert's "significant stature [*62] and expertise" may be treated as "circumstantial evidence as to whether [he] employed a scientifically valid methodology or mode of reasoning." *Ambrosini, 101 F.3d at 140*.

As to methodology, plaintiff argues that Rostain's opinions are reliable because they are based on the traditional tools used by a neuropsychiatrist to make an assessment of a patient: a personal interview, a medical record review, clinical rating scales, and background facts of past symptoms, behaviors, and experiences. Defendants do not dispute that these tools are the appropriate ones for rendering an expert opinion, and the case law suggests that this is, indeed, the type of methodology employed to form a reliable psychiatric opinion. See *United States v. Finley, 301 F.3d 1000, 1006, 1008 (9th Cir. 2000)* (appropriate psychology methodology includes "a history of the patient, consisting of family, vocational, educational, medical, and legal histories, the observation of the patient's behavior, and the administration of standard psychological tests"); *Skidmore v. Precision Printing and Packaging, 188 F.3d 606, 618 (5th Cir. 1999)* (psychiatrist expert testimony [*63] regarding cause of plaintiff's post-traumatic stress disorder and depression was admissible where he "testified to his experience, to the criteria by which he diagnosed [plaintiff], and to standard methods of diagnosis in his field"). n17 Defendants instead focus on the limited nature of the interview (1.5 hours), suggesting that it provides an inadequate factual basis for a reliable opinion, and, more significantly, that Rostain did not go far enough in ruling out other potential causes of plaintiff's emotional distress.

> n17 It has often been noted that Daubert discussed four factors that a court may consider in evaluating scientific validity: (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the method's known or potential rate of error; and (4) whether the theory or technique finds general acceptance in the relevant scientific community. See, e.g., *Ambrosini, 101 F.3d at 133-34*. Daubert emphasized, however that the inquiry is a "flexible one," and that the four

Case 1:05-cv-01355-JR   Document 22-13   Filed 01/30/2006   Page 16 of 18

Page 16
2005 U.S. Dist. LEXIS 37879, *

enumerated factors are not intended to be a definitive checklist. Id. In Kumho, the Supreme Court reiterated that these factors "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *526 U.S. at 150-51* (citations and quotations omitted). Neither defendants nor plaintiff explain how the four-factor test would apply here. Both presume that the type of data analyzed is important and that comprehensive consideration of data in rendering a diagnosis or opinion is required. This is consistent with the case law discussed above, and the Court thus focuses its inquiry into reliability on these factors, rather than the factors described in Daubert.

[*64]

After a review of the amended report, the Court finds that Rostain gathered sufficient factual information to form a reliable opinion. The report states that he relied on multiple sources of significant data, not solely the 1.5 hour interview of plaintiff. He lists these as:

> 1. Psychiatric interview, neuropsychological screening test and clinical rating scales and questionnaires administered to Mr. Bell on 10/1/03. n18
>
>> n18 The clinical rating scales consisted of the NEO-PI for personality inventory, the Tic Symptom Self Report Scale, the Leyton Obsessional Scale, the SCID-II addressing obsessive-compulsive personality disorder, and a test referred to as the SCL-90 measuring a range of behaviors including unwanted thoughts and urges. Rostain Amended Report at 4.

2. Medical records from Mr. Bell's treating neurologist, Dr. Susan Calkins.

3. Excerpts from FBI disciplinary files pertaining to two incidents involving Mr. Bell.

4. Records from a complaint of discrimination filed with the EEO. [*65]

5. Phone interviews with Dr. Susan Calkins and with Mr. Bell's mother, Doris Bell.

Rostain Amended Report at 2. Other excerpts in the report show that Rostain is familiar with the 1992 sexual harassment charge and the 1999 solicitation arrest and related FBI disciplinary proceedings. Both the range and quality of the information are of the type routinely considered in the medical field, and of significance to the cause of plaintiff's alleged injuries in this case. Thus, the Court concludes that there is an adequate factual basis for Rostain's testimony, and that his basic approach to an assessment of Bell's emotional distress is consistent with accepted methodology in the relevant medical field.

All that is left of defendants' objection, then, is the absence of an opinion from Rostain ruling out other stressors as the cause of plaintiffs emotional distress. However, as discussed above, there is no legal requirement that other sources of a plaintiffs emotional distress be eliminated in order to support a finding of causation. *Jenson, 130 F.3d at 1297.* More important is whether there is some etiology that would reveal the nexus between the event and the [*66] injury. See, e.g., *Raynor, 104 F.3d at 1376.* Rostain provides an explanation of causation in his amended report. In short, in Rostain's opinion, the obsessive compulsive aspect of plaintiffs TS symptoms have resulted in his devotion to photography to an obsessive degree, and an inability to gain satisfaction, enjoyment or ego-support from other interests or relationships. Amended Report at 13. Rostain thus concludes that to take away plaintiff's status and work as a shooting photographer has caused him a level of emotional pain far beyond what others would likely experience. Id.

Rostain does acknowledge other stressors in plaintiff's life, including the 1999-2000 FBI disciplinary proceedings against plaintiff. His anticipated testimony does not exclude these other events as contributing to plaintiff's emotional pain and suffering because he, in fact, agrees that any perceived unfair treatment at work contributes to some degree to plaintiff's suffering. Rostain Amended Report at 12 (describing severe emotional pain from "what [plaintiff] perceived to be unfair treatment by his supervisors," not limited to the reassignment). He concludes that the reassignment [*67] played a particularly significant role in plaintiff's injuries based on his knowledge of TS and obsessive-compulsive dis-

Case 1:05-cv-01355-JR   Document 22-13   Filed 01/30/2006   Page 17 of 18

Page 17

2005 U.S. Dist. LEXIS 37879, *

orders and the information he gathered about the manifestation of these disorders in plaintiff, explaining that these disorders have led to shooting photography as central to plaintiffs life and well-being. Rostain Amended Report at 13. Thus, to be removed from shooting photography duties caused plaintiff extreme emotional distress in Rostain's view. In light of these rational explanations -- which give due consideration to alternative causes of plaintiffs juries -- the Court concludes that Rostain's expert testimony is sufficiently reliable under the Daubert standard. That, of course, is an admissibility determination only. To the extent Rostain has not provided a more in-depth analysis of other potential causes, such failure goes to the weight and credibility of the evidence, to be determined by the trier of fact. See *Ambrosini, 101 F.3d at 141*. Defendants, presumably, will explore that issue further at trial. n19

> n19 Defendants will have the opportunity to cross-examine Rostain on those other potential causes, and the jury will be given an appropriate instruction on assessing and weighing expert testimony as the parties already have agreed. See Joint Pretrial Statement at 30 (agreeing to Instruction 3.03 of the Standardized Civil Jury Instructions for the District of Columbia, which provides, inter alia, that "you may accept [the expert opinion] or reject it, or give it as much weight as you think it deserves, considering . . . the reasons given for the opinion, the expert's credibility, and all the other evidence in the case").

[*68]

Turning to the second prong of Daubert -- relevance -- Rostain's testimony easily satisfies that requirement. This prong focuses on whether the evidence "will assist the trier of fact to understand or determine a fact in issue." *Meister, 267 F.3d at 1127*. The probative value of expert psychiatric or psychological proof regarding the cause of a plaintiff's depression and emotional distress is well-recognized. See *Jenson, 130 F.3d at 1298*; *Nichols v. American Nat'l Ins. Co., 154 F.3d 875, 881 (8th Cir. 1998)*; *Skidmore v. Precision Printing & Packaging, Inc., 188 F.3d 606, 617-18 (5th Cir. 1999)*; *Webb, 861 F. Supp. at 1114*. The evidence proffered in this case clearly has such probative value and would assist the trier of fact in understanding plaintiff's claim for damages. It explains why an arguably neutral reassignment to a different subunit, unaccompanied by any demotion, might cause plaintiff to suffer unusually severe emotional distress, including depression and mental anguish.

## CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the motions in limine as follows:

(1) Defendants' motion to exclude evidence [*69] pertaining to the separate administrative finding of retaliation by Athena Varounis is granted.

(2) Defendants' motion to exclude the Holliday testimony is granted in part and denied in part. Holliday's testimony as to an atmosphere of retaliation or his fear of retaliation is excluded, as is his testimony on plaintiff's out-of-court statements; however, he will be permitted to testify as to the statements he made to plaintiff at their meetings on August 25, 2000, and October 5, 2000.

(3) Plaintiff's motion to exclude evidence pertaining to OPR proceedings is granted in part and denied in part. Evidence pertaining to the 1991-1992 OPR proceedings is excluded from trial, but evidence pertaining to the 1999-2000 proceedings is admissible for the purpose of proving that plaintiff's damages were not caused by the reassignment.

(4) Defendants' motion to exclude expert testimony is granted in part and denied in part. Calkins' testimony pertaining to her personal observations of plaintiff's symptoms and her communications with the FBI will be admitted, but her testimony as to diagnosis and treatment will be excluded. Rostain's testimony will be admitted.

A separate [*70] order will be issued.

/s/?

JOHN D. BATES

United States District Judge

Dated: December 23, 2005

**ORDER**

Upon consideration of the pending motions in limine to exclude evidence [# 82, 83, 84, 86], and for the reasons stated in the memorandum opinion issued on this date, it is hereby

ORDERED that defendants' motion to exclude evidence pertaining to the separate administrative finding of retaliation by Athena Varounis [# 86] is GRANTED; it is further

ORDERED that defendants' motion to exclude the testimony of Bryan Holliday [# 83] is GRANTED IN PART and DENIED IN PART. Holliday's testimony regarding plaintiff's out-of-court statements and an atmosphere of retaliation or Holliday's fear of retaliation is excluded. He will be permitted to testify as to the statements he made to plaintiff at their meetings on August 25, 2000, and October 5, 2000; it is further

ORDERED that plaintiff's motion to exclude evidence pertaining to OPR proceedings [# 82] is GRANTED IN PART and DENIED IN PART. Evidence pertaining to the 1991-1992 OPR proceedings is excluded from trial. Evidence pertaining to the 1999-2000 proceedings is admissible for the purpose of [*71] proving that plaintiff's damages were not caused by the reassignment; it is further

ORDERED that defendants' motion to exclude expert testimony [# 84] is GRANTED IN PART and DENIED IN PART. Calkins' testimony pertaining to her personal observations of plaintiffs symptoms and her communications with the FBI will be admitted, but her testimony as to diagnosis and treatment will be excluded. Rostain's testimony will be admitted.

SO ORDERED.

JOHN D. BATES

United States District Judge

Dated: December 23, 2005